**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel.** ) | |
| **DRC, INC., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 1:04cv199** |
| ) | |
| **CUSTER BATTLES, LLC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

---

**MEMORANDUM OPINION**

This *qui tam* False Claims Act (FCA)[1] case involves allegations that defendants submitted

tens of millions of dollars in false claims to the Coalition Provisional Authority (CPA), the agency

established in Iraq in 2003 to administer and rebuild Iraq during the transition from the overthrown

Hussein regime to the new democratic government of Iraq.  The novel, threshold question presented

is whether the FCA applies to claims submitted to the CPA.

**I.[2]**

Relator DRC, Inc. (DRC) is an Alabama corporation with its principal place of business in

Mobile, Alabama.  DRC provides emergency construction, logistics, security, and life support

services in disaster areas and war zones.  DRC collaborated with defendant Custer Battles, LLC

(Custer Battles) in Iraq, either as a subcontractor or joint venturer,[3] in fulfillment of contracts

---

[1] 31 U.S.C. § 3729 *et seq.*

[2] The facts recited here are largely undisputed.  Where disputes exist, they are noted and, if material, the facts are construed favorably to plaintiff, as required.  *See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[3] Whether DRC and Custer Battles were joint venturers or subcontractor and contractor, respectively, is a sharply disputed issue between these parties in a separate civil lawsuit, but is immaterial to the FCA question presented here.  *See DRC, Inc. v. Custer Battles, LLC*, Case. No.

performed for the CPA.  Relator Robert Isakson is the managing director of DRC and relator

William D. Baldwin was a Custer Battles employee in Iraq.

Defendant Custer Battles, a Delaware Limited Liability Company headquartered in Fairfax,

Virginia, was formed in 1989 by defendants Scott Custer and Michael Battles to provide support

services to the United States and other governments engaged in wars and conflicts around the globe.

Defendants Secure Global Distribution, Mideast Leasing, Inc.,[4] and Custer Battles Levant are

allegedly related entities of Custer Battles, either as wholly-owned subsidiaries or through common

ownership.  Defendants Custer Battles, Scott Custer, Michael Battles, Secure Global Distribution,

Mideast Leasing, and Custer Battles Levant have filed joint motions and pleadings in this case and

are hereinafter referred to as "Custer Battles Defendants."  Defendant Joseph Morris was a manager

for Custer Battles in Iraq and has filed separate motions and pleadings.  Defendants Laru, Ltd.,

Muhammed Issam Abu Darwish, a citizen of Lebanon and Iraq, and Murtaza Lakhani, a citizen of

Pakistan, are also alleged to have conspired in the purported fraud, but have not yet been served.

According to the complaint, Custer Battles and the other defendants conspired to overbill the

CPA for tens of millions of dollars in services and facilities in the fulfillment of two CPA contracts

awarded to Custer Battles, the first of which was for the provision of security, housing, and related

facilities and services at the Baghdad International Airport (BIAP), including armed security at the

main gate and perimeter of the airport and a team of Transportation Safety Administration -

approved security screeners.  The second contract was for security, construction, and operational

services to support the Iraqi Currency Exchange (ICE), which was charged with the creation of a

---

1:04cv1499 (E.D. Va.).

[4] This defendant is named in the complaint as Middle East Leasing, but defendants
represent that this company is properly referred to as "Mideast Leasing, Inc."

new Iraqi currency to replace the "old" Iraqi dinars (bearing the face of Saddam Hussein) with "new" Iraqi dinars.  If the allegations in the complaint are true, the fraud was accomplished, in the case of the BIAP contract, by contracting for services and facilities defendants never provided to the CPA, and in the case of the ICE contract, by using "shell companies" to create the appearance of additional costs and overhead, thus inflating the price of those products and services charged on a cost-plus basis to the CPA.  Because the threshold issue is whether the FCA applies to these claims presented to the CPA, only the facts relevant to this issue are recounted here, and not the details of the alleged fraud.

**A. Creation of the CPA**

The parties understandably devote much of their argument to the nature and genesis of the CPA, for if it were an American agency, then the FCA question would be largely resolved.  Yet, in the end, the parties' efforts in this regard are largely unavailing inasmuch as the essential nature of the CPA is shrouded with ambiguity.  Even so, the effort has some value insofar as it helps cast light on the parties' other arguments on the applicability of the FCA.

To begin, the CPA's origins are difficult to pin down, as there is no formal document – whether statute,  United Nations Security Council resolution, or other organic document – that plainly establishes the CPA or provides for its formation.  When the United States and its Coalition partners first occupied much of Iraq in late March 2003, responsibility for providing humanitarian assistance and overseeing the economic reconstruction of Iraq initially fell to the Office of Reconstruction and Humanitarian Assistance (ORHA), an organization established by President George W. Bush and placed under the operational control of General Tommy R. Franks, who was then both the Commander of the Coalition Forces and the Commander of U.S. Central Command.  Many of ORHA's duties would eventually become the CPA's responsibility.

3

The earliest public reference to the CPA appears in General Franks' April 16, 2003 Freedom Message to the Iraqi People.  In that message, General Franks, in his capacity as Commander of the Coalition Forces, announced the formation of the CPA as the body that would exercise the temporary powers of government in Iraq.  In his words,

> Our stay in Iraq will be temporary, no longer than it takes to eliminate the threat posed by Saddam Hussein's weapons of mass destruction, and to establish stability and help the Iraqis form a functioning government that respects the rule of law and reflects the will, interests, and rights of the people of Iraq.  Meanwhile, it is essential that Iraq have an authority to protect lives and property, and expedite the delivery of humanitarian assistance to those who need it.  Therefore, I am creating the Coalition Provisional Authority to exercise powers of government temporarily, and as necessary, especially to provide security, to allow the delivery of humanitarian aid and to eliminate the weapons of mass destruction.[5]

This proclamation was not followed by any formal document or order establishing the CPA or defining its legal responsibilities.

The public record contains no other significant reference to the CPA until May 8, 2003, when the United States and the United Kingdom presented a joint letter to the United Nations Security Council announcing the creation of the CPA.  In that letter, the United States and the United Kingdom stated that they "and Coalition partners, acting under existing command and control arrangements through the Commander of Coalition Forces have created the Coalition Provisional Authority, which includes the Office of Reconstruction and Humanitarian Assistance."[6]  According to the letter, the purpose of the CPA was "to exercise powers of government temporarily" and "to provide security, to allow the delivery of humanitarian aid, and to eliminate weapons of mass destruction."  *Id.*

---

[5] Tommy R. Franks, Freedom Message to the Iraqi People (Apr. 16. 2003).

[6] *Letter from the Permanent Representatives of the United Kingdom of Great Britain and Northern Ireland and the United States of America to the United Nations addressed to the President of the Security Council*, U.N. SCOR, U.N. Doc. No. S/2003/538 (May 8, 2003)*.*

While the United Nations considered its response to this letter, President Bush, on May 9, 2003, appointed Ambassador L. Paul Bremer to serve as the Presidential Envoy to Iraq, reporting through the Secretary of Defense.[7]   The President neither sought nor obtained Senate confirmation for this appointment.   Four days later, on May 13, 2003, Secretary of Defense Donald Rumsfeld designated Ambassador Bremer to head the CPA, assigning him the title of "Administrator."   The Administrator was given responsibility for "the temporary governance of Iraq" and to "oversee, direct and coordinate all executive, legislative and judicial functions necessary to carry out this responsibility, including humanitarian relief and reconstruction and assisting in the formation of an Iraqi interim authority."[8]   Shortly after he was installed as Administrator, Ambassador Bremer promulgated the CPA's first regulation to define the powers of the CPA and to provide for the continued application of existing Iraqi law.   CPA Regulation No. 1 provided that,

> [T]he CPA shall exercise powers of government temporarily in order to provide for the effective administration of Iraq ... .   The CPA is vested with all executive, legislative, and judicial authority necessary to achieve its objectives, to be exercised under relevant U.N. Security Council resolutions, including Resolution 1483 (2003),[9] and the laws and usages of war.[10]

---

[7] Letter from President George W. Bush to Ambassador L. Paul Bremer (May 9, 2003) ("Subject to the authority, direction, and control of the Secretary of Defense, you are authorized to oversee, direct, and coordinate all United States Government (USG) programs and activities in Iraq, except those under the command of the Commander, U.S. Central Command. ... As Presidential Envoy to Iraq, you are not only my personal representative in Iraq, but also that of our country.").

[8] Donald Rumsfeld, Secretary of Defense, Memorandum for Presidential Envoy to Iraq (May 12, 2003).

[9] CPA Regulation No. 1 was issued shortly before the United Nations Security Council adopted Resolution 1483 on May 22, 2003.

[10] Coalition Provisional Authority, Reg. No. 1 (May 16, 2003), *available at* http://www.iraqcoalition.org/regulations (last visited June 15, 2005) (hereinafter "CPA Reg. No. 1").

Less than one week later, the Security Council adopted Security Council Resolution 1483 formally recognizing the CPA.  *See* S.C. Res. 1483, U.N. SCOR, U.N. Doc. S/RES/1483 (May 22, 2003) (hereinafter "UNSCR 1483" or "Resolution 1483").  Although Resolution 1483 did not establish or create the CPA,[11] it reaffirmed "Iraq's sovereignty and territorial integrity," recognized the "specific authorities, responsibilities, and obligations under applicable international law of these states as occupying powers under unified command ('the Authority')," and called upon the CPA, "to promote the welfare of the Iraqi people through the effective administration of the territory." *Id.* Among other things, Resolution 1483 also welcomed member states "to contribute to stability and security in Iraq by contributing personnel, equipment, and other resources under the Authority" and noted the establishment of the Development Fund for Iraq (DFI), to be administered by the CPA for Iraq's (i) humanitarian needs, (ii) economic reconstruction and infrastructure, (iii) disarmament, and (iv) civilian administration.[12]  *Id.* ¶ 12.  The resolution further requested that member states freeze

---

[11] While Congress in passing the Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan, Pub. L. No. 108-106, 117 Stat. 1209 (Nov. 6, 2003), regarded the CPA as having been "established pursuant to United Nations Security Council resolutions including Resolution 1483" and although all CPA Regulations purported to be pursuant to "the laws and usages of war" and "consistent with relevant U.N. Security Council resolutions, including Resolution 1483," Resolution 1483 did not establish or create the CPA.  Rather, it (i) *noted* the letter from the United States and United Kingdom announcing the creation of the CPA, (ii) *recognized* the authorities, responsibilities and obligations of the CPA and the Coalition members as "occupying powers under unified command" and (iii) *invited* United Nations members to contribute personnel, equipment and other resources to the CPA.  *See* UNSCR 1483; Statement by the President on H.R. 3289 [Pub. L. No. 108-106] (Nov. 6, 2003), *available at* http://www.whitehouse.gov/news/releases/2003/ 11/20031106-12.html (last visited June 15, 2005) ("The Act incorrectly refers to the [CPA] as it if were established pursuant to U.N. Security Council resolutions.  The executive branch shall construe the provision to refer to the CPA as established under the laws of war for the occupation of Iraq.").

[12] The DFI and its various funding sources are discussed at greater length below.  *See infra* subsection I(B)(3).

all financial assets of the former Government of Iraq located outside of Iraq and transfer them to the

DFI. *Id.* ¶ 23.

The parties agree that the CPA was neither created, nor explicitly authorized, by Congress.

Nonetheless, a substantial majority of the CPA's operating budget was appropriated by Congress.

More specifically, the CPA's daily operating budget was initially funded from the Iraq Freedom

Fund (IFF), established by Congress as a part of the Emergency Wartime Supplemental

Appropriations Act.[13]  Of the total amount allocated for this fund, approximately $698 million was

appropriated for the operating expenses of the CPA.[14]  The IFF provided the CPA's operating

expenses for six months until the passage of a second Emergency Supplemental in November 2003,

when Congress appropriated an additional $983 million for CPA operations.[15]  Given this amount of

Congressional funding, it is not surprising that Congress in November 2003 (which is after the time

period relevant here), also began to exercise financial oversight of the CPA through the appointment

of an Inspector General for the CPA (IG-CPA).[16]  *See id.*

References to the CPA in Congress' November 2003 Emergency Supplemental reflect a

somewhat mixed understanding of the CPA's legal status.  Thus, the CPA is first referred to as an

entity established "pursuant to United Nations Security Council resolutions including Resolution

---

[13]  Pub. L. No. 108-11, 117 Stat. 559 (April 16, 2003).

[14]  *See* Office of the Inspector General of the Coalition Provisional Authority (CPA-IG), *Quarterly Report to Congress* 53 (July 30, 2004) (hereinafter "CPA-IG Quarterly Report").

[15]  *See* Emergency Supplemental Appropriations Act for the Defense and Reconstruction of Iraq and Afghanistan, Pub. L. No. 108-106, 117 Stat. 1209 (Nov. 6, 2003).

[16]  Worth noting is that the United Kingdom also provided substantial funding for the operation of the CPA – approximately £30 million during the period from April 1, 2003 to March 31, 2004.  *See* United Kingdom House of Commons Foreign Affairs Committee, *Foreign and Commonwealth Office Annual Report 2003-2004*, Evid. 60 n.8 (Sept. 14, 2004).

1483;" later, the Supplemental notes that certain money appropriated in the Act would be earmarked for the "Coalition Provisional Authority in Iraq (in its capacity as an entity of the United States Government)." *See* 117 Stat. at 1225. The parties dispute whether these legislative references indicate that the CPA is a U.S. entity, but they do not argue, nor does the record suggest, that Congress had a hand in the creation of the CPA.

Although the circumstances of its creation are unclear, the CPA under Ambassador Bremer's direction had begun by May 2003 to exercise civil governing authority in Iraq. Significantly, the CPA was staffed with an assortment of civilians and military personnel from (i) various Coalition countries, (ii) Iraqi expatriates from the Iraq Reconstruction and Development Council, and (iiii) temporary civilian hires or contractors. While the substantial majority of the positions in the CPA were filled by United States citizens, many of whom were also United States government employees, an average of 13% of CPA personnel came from other Coalition partners, including Australia, the Czech Republic, Denmark, Italy, Japan, Poland, Romania, Spain, the United Kingdom, Ukraine, and others.[17] Also significant is that high level CPA positions were not filled solely with U.S. personnel; British, Australian, and Polish officials also served in high level CPA positions.[18]

---

[17] *See* United States General Accounting Office, *Rebuilding Iraq: Resource, Security, Governance, Essential Services, and Oversight Issues,* GAO-04-902R, at 37-41 (June 2004). In the early months of 2004, prior to its dissolution, the CPA had approximately 1200 personnel in Iraq who directly supported its mission. *See id.* Approximately 28 percent of CPA personnel were U.S. military detailees, 26 percent were civilian detailees from various U.S. federal agencies, including the Department of Defense, 25 percent were contractors and temporary U.S. government employees, and an average of 13 percent were detailees from other countries. *Id.*

[18] It is also worth noting that the CPA was headed for a week by Sir Jeremy Greenstock, the U.K. Ambassador to the United Nations, while Ambassador Bremer and his deputies were on Christmas leave. *See* Sir Jeremy Greenstock, *Iraq: The View from Baghdad in December 2003, in* United Kingdom Foreign and Commonwealth Office, *Departmental Report, April 1, 2003 -*

Following its creation in May 2003, the CPA governed Iraq for the next thirteen months.[19]

On June 28, 2004, the CPA was dissolved and authority was handed over to the Interim Government

of Iraq, which governed Iraq until an elected Transitional Government of Iraq assumed this

responsibility.[20]

**B. Sources of Funding**

In contrast with the CPA's nature and genesis, which are shrouded in ambiguity, the CPA's

funding sources provide dispositive clues to the FCA question presented and hence the parties'

arguments also appropriately focus substantial attention on this subject.

The CPA conducted its operations and awarded contracts for projects intended to promote

Iraq's reconstruction from four primary funding sources: (i) funds appropriated by Congress from

the general revenues of the United States (hereinafter "Appropriated Funds"); (ii) Iraqi funds

confiscated by the President and vested in the Department of the Treasury (hereinafter "Vested

Funds"); (iii) Iraqi state assets, primarily in the form of currency and negotiable instruments, seized

by the Coalition Forces occupying Iraqi territory (hereinafter "Seized Funds"), and (iv) funds from

the Development Fund for Iraq (DFI). Significantly, it is undisputed that the contracts awarded to

Custer Battles did not obligate U.S. Appropriated Funds. Each of the three other funding sources,

however, was used to pay invoices submitted by Custer Battles for payment on the two contracts at

---

*March 31, 2004* (2004).

[19] On June 16, 2003, ORHA was dissolved and all of its remaining functions, responsibilities and legal obligations were formally assumed by the CPA. *See* Memorandum from Paul Wolfowitz, Deputy Secretary of Defense, to the Secretaries of the Military Departments, et al. (June 16, 2003).

[20] Coalition Provisional Authority, Order No. 100, *Transition of Laws, Regulations, Orders, and Directives Issued by the CPA* (June 28, 2004), *available at* http://www.iraqcoalition.org/regulations (last visited June 15, 2005).

issue.  The CPA distinguished these three categories of funds from Appropriated Funds, describing

them collectively as "Iraqi Funds."[21]  According to the CPA, Iraqi Funds "belong[ed] to the Iraqi

people," and were to be stewarded and managed for their benefit.  Although eye-catching, the

CPA's labeling of these funds is not definitive; it is the ownership of each of these funds that is

ultimately relevant to the FCA analysis, not the use to which the owner put the funds.  Hence, it is

necessary to describe each category of funds in some detail.

*1. Vested Funds*

Vested Funds consist of Iraqi funds confiscated pursuant to Executive Order from United

States bank accounts held in the name of the Government of Iraq and its various agencies and

instrumentalities.  The authority for such an order derives from the International Emergency

Economic Powers Act (IEEPA),[22] which provides that when the United States is engaged in armed

conflict or has been attacked by a foreign country or foreign nationals, the President has the

authority to confiscate property within the jurisdiction of the United States belonging to any foreign

entity that he determines has planned, authorized, aided or engaged in those hostilities.  *See* 50

---

[21]  *See* Coalition Provisional Authority, Memorandum No. 4, *Contract and Grant Procedures Applicable to Vesterd* [sic] *and Seized Iraqi Property and the Development Fund for Iraq* 1 (Aug. 19, 2003), *available at* http://www.iraqcoalition.org/regulations (last visited June 15, 2005) (hereinafter "CPA Memo. No. 4").  CPA Memorandum No. 4 defines "Iraqi Funds" as follows:

"Iraqi Funds": Funds under the control of the Authority consisting of (a) proceeds from Iraqi state-owned property that has been vested or seized in accordance with applicable law and made available to the CPA to assist the Iraqi people and assist in the reconstruction of Iraq; and (b) funds in the Development Fund for Iraq, the establishment of which is noted in Resolution 1483 (20003).  As used in this Memorandum, "Iraqi Funds" do not include funds provided through the appropriations process of Coalition member governments (for example, funds provided directly to the CPA by the governments of the United States or the United Kingdom).

[22] *See* 50 U.S.C. §§ 1701 *et seq.*, as amended.

U.S.C. § 1702(a)(1)(C).[23]  Importantly, the IEEPA further provides that "all right, title, and interest"

in the seized property shall vest in any agency or person the President designates.  *Id.*  In 2003, the

President twice exercised this authority, issuing Executive Orders directing that certain Iraqi assets

should vest in the United States Treasury.  The first Vesting Order, issued on March 20, 2003 the

day after armed hostilities began, served to confiscate funds that had been frozen since the first Gulf

War in 1990 when President George H.W. Bush directed that these assets be blocked.[24]

Specifically, the first Vesting Order "confiscated and vested in the Department of the Treasury" all

"blocked funds held in the United States" in various accounts held by the Government of Iraq and

associated agencies or instrumentalities.  *See* Confiscating and Vesting Certain Iraqi Property, Exec.

Order No. 13290, 68 Fed. Reg. 14307 (Mar. 24, 2003).[25]  It also stated that the vested property

"should be used to assist the Iraqi people and to assist in the reconstruction of Iraq," and authorized

---

[23] When the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, the President is authorized by the IEEPA to:

> confiscate any property, subject to the jurisdiction of the United States, of any [foreign entity] that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest ... in such agency or person as the President may designate from time to time, and ... such interest or property shall be held, used, administered, liquidated, sold or otherwise dealt with in the interest of and for the benefit of the United States ... .

50 U.S.C. § 1702(a)(1)(C).

[24] In 1990, President George H.W. Bush, finding that the Government of Iraq constituted an "unusual and extraordinary threat to the national security and foreign policy of the United States," imposed sanctions on Iraq including the blocking of certain Iraqi property and property interests within the jurisdiction of the United States.  *See* Blocking Iraqi Government Property and Prohibiting Transactions with Iraq, Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990).  These Iraqi assets remained blocked until 2003 when President George W. Bush ordered their confiscation and vesting.

[25] The first Vesting Order specifically exempted funds subject to certain diplomatic immunities and certain then-existing writs not relevant here.

Treasury Secretary John Snow to take additional steps as necessary to carry out the Order. 68 Fed. Reg. at 14307. In turn, Secretary Snow directed the Federal Reserve Bank of New York (FRBNY) to establish a new Treasury Special Purpose Account to hold and manage these Vested Funds. Of the approximately $2.1 billion in frozen Iraqi assets that vested in the United States Treasury pursuant to the first Vesting Order, approximately $192 million was transferred from the Special Purpose Account directly to the DFI, where it was made available for expenditure at the direction of the CPA. *See* IG-CPA, Quarterly Report at 58-59. But the substantial majority of the Vested Funds, approximately $1.7 billion, was converted into cash and shipped to Iraq over the course of seven months.[26] *See id*. The funds were used to make payments to Iraqi civil servants and pensioners, as well as to fund both Iraqi ministry operations and repair and reconstruction contracts. When additional funds were needed by the CPA, a shipment of Vested Funds was withdrawn as U.S. currency from the FRBNY Treasury Special Purpose Account at the direction of the Treasury Department and at the request of the Office of the Secretary of Defense.[27] Cash shipments were made to Camp Arifjan, Kuwait under military supervision in the form of shrink-wrapped pallets of U.S. bills. Different denominations were sent depending on the needs of the CPA. Once the shipment arrived, the Army's 336th Finance Command (FINCOM) took control of the cash assets and responsibility for their security and recorded their receipt in an account designated for cash deposits and disbursements of Vested Funds.

On August 28, 2003, the President issued a second Vesting Order to confiscate certain

---

[26] An additional $128 million was paid in claims to third parties and, as of July 30, 2004, the government still held $60 million in Vested Funds it expected to return to the titleholders of those assets. *See* IG-CPA Quarterly Report at 59.

[27] *See* Office of the Fiscal Assistant Secretary, U.S. Department of the Treasury, *Using Vested Assets for the Reconstruction of Iraq* 6 (May 2004) (hereinafter "Using Vested Funds").

additional property of the former Iraqi regime and property of its senior officials and their family members.[28]  Unlike the first Vesting Order, this second Order directed that, after vesting in the Treasury, all newly vested property should be promptly transferred to the Development Fund for Iraq.  *Id.* § 2.  In all, approximately $16 million was vested in the Treasury and promptly transferred to the DFI pursuant to this second Vesting Order.  *See* IG-CPA Quarterly Report at 59.  Thus, counting the funds already transferred to the DFI pursuant to the first Vesting Order, this brought the total of Vested Funds transferred to the DFI to approximately $210 million.

    *2. Seized Funds*

    A second category of funds, Seized Funds, consists of Iraqi state- or regime-owned cash, funds, or realizable securities that were found and seized by Coalition Forces in Iraq as an occupying force in accordance with the laws and usages of war, including the well-publicized funds hidden in or near Hussein's presidential palaces.  When the President delegated the authority to seize these assets, he directed that Seized Funds should be used "only to assist the Iraqi people and support the reconstruction of Iraq, consistent with the laws and usages of war."[29]  In total, $927 million in currency was seized by United States and Coalition Forces, primarily in the form of U.S. dollars, but also in euros, Iraqi bonds, and Iraqi dinars. Coalition Forces also seized non-financial assets, including real estate, motor vehicles, and jewelry, which were turned over to the Iraqi Ministry of Culture on June 18, 2004, shortly before the termination of the CPA.  *See* IG-CPA Quarterly Report at 58.

------------------------------------

    [28]  *See* Executive Order Blocking Property of the former Iraqi Regime, Its Senior Officials and their Family Members, and Taking Certain Other Actions, Exec. Order. No. 13315 of Aug. 28, 2003, 68 Fed. Reg. 52315 (Sept. 3, 2003).

    [29]  *See* Memorandum from President George W. Bush to Secretary of Defense Rumsfeld (Apr. 30, 2003).

Seized Funds never physically left the war zone in Iraq and Kuwait.  Following seizure of these assets by Coalition Forces, they were transported to U.S. Army Camp Arifjan, Kuwait, where they were placed in the custody of the 336th FINCOM.  Once the authenticity of the funds was verified and the public property status of the assets was confirmed, the deposit was recorded under a Treasury account number reserved for "Collection of Seized Funds."[30]  Like Vested Funds, the Army was responsible for maintaining the security of and managing the accounting for Seized Funds until they were disbursed.  In contrast with Vested Funds, which were reported on the general fund financial statements of the Army and distinguished from Army assets only in the footnotes, Seized Funds were separately reported on Department of Defense (DoD) and Department of the Army financial statements in a "Statement of Custodial Activity."  More specifically, Seized Funds were reported on balance sheets as "Non-entity Seized Iraqi Cash" separate from "entity assets."[31]

*3. Development Fund for Iraq*

The DFI was established through the coordinated effort of the United Nations and the CPA to fund relief and reconstruction efforts in Iraq.  It was established to hold various funds for Iraq's reconstruction needs, including (i) deposits from surplus funds in the U.N. "Oil for Food" program,[32] (ii) revenues from export sales of Iraqi petroleum and natural gas, (iii) international donations, and (iv) repatriated Iraqi assets seized by the United States and other nations. While the

---

[30] Seized Funds were later transferred to an account for "Disbursement of Seized Funds" once funding authority was approved by the Department of Defense.

[31] This information is reflected in the record in Appendix H to the Department of Defense's Procedures for Administering, Using and Accounting for Vested and Seized Iraqi Property.

[32] The "Oil for Food" funds were proceeds from Iraqi oil sales held by the United Nations under a preexisting program.

DFI was administered by the CPA and the corpus of the account was held at the Federal Reserve Bank of New York (FRBNY), it was recorded on the books of the Central Bank of Iraq.[33] Significantly, as the government conceded in its brief, "[t]he funds in the DFI have always been Iraqi funds." Gov't Br. at 35.

On May 17, 2003, at Ambassador Bremer's request, the DFI bank account, entitled "Central Bank of Iraq/Development Fund for Iraq," was established at the FRBNY as a foreign central bank account, owned by and subject to the instructions of the Central Bank of Iraq (CBI).[34]   Shortly thereafter, on May 22, 2003, the United Nations Security Council formally recognized the creation of the DFI in Resolution 1483.   *See* UNSCR 1483 ¶ 12.   It further provided that the fund should be held by the Central Bank of Iraq and "disbursed at the direction of the Authority," and stated that the assets should be used in a transparent manner for purposes that would benefit the Iraqi people.   *See* UNSCR 1483 ¶¶ 13, 14.[35]   Resolution 1483 also established the principal sources of funding for the DFI[36] and directed that it be subject to oversight by an International Advisory and Monitoring Board

---

[33] *See* Coalition Provisional Authority, Regulation No. 2, *The Development Fund for Iraq*, § 3 (June 28, 2004), *available at* http://www.iraqcoalition.org/regulations (last visited June 15, 2005) (hereinafter "CPA Reg. No. 2").

[34] Section 14(e) of the Federal Reserve Act, 12 U.S.C. § 358, authorizes a branch of the Federal Reserve Bank to open and maintain an account for any foreign bank.

[35] Specifically, Resolution 1483 emphasized that the DFI should be used "in a transparent manner to meet the humanitarian needs of the Iraqi people, for the economic reconstruction and repair of Iraq's infrastructure, for the continued disarmament of Iraq, and for the costs of Iraqi civil administration, and for other purposes benefiting [sic] the people of Iraq." *Id.* ¶ 14.

[36] Resolution 1483 directed that "all surplus funds" in the "Oil for Food" program, totaling approximately $1 billion, be transferred to the DFI. *Id.* ¶ 17.  Further, it directed that 95% of all proceeds from future export sales of Iraq petroleum, petroleum products, and natural gas should be deposited into the DFI.  The third source of funds was international donations and deposits from the United States and other countries of Iraqi assets frozen by these countries during the 1990's, which Resolution 1483 directed member states to transfer to the DFI.  *See id.* ¶

of the Development Fund for Iraq and to audits by independent public accountants approved by the Board.  *See id.* ¶ 12.

Because the CPA was the temporary governing authority in Iraq, and thereby controlled the Central Bank of Iraq, Ambassador Bremer and those he authorized controlled the DFI. Disbursements from the DFI Account in New York were made in one of two ways, either by lump sum shipments of currency to the CBI via U.S. military transport in amounts and at times as directed by the CPA Comptroller's Office, or by electronic funds transfers (EFT) directly to the parties. When the CPA transferred sovereignty to the Iraqi Interim Government on June 28, 2004, it also transferred administration of the DFI.  *See* IG-CPA Quarterly Report at 59.  At the time, the DFI had a liquid asset balance of $6.641 billion.  *Id.*

### C. Management, Accounting, and Expenditure of Funds

The management, accounting, and expenditure of these funds is also relevant to the FCA question presented.  This process was substantially similar for Vested and Seized Funds, which required more significant involvement and oversight of the DoD and the U.S. Army.  The process differed somewhat for DFI funds, however, which during the relevant period  were solely controlled, expended, and accounted for by the CPA.

*1. Vested and Seized Funds*

In the case of Vested and Seized Funds, the process may be broken down into two parts:

---

23.  During the period of CPA control, a total of $20.706 billion was transferred into the DFI Account: $8.1 billion in U.N. Oil for Food program funds, $11.42 billion in Iraqi oil proceeds, $120 million in U.N. non-Oil for-Food funds, and $1.12 billion in seized assets and donations from around the world (including $210 million in U.S. Vested Funds).

allocation of funding authority (*i.e.* budgeting), and contract awards and disbursement.[37]  The first step in the process for expending Vested and Seized Funds was the allocation of funding authority, which required the approval not only of the CPA, but also of the Office of the Secretary of Defense. This step was initiated when Iraqi Ministries submitted funding requests for review to the CPA Program Review Board (PRB), a committee comprised of high-level CPA officials as well as authorized representatives of the Commander of Coalition Forces, the Iraqi Ministry of Finance, the United Kingdom, Australia, and the Council for International Coordination.[38]  The PRB was responsible for reviewing these funding requests, prioritizing them, and integrating them into a "spending plan" for the CPA Administrator's approval.  *Id.*  The CPA Administrator then reviewed and, if appropriate, approved the spending plan.  But the approval process did not end there; final approval was still required from the United States government.  Specifically, both the Office of Management and Budget (OMB) and the Under Secretary of Defense (Comptroller) were required to approve each funding request from Vested or Seized Funds before the money could be allocated for use by the CPA.  Once the allocation of funds was approved, this budget commitment was reported to the 3rd Army Comptroller and the CPA Comptroller and entered on the CPA's ledger as

---

[37] The DoD's internal procedures provided that "vested and seized property may be expended in accordance with spending plans only following the express approval of the Under Secretary of Defense (Comptroller)." *See also* Using Vested Funds at 6 (describing transfer of budget authority for Vested Funds from National Security Council to the Department of Defense).

[38] *See* Coalition Provisional Authority, Memorandum No. 3, *Program Review Board* § 4(1) (June 18, 2003), *available at* http://www.iraqcoalition.org/regulations (last visited June 15, 2005) (hereinafter "CPA Memo No. 3").  Although the contracts at issue here did not involve any Appropriated Funds, when taking action on any matter directly related to the disposition of Appropriated Funds, voting members also included representatives of the U.S. Departments of Defense, Treasury, and State.

well as in the Army's STANFINS system.  Importantly, this first step in the process merely

distributed funding authority to the CPA.  In other words, it confirmed that Seized or Vested Funds

were available to meet the Ministry's funding requests and assured that the funds could be

obligated.  It did not result in the transfer of the money to the CPA.  Rather, the money remained

within the dominion, control, and possession of the DoD and the U.S. Army.

The next step in the process was the awarding of contracts and the disbursement of funds

pursuant to those contracts.  In the normal course of events, after the DoD confirmed the CPA's

authority to obligate Seized or Vested Funds, CPA Contracting Officers solicited contract bids and

awarded contracts through a competitive bidding process.[39]  Once the contract was awarded, the

contract award amount was recorded both in STANFINS and the CPA ledger, to document that a

certain sum of Seized or Vested Funds had been obligated to pay for a specific contract.  Thereafter,

the contracts were performed and contractors submitted invoices to the CPA for payment.  In

reliance on these invoices, CPA Contracting Officers certified the disbursement of these funds to the

United States Army.  Importantly, the Army in turn made disbursements from Seized and Vested

Funds in reliance on these CPA certifications.  Payments were made by electronic fund transfer,

check, or cash.  CPA payments via check were made with U.S. Treasury checks.  And cash

payments in dollars were coordinated by the Army's 336th Finance Command (FINCOM), which

maintained physical control of the currency.  Finally, the disbursement of the funds was recorded in

---

[39]  In the case of the BIAP contract, which was awarded within weeks of the
establishment of the CPA, it appears that the contract was awarded before the PRB or the DoD
could approve the use of Vested or Seized Funds to pay for the contract.  By the time the PRB
approved $16.3 million for this project in early August 2003, Custer Battles had already begun to
perform in reliance on one-month letter contracts.  Thereafter, the contract was finalized on
August 31, 2003.  In any event, the exact timing of the contract award and PRB approval is not
crucial to the issues presented.

the Army's STANFINS system as well as on the CPA ledger.

Vested and Seized Funds were managed by the processes described here until the CPA's termination. At that time, virtually the entire balance of these assets was transferred to the Iraq Ministry of Finance.[40]

### 2. Development Fund for Iraq

The initial steps in the funding process were the same for the DFI as for Seized and Vested Funds. Specifically, as with Seized and Vested Funds, before a contract could be awarded, funding requests from Iraqi Ministries had to be approved by the PRB, which recommended an allocation of funds to the CPA Administrator.[41] Unlike Seized and Vested Funds, however, once the CPA Administrator approved the allocation, no approval was needed from the DoD or from the OMB. *Id.* Also, the management and accounting for the DFI Account did not involve the Army or its STANFINS system. Instead, the CPA's DFI Manager, appointed by Ambassador Bremer, was responsible for maintaining and updating the DFI Account records.

Contracts were awarded by CPA Contracting Officers in accordance with the allocations approved by the CPA Administrator. Then, invoices were submitted to the DFI Manager for approval. The DFI Manager determined the form of payment, whether wire transfer, check, or cash, and executed the disbursement. In the case of wire transfers, the DFI Manager sent instructions to the FRBNY, and transfers were made directly from that account. Cash or check payments were made from the CBI, where funds had been transported from the FRBNY in lump sum shipments of

---

[40] The government represented in its supplemental brief that a balance of $280.51 in Vested Funds remains in the Treasury account and that a small amount of Seized Funds remains under the possession and control of the United States as a member state of the Coalition. *See* Gov't Supp. Br. at 9.

[41] *See* CPA Reg. No. 2.

currency via U.S. military transport.  In all, throughout the CPA Control Period, the FRBNY made twelve shipments of currency to the CBI totaling approximately $10.3 billion, and approximately 1,100 electronic fund transfers were executed totaling approximately $6 billion.

### D.  CPA Contracting Authority

Given the exigencies and difficulties attendant to awarding contracts in a war zone, it is not surprising that aspects of U.S. government contracting procedures were integrated into the CPA's contracting procedures, including the use of U.S. government standard forms and contracting officers who were also employed by the United States and other Coalition countries.  Nonetheless, early on, the CPA set out its own very explicit contracting procedures in the form of a Memorandum that were followed and incorporated into CPA contracts.  *See* CPA Memo. No. 4.

Unless otherwise exempt, all contracts obligating Vested, Seized, or DFI Funds, were required to be awarded through a competitive bidding process and authorized by a person appointed as a CPA "Contracting Officer."  *See* CPA Memo. No. 4 (detailing CPA contracting procedures). To the extent practicable, the CPA was to confer the title and authority of a CPA Contracting Officer on officers already holding Coalition government contracting warrants.  *See* CPA Memo. No. 4 § 4.  Yet, the holder of a Coalition government contracting warrant could not award a CPA contract unless the CPA Head of Contracting Authority or his or her designate explicitly conferred this authority on the officer.  *See id.*

Although the two contracts at issue here were both signed on standard U.S. contracting forms, the government concedes that in contrast with typical U.S. military contracts, contracts obligating Vested, Seized, or DFI Funds were not subject to U.S. contracting procedures, whether statutory or regulatory, including, for example, the Federal Acquisition Regulations (FAR) or the Truth in Negotiations Act (TINA), 10 U.S.C. § 2306a.  Even so, many contracting requirements

essentially similar to the competition, transparency, and accountability standards applicable to federally funded U.S. contracts were also set forth in Appendix B to CPA Memorandum No. 4, which provided the "Standard Terms and Conditions" for contracts in excess of $5,000. Memorandum No. 4 further required that these standard terms be incorporated into each CPA contract, including the BIAP and ICE contracts.

### E. Contracts with the CPA

*1. The BIAP Contract*

On June 19, 2003, the CPA, through the Iraqi Ministry of Transportation, solicited proposals to provide security services at the BIAP. Custer Battles submitted a proposal for the contract and was awarded a one-month letter contract first for the month of July 2003, and later extended for the month of August. On August 6, 2003, the PRB recommended approval of the BIAP contract to Ambassador Bremer, to be paid with $14.8 million from Vested Funds and $2 million in Seized Funds.[42] The funding authority was approved and on August 31, 2003, the BIAP contract was finalized at a firm fixed-price in the amount of $16.84 million. The period of performance was one year, ending June 30, 2004, with a one-year renewal option. Pursuant to the contract, Custer Battles was entitled to the contract price, paid in monthly installments, less three advance payments of $2 million each. While there is some confusion in the record regarding the exact source of each payment, it is undisputed that the large majority of the payments was from

---

[42] Although the PRB originally recommended that $2 million of the contract price be paid from the budget of the Iraqi Ministry of Transportation, the first $2 million payment was made with Seized Funds and it appears from the record that this money was never reimbursed from the Iraqi Ministry.

Vested Funds and that at least $2 million was paid with Seized Funds.[43]

Defendants contend they were repeatedly assured by CPA officials that these were not United States government contracts.  For instance, on one occasion, Scott Custer claims he was instructed that his company could not file a request under the Freedom of Information Act, 5 U.S.C. § 552, because the CPA was not an agency of the United States and thus, U.S. laws and regulations did not apply. *See* Custer I Tr. at 153, 204-05.  Indeed, consistent with this representation, CPA regulations provided that Coalition member laws did not apply to contracts obligating Seized, Vested, and DFI Funds.  *See* CPA Memo. No. 4 at 1-2 ("Iraqi Funds are not subject to the same laws and regulations that apply to funds provided to the [CPA] directly from coalitions [sic] governments.").  Similarly, Michael Battles claims he was assured that a U.N. Resolution required that the CPA be a "separate and distinct entity from any of the warring powers" and that "under no circumstances was it the U.S. government."  Battles Tr. at 67.

Relators, on the other hand, point to various facts in the contracting process they contend indicated that Custer Battles was entering into a contract with the United States government.  More specifically, the BIAP Contract, and the ICE contract as well, were completed on a United States government form – United States Standard Form (SF) 33.  Indeed, the signature block (Block 27) on that form was clearly labeled "United States of America."  Of course, standing in opposition to the simple conclusion that these contracts were with the United States is that Block 7 of the form also stated that the contract was issued by  "CPA - Contracting Authority; Republican Presidential

---

[43]   The initial payment under the BIAP contract was paid during the first week of July with $2 million cash in Seized Funds.  The payment was made in the form of $100 U.S. bills, a portion of which was shrink-wrapped in blocks of cash, and delivered to Michael Battles at CPA headquarters.  A second payment in August, and a portion of a third, also consisted of shrink-wrapped bills of U.S. currency.  Thereafter, it appears that payments to Custer Battles took the form of U.S. Treasury checks and wire transfers.

Compound; Baghdad, Iraq, APO AE 09335."[44]   And, moreover, the "Standard Contract Terms and

Conditions" incorporated into all CPA contracts for amounts in excess of $5,000 stated that CPA

contracts awarding Iraqi Funds – defined as Seized, Vested, and DFI Funds – did not obligate

appropriated funds of member governments.[45]   Relators also observe that the contracting officer

who signed the BIAP Contract on behalf of the CPA, Patricia Logsdon, was a civilian contracting

officer employed by the U.S. Department of the Army.   Yet, at the time the BIAP contract was

signed, Logsdon, certified as a CPA Contracting Officer, also was assigned to the CPA and

performed her duties on the second floor of an Iraqi presidential palace in the CPA headquarters in

Baghdad.

   *2. The ICE Contract*

   On August 27, 2003, Custer Battles signed a second contract with the CPA to construct

camps and provide security and operational support for the ICE project to replace old Iraqi dinars

bearing Saddam Hussein's picture with a new Iraqi currency.   In contrast with the BIAP contract,

which was awarded to Custer Battles shortly after the creation of the CPA, this contract was

---

   [44] Defendants claim that Custer Battles was told by CPA Contracting Officer Patricia
Logsdon that the CPA did not consider the use of the SF-33 as the cover sheet for its contracts to
be an indication that the contract was a contract with the United States government as the CPA
was at liberty to use any form it wished.  *See* Custer I Tr. at 153-54, 203.

   [45]  Appendix B to CPA Memorandum No. 4, incorporated into all CPA contracts for
amounts in excess of $5,000 and obligating Seized, Vested, or DFI Funds, provides as follows:

   **Source of Funds.**  The obligation under this contract is made with Iraqi Funds, as defined
   in CPA Memorandum Number 4, dated 19 August 2003.  No funds, appropriated or
   other, of any Coalition country are or will be obligated under this contract.

CPA Memorandum No. 4, Appx. B (emphasis original); *see also supra* note 21 (defining   "Iraqi
Funds").

awarded by a competitive bidding process, as required by CPA regulations.  *See* CPA Memo. No. 4

§ 6.  Three bids were submitted in response to the Iraqi Ministry of Finance request for proposals,

and Custer Battles won the contract with the lowest bid of $9,801,550.00.

Like the BIAP contract, the ICE contract was drafted using an SF-33 form.  And similar to

the BIAP contract, it was signed by a U.S. Army officer assigned to the CPA as a Contracting

Officer.  Yet, unlike the BIAP contract, the ICE contract was not a firm fixed-price contract

because the CPA determined that such a contract was not appropriate.  Instead, a time and materials

contract was awarded, requiring Custer Battles to track its labor hours and material costs, as well as

those of its subcontractors, and then allowing payment on a cost-plus basis.

The ICE contract underwent a number of modifications, each of which resulted in an

increase to the contract price.  Each modification was also reflected on a U.S. government SF-30

form, but "Issued by" the CPA and signed by a CPA Contracting Officer.  The contract itself

identified two sources of funding for the ICE contract: Seized Funds and DFI.  A payment of

$3,000,000 was paid with Seized Funds by U.S. Treasury check on the day the contract was signed.

Then, the remainder of the contract price, approximately $12 million,[46] was paid with DFI funds.[47]

---

[46] While the exact total amount for the ICE contract appears to be in dispute, the final sum
was approximately $15 million, of which $3 million came from Seized Funds.  In any event, a
dispute regarding the exact amount of the contract is not material to the FCA question at bar
because the issue presented at this stage is *whether* the FCA applies, not the proper damages
award.

[47] In the facts section of their amended complaint, relators also include general allegations
regarding two subcontracts between Custer Battles and Washington Group, International (WGI)
and between Custer Battles and BearingPoint, Inc. (BPI).  Importantly, however, the WGI and
BPI subcontracts are not the subject of any count in the amended complaint.  Moreover, the
vague allegations regarding these contracts fail to state a fraud claim with sufficient particularity
to satisfy Rule 9(b), Fed. R. Civ. P.  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d
776, 783, 789 (4th Cir. 1999) (dismissing FCA claims under Rule 9(b) because they lacked
requisite specificity, including "the time, place, and contents of the false representations, as well

**F. Procedural History**

On February 24, 2004, relators filed the complaint under seal, as required by 31 U.S.C. §

3730(b)(2),[48] initiating this civil FCA action and alleging claims under §§ 3729(a)(1), (a)(2), and

(a)(3), and as well as § 3730(h). [49]   Seven months later, the government elected not to intervene.[50]

Thereafter, the complaint was unsealed and served upon the defendants.  The Custer Battles

Defendants filed a joint motion to dismiss for lack of subject matter jurisdiction pursuant to Rule

12(b)(1), Fed. R. Civ. P., and for failure to state a claim, pursuant to Rule 12(b)(6), Fed. R. Civ. P.

Defendant Joseph Morris filed a separate motion to dismiss on the same grounds.  In their motions,

Morris and the Custer Battles Defendants argued that claims presented to the CPA for Vested,

Seized, and DFI Funds did not fall within the False Claims Act because these requests for payment

(i) did not represent a "claim for payment or approval" that would, if paid, result in an economic

loss to the U.S. government and (ii) were not presented to an officer of the United States.  Relators

countered, arguing that (i) a "claim" requires only a request for payment that "might result in

---

as the identity of the person making the misrepresentation and what he obtained thereby")
(quoting 5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1297, at 590 (2d ed.
1990)).  Thus, to the extent that relators intended to include claims for these two contracts, they
have failed to state a claim, and these claims must be dismissed.

[48] Section 3730(b)(2) provides that actions brought under the FCA by private parties shall
be served on the government and filed *in camera*, to remain under seal for at least sixty (60) days
and not served on the defendant until the court so orders.  31 U.S.C. § 3730(b)(2).

[49] Relators later filed an amended complaint on August 26, 2004, adding a fourth count
under the FCA's "whistle-blower" provision, 31 U.S.C. § 3730(h).  According to the amended
complaint, relator Baldwin was terminated or forced to resign from his employment with Custer
Battles in response to his efforts to investigate and to report the alleged fraud.

[50] The sixty-day period permitted for the government to decide whether to intervene in a
FCA action was extended for good cause pursuant to 31 U.S.C. § 3730(b)(3) through and
including October 29, 2004.

financial loss to the Government,"[51] (ii) and that the undisputed facts establish that defendants presented or caused to be presented false claims to an officer of the United States.

Because it was clear that the issues could not be resolved on the face of the complaint, the motions were converted to motions for summary judgment and a schedule for briefing and limited discovery was set.[52]  Additionally, the government was invited, but not required, to submit a brief "setting forth the government's position with respect to whether the FCA applies to false claims made or presented to the CPA." *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, Case No. 1:04cv199 (E.D. Va. Dec. 21, 2004) (Order).  The government accepted the invitation to file a brief, taking the position that the FCA applies to claims presented to the CPA (i) because a "claim" includes any request for payment from the United States, whether the government has title to or is merely a custodian of the money paid, and (ii) while not conceding that presentment is required, that the claims were presented to a U.S. government officer.  The government declined to answer the question whether the CPA is a U.S. entity, agency, or instrumentality, finding that this determination was unnecessary to its analysis.  Yet, because the parties disputed the status of the CPA and because

---

[51]  *United States v. Neifert-White*, 390 U.S. 228, 232 (1968).

[52]  *See United States ex rel. DRC, Inc. v. Custer Battles, LLC*, Case No. 1:04cv199 (E.D. Va. Dec. 17, 2004) (Order).  Defendants also argue that evidence outside the complaint may be considered, without converting the motions to motions for summary judgment, because they have also moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P.  *See Carter v. Arlington Pub. Sch. Sys.*, 82 F. Supp. 2d 561, 564 (E.D. Va. 2000) (on a 12(b)(1) motion, courts may consider evidence outside the complaint to resolve jurisdictional issues without converting the motion to a motion for summary judgment).  But defendants' reliance on Rule 12(b)(1) is misplaced.  It is well-settled that "the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." *Bell v. Hood*, 327 U.S. 678, 682 (1946); *see also* 2 James Wm. Moore, *Moore's Federal Practice* § 1230[1] (3d ed. 1997) ("Subject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief – a merits-related determination.").  Thus, defendants' motions to dismiss for lack of subject matter jurisdiction must be denied.

its status seemed relevant to many of the questions raised by this case, the government was directed to answer the question whether the CPA was an entity, agency, or instrumentality of the United States government. *See United States ex rel. DRC, Inc. v. Custer Battles, LLC*, Case No. 1:04cv199 (E.D. Va. Apr. 12, 2005) (Order). Thereafter, the government, somewhat reluctantly,[53] responded that the CPA was indeed a U.S. instrumentality solely for the limited purposes of the False Claims Act. The parties were then given an opportunity to respond to the government's briefs. As the issues have now been fully briefed and argued, the matter is now ripe for disposition.

## II.

At the threshold, it is important to identify the proper procedural posture of this case. Defendants have moved for summary judgment pursuant to Rule 56, Fed. R. Civ. P. Summary judgment is appropriate only when, viewing the evidence in a light most favorable to the non-moving party, there is no issue of material fact and the movant is entitled to judgment as a matter of law. Rule 56(c), Fed. R. Civ. P.; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is also true that "the mere existence of some disputed facts does not require that a case go to trial," rather, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). In this case, to the extent that the facts are known, they are largely undisputed. Thus, the issue to be resolved is whether, on

---

[53] The government's reluctance in this regard is reminiscent of the guest invited to dinner who gladly accepts the invitation, but once she arrives and sits down to eat, proceeds to complain about the menu.

the undisputed facts in the record, defendants are entitled to judgment as a matter of law.

III.

The *qui tam* provision of the False Claims Act authorizes "private persons" to bring a civil action for a violation of the FCA in the government's stead.  *See* 31 U.S.C. § 3730(b).  And the FCA provides, in pertinent part, for civil penalties of up to $10,000 per false claim and treble damages against any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; and

> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid ... .

31 U.S.C. § 3729(a).  Although relators seek to prove liability under all three subsections, the parties focused chiefly on § 3729(a)(1).  And significantly, resolution of the issues raised by defendants' challenge to the § 3729(a)(1) claim serves also to dispose of the challenges defendants have raised at this stage to the claims asserted under §§ 3729(a)(2) and (a)(3).  Accordingly, the analysis here focuses first on § 3729(a)(1) and defendants' challenges to the claim based on this provision.

In its simplest terms, to establish a prima facie case under § 3729(a)(1) of the FCA, a plaintiff must establish the following elements: (i) a "claim" (ii) that is "knowingly ... false or fraudulent," and (iii) "presented to an officer or employee of the United States" for payment or approval.[54]  31 U.S.C. § 3729(a)(1).  Whether the claims presented to the CPA were knowingly false

---

[54] An additional judicially-imposed element of FCA liability under each of the provisions of the FCA is the requirement that the false statement or claim be shown to be "material."  *See*

is vigorously disputed by the parties, but is assumed at this stage and hence not material to the FCA question now at bar.  Instead, the central issues for resolution are (i) whether the requests for payment submitted by Custer Battles to the CPA in furtherance of the BIAP and ICE contracts were false or fraudulent "claim[s]" within the meaning of the FCA, and (ii) whether they were presented to an officer of the United States government.  Defendants argue they are entitled to summary judgment on both issues.  Each of these issues is separately addressed.

## A. Claim for Payment or Approval

The FCA requirement of a "claim" to establish liability under §§ 3729(a)(1), (2), and (3) reflects that the FCA was "not designed to punish every type of fraud practiced on the Government." *United States v. McNinch*, 356 U.S. 595, 599 (1958).  The statute does not attach liability "to the underlying fraudulent activity or to the government's wrongful conduct." *Harrison*, 176 F.3d at 785 (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)).  Only false "*claims*" are covered. Thus, a "central question in False Claims Act cases is whether the defendant ever presented a 'false or fraudulent claim' to the government." *Id.*

Although the FCA has long required a "claim" before liability will attach, the term was not statutorily defined until recently.  In 1986, Congress amended the FCA to add § 3729(c), which provides that for the purposes of the FCA, a "claim" includes the following:

> any request or demand ... for money or property which is made to a contractor, grantee, or other recipient if the United States Government *provides any portion of the money or property* which is requested or demanded, or if the Government *will reimburse* such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

---

*Harrison v. United States*, 176 F.3d 776, 785 (4th Cir. 1999).  It is also worth noting that in the Fourth Circuit "there is no requirement that the government have suffered damages as a result of the fraud." *Id.* at 785 n.7 (noting split in authority).

31 U.S.C. § 3729(c) (emphasis added).  Thus, a claim includes any request for payment when the government "provides ...[or] will reimburse" any portion of the money requested or demanded.  *Id.*

Relying on this language, relators and the government argue that the term "provides" in subsection (c) must be read broadly to include any demand that causes the government to disburse resources within its legal possession, control, or administration,[55] without respect to whether it is the government's money that is paid out.  Put differently, relators and the government contend that even if the government is merely a custodian of the property, a request for that property triggers the FCA.  From this premise, relators and the government conclude that even if Seized Funds, Vested Funds, and DFI Funds were "Iraqi Funds" — so long as the United States administered these funds — then defendants may be held liable for any payments the United States made from these assets in response to a false or fraudulent request for payment.  In response, defendants argue that for the government to "*provide[]*" or "*reimburse*" the money requested or demanded, it must be the *government's* money.  In other words, a "claim" requires a "call upon the government fisc."  *Harrison*, 176 F.3d 785.

Despite the recent amendment defining "claim," the statutory language, by itself, does not definitively exclude either argument.  This is so because the plain meaning of the term "provide" is capacious enough to accommodate both arguments.  Both interpretations of "provide" advanced by the parties are plausible; neither is obviously correct.[56]  Importantly, however, there is a long history

---

[55] In fact, the government even suggests that the definition can be applied so broadly as to include any request for money or property from resources "in which [the government] has an interest."  Gov't Br. at 26.

[56] *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176 (3d Cir. 2001) ("Although [relator's contention that the term "claim" includes requests for payment even if no claim is made against the United States Treasury money is] not linguistically implausible, we find no support for this reading from the jurisprudence interpreting the False Claims Act.").

of Supreme Court precedent defining the contours of an FCA "claim."   The term was judicially

well-defined prior to 1986 and thus the amendment defining the term must be understood in light of

that precedent.[57]

Courts have often liberally construed the FCA to reach a wide range of fraud committed

upon instrumentalities of the United States, but they have always done so consistent with Congress'

purpose in promulgating the Act, namely to protect *government* funds and property from fraudulent

claims for payment.[58]   Significantly, no case has held, as relators and the government argue here, that

the FCA is so broad as to reach not only false claims presented for *government* property, but to

claims for any property in the government's possession, even if the government is only a custodian,

bailee, or administrator of the property.   To the contrary, the Supreme Court, in one of its earliest

cases interpreting an earlier version of the FCA, rejected the argument that a "claim" includes a

demand for money or property that does not belong to the government, but is merely in the

government's possession.   *See United States v. Cohn*, 270 U.S. 339, 345-46 (1926).   In *Cohn*, the

Supreme Court held that a knowingly false and fraudulent request to obtain the release of cigars held

in the possession of U.S. customs officials, but owned by a third party in the Phillipines, did not

constitute a "claim upon or against the Government" because that provision "relates solely to the

---

[57]  *See CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 553 (4th Cir. 2004)
("[W]ithout explicit statutory instructions, the cases drawn upon by Congress in writing
legislation are *not* supplanted by the legislation, and courts may — indeed should — continue to
look to these cases for guidance.").

[58]  *Rainwater v. United States*, 356 U.S. 590, 592 (1958) ("It seems quite clear that the
objective of Congress was broadly to protect the funds and property of the Government from
fraudulent claims, regardless of the particular form, or function, of the government
instrumentality upon which such claims were made."); *United States ex rel. Marcus v. Hess*, 317
U.S. 537, 551 (1943) ("We think the chief purpose of [the False Claims Act] was to provide for
restitution to the government of money taken from it by fraud ... .").

payment or approval of a claim for money or property to which a right is asserted against the

Government, based upon the Government's liability to the claimant." *Id.*  Thus, a "claim" does not

include property as to which "the Government makes no claim, and which is merely in the

temporary possession of an agent of the Government for delivery to the person who may be entitled

to its possession." *Id.* at 346.  Thus, the Supreme Court's holding in *Cohn* may be summarized this

way: a request for resources from the government does not constitute a claim when the government

acts only as custodian or bailee of a third-party's property.  Instead, a "claim" must be a request for

*government* funds or property, *i.e.* a "call on the government fisc." *Harrison*, 176 F.3d at 785.

In later elucidations of "claim," the Supreme Court has not overruled *Cohn* but instead has

implicitly affirmed it.  Thus, in *United States v. McNinch*, 356 U.S. 595 (1958), the Supreme Court

ruled that a "claim" is a "demand for money or for some transfer of public property" that requires the

government to disburse public funds or to "otherwise suffer immediate financial detriment." *Id.* at

599 (citation and internal quotations omitted); *see also United States v. Rivera*, 55 F.3d 703, 709

(1st Cir. 1995).[59]  Accordingly, the Supreme Court held that a fraudulent application for credit

insurance did not amount to a claim because there was no potential that the government would

"suffer immediate financial detriment." *Id.*

Also in accord with this principle is *United States v. Niefert-White*, 390 U.S. 228 (1968),

---

[59] It should be noted that the Supreme Court's decisions in *Cohn* and *McNinch* were interpreting an earlier version of the FCA that imposed both criminal and civil sanctions.  And while criminal statutes are usually given a more restrictive reading, the holdings in these cases regarding the definition of "claim" are still relevant here because this interpretation is not dependent on a restrictive reading of the term and because the FCA has always been read broadly, even before it was amended to impose only civil liability. *See United States v. Niefert-White Co.*, 390 U.S. 288, 232 (1968) ("[T]he Court has consistently refused to accept a rigid, restrictive reading [of the FCA], even at the time when the statute imposed criminal sanctions as well as civil.").

where the Supreme Court held that a "claim" for the purposes of the FCA includes not only legally

enforceable "claims," but also a fraudulent application for a loan, emphasizing that the key

distinction is whether a false statement is made "with the purpose and effect of inducing *the*

*Government* immediately to part with money." *Id.* at 232 (emphasis added). Or, put differently, a

"claim" includes "all fraudulent attempts to cause the Government to 'pay out' sums of money." *Id.*

at 233. Relying on this statement of the rule, relators and the government argue that a "claim"

includes any fraudulent request to the U.S. government to "pay out" money, whether the money

belongs to the government or whether it was merely in its possession, control or administration.

Yet, the Supreme Court in *Niefert-White* explicitly distinguished the facts presented there from the

facts presented in *Cohn*, emphasizing that *Cohn* did not involve a fraudulent attempt "to cause the

Government to part with *its* [*own*] money or property," but that the government acted there only as a

"bailee" of goods that did not belong to the United States. *Id.* at 231 (emphasis added). In contrast,

the submission of false loan applications did involve a false claim for government property, even if

the grantee had no legal right or "claim" to the loan. Thus, *Niefert-White* does not stand for the

proposition that any request that induces the government to write a check or to hand over money is a

"claim." Instead, consistent with *Cohn*, it holds that a "claim" is any fraudulent attempt to cause the

government to part with *its own* money.[60]

––––––––––––––––––

[60] Relators also argue for a nearly limitless expansion of the FCA by relying on *dictum* in
*Niefert-White*, which noted that debates in the FCA legislative history "*suggest*" that the Act was
"intended to reach all types of fraud, without qualification, that *might* result in financial loss to
the Government." 390 U.S. at 232 (emphasis added). In reliance on this statement, relators
argue that the FCA applies to any fraud perpetrated on the United States government or any third
party, if that fraud "might result in financial loss" to the government, whether directly or
indirectly. *Id.* at 232. Such a conclusion is simply unwarranted, as it finds no support in the
caselaw and is tenuously founded on *dictum* that refers to legislative history that, at best, merely
"suggests" this standard. *But see United States ex rel. Hayes v. CMC Elecs., Inc.*, 297 F. Supp.
2d 734, 738 (D.N.J. 2003) (noting in *dictum* that fraudulent attempt to overcharge United States

Although Congress added § 3729(c) in 1986 to expand the definition of "claim," there is no indication that in doing so Congress intended to supplant the well-established principle that a "claim" requires a request or demand for payment *from government funds*. Put differently, it is true, as relators and the government contend, that the definition in § 3729(c) is not exclusive; it defines what a "claim includes" and hence serves to expand the then-existing judicially-established definition of "claim." 31 U.S.C. § 3729(c). But importantly, it is a settled principle that judicial precedent not directly inconsistent with that definition survives the amendment. *See CoStar Group*, 373 F.3d at 553. And, in expanding the definition of "claim," § 3729(c) did not explicitly overturn the rule that a claim requires a request or demand for payment from government funds. That section still provides for FCA liability when the "United States Government provides" or "if the Government will reimburse" a grantee for the money or property requested, which requirements are not inconsistent with the prior established principle that in doing so the government must do so with its own money, not that of a third party.[61]

The government and relators argue that § 3729(c) did overrule this principle as the plain

_____

for military equipment to be sold to Saudi Arabia *might* reduce money Saudi Arabia had to spend on its defense, thus increasing total U.S. expenditures on global security, while actually basing FCA liability on the fraudulent attempt to cause the *U.S. government* to overpay (*i.e.* suffer a direct financial loss to the federal fisc) for equipment to be resold to Saudi Arabia).

[61] Moreover, there is no indication in the legislative history that § 3729(c) was intended to expand the scope of FCA liability to demands for payment from money or property merely in the possession of the United States government. Nor does anything in the legislative hisotry indicate an intent to overrule *Cohn*. Instead, Congress sought to clarify that the FCA extends to false claims made to states and other grantees of *federal funds*, overturning certain lower court decisions holding to the contrary. *See* S. Rep. No. 99-345, at 21 (1986); *see also United States ex rel. Totten v. Bombardier Corp. (Totten II)*, 380 F.3d 488, 494-97 (D.C. Cir. 2004) (holding that Congress may even have been unsuccessful in this regard when those false claims are not ultimately presented to the United States). Nowhere does the legislative history suggest that Congress meant to expand FCA liability to false claims submitted to the government, states, or other grantees to be paid with *non-federal* funds.

meaning of "provides" in § 3729(c) is "to make ready; prepare," "to make available," or "to make arrangements for supplying the means of support, money, etc." and does not require that the government make such a payment with its own funds.   Yet at best, the government and relators identify some degree of ambiguity in the term which is resolved by noting that if Congress intended to announce such a new rule, or to overrule *Cohn*, it should have been more explicit; it could have stated that the FCA applies whenever the United States *processes*, rather than *provides*, the money requested or demanded.   But Congress did not do so.   And as the Fourth Circuit recently reiterated, "without explicit statutory instructions, the cases drawn upon by Congress in writing legislation are *not* supplanted by the legislation, and courts may — indeed should — continue to look to these cases for guidance." *See CoStar Group*, 373 F.3d at 553; *see also Midatlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) ("[T]he normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.").   Thus, the rule that a "claim" requires a request or payment for government property plainly survives the 1986 FCA amendment.[62]

_____

[62] It is also worth noting that the definition of "claim" espoused by the government and relators, if applied, would produce anomalous results inconsistent with the purpose of the treble damages provision of the FCA.   The FCA authorizes civil penalties up to $10,000 for each false claim and three times the amount of damages "which the Government sustains" because of the act of fraud.   31 U.S.C. § 3729(a).   Were FCA liability to attach to a false claim presented to the United States for Iraqi funds merely in the government's possession, it is Iraq that would sustain the damages, not the United States.   *See Hess*, 317 U.S. at 551 ("We think the chief purpose of [the False Claims Act] was to provide for restitution to the government of money taken from it by fraud, and that the device of [multiple] damages plus a specific sum was chosen to make sure that the government would be made completely whole.").   And even if the government could be said to have "sustain[ed]" the damage in some loose sense if it once possessed the funds but does no longer, to whom should the treble damages be paid?   According to the statute, recovery would be paid to the government and to relators, but not to Iraq.   Yet, Iraq presumably would still have an independent claim against the defendants for which it could recover damages, resulting in a quadruple damages award.   *Cf. United States ex rel. Totten v. Bombardier Corp. (Totten I)*, 286 F.3d 542, 553 (D.C. Cir. 2002) (Randolph, J., concurring) (recognizing similar problem if FCA is

Indeed, this conclusion is consistent with every post-1986 decision to consider the definition of a "claim" within the meaning of the FCA. Thus, the Third Circuit in *Hutchins v. Wilentz, Goldman & Spitzer* held that,

> [Th]e submission of false claims to the United States for approval which do not or would not cause financial loss to the government are not within the purview of the False Claims Act. Unless these claims would result in economic loss to the United States government, liability under the False Claims Act does not attach.

253 F.3d at 184 (citing *United States v. Bornstein*, 423 U.S. 303, 309 n.4 (1976) ("The conception of a claim against the government normally connotes a demand for money or for some transfer of public property.")). In reaching this result, the Third Circuit noted that the purpose of the FCA was "to provide for restitution to the government of money taken from it by fraud."[63] Significantly, the court rejected and found no case support for the argument that "a false statement to the government which would not cause the government economic loss gives rise to the False Claims Act." *Id.* at 183. Similarly, the D.C. Circuit in *Totten II*, in both its majority and dissenting opinions, agreed that the False Claims Act is limited to false claims "where the Government directly or indirectly provides the funds and suffers the loss." *See Totten II*, 380 F.3d at 499 n.6 (Roberts, J.); *id.* at 507 n.8 (Garland, J., dissenting). Moreover, consistent with these rulings, the Fourth Circuit has stated that a "claim" requires a "call upon the government fisc." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999); *see also United States ex rel. Bustamante v. United Way/Crusade of Mercy, Inc.*, 2000 U.S. Dist. LEXIS 7326, *13-14 (N.D. Ill. 2000) (finding no "claim" where

---

applied to claims presented to any federal grantee even if claims are not re-presented to United States). The more sensible interpretation, consistent with the conclusion reached here, is that the FCA, as a whole, is intended to reach only false claims that, if paid, would cause financial loss to the federal government.

[63] *Id.* at 184 (quoting *Hess*, 317 U.S. at 551).

payments made by federal entity to United Way because voluntary charitable contributions deducted from employee paychecks were not "federal" funds but personal funds).  Thus, a "claim" requires more than a request or demand for payment from the United States; it must be a request for government money or property, a call on the federal fisc.

Although relators and the government cite a number of cases in an attempt to overcome the conclusion that a "claim" requires a call on the federal fisc, these cases are easily distinguished. First, they point to cases that have upheld FCA liability for military contractors that submitted false contract bids to the United States under the Foreign Military Sales ("FMS") program.  *See, e.g.*, *United States ex rel. Campbell v. Lockheed Martin Corp.*, 282 F. Supp. 2d 1324, 1338 (M.D. Fla. 2003); *United States ex rel. Hayes v. CMC Electronics, Inc.*, 297 F. Supp. 2d 734 (D.N.J. 2003). Under the FMS program, the United States acts as the "middle-man" to facilitate the sale of military equipment from military contractors to foreign governments. Yet, in fact the government acts as more than a mere "conduit" in these cases.  Rather, the process is comprised of two separate transactions — a transaction between the military contractors and the United States and a transaction between the United States and the foreign governments.  *See Campbell*, 282 F. Supp. 2d at 1341 ("Lockheed was obligated to deliver [the military equipment] to the United States and the United States was obligated to pay Lockheed ...the United States actually takes title to the [equipment] upon delivery from Lockheed, and title then passes from the United States to the foreign government."); *Hayes*, 297 F. Supp. 2d at 736 (defendant subcontractor for prime contract caused claims to be submitted to U.S. government for radios that were to be re-sold by the United States to the Saudi Arabian government).  Importantly, the *Campbell* and *Hayes* courts rejected the argument that the FMS cases involved no claim upon the federal treasury, distinguishing *Cohn*, *Hutchins*, and *Bustamante*.  Instead, entirely consistent with the holdings in *Cohn*, *Hutchins*, and *Bustamante*, both

37

courts held that the military contractors presented false claims to the United States for payment, not from money belonging to the foreign government, but from money that had "vest[ed]" in the United States Treasury.[64]  Thus, the military contractors in each of those cases presented a "claim" to the United States for payment from "the government fisc." *Harrison*, 176 F.3d at 785.

Nor are cases interpreting the "distinctly different" FCA liability provision found in 31 U.S.C. § 3729(a)(7) either controlling or persuasive.[65]  Significantly, the Tenth Circuit in *Kennard v. Comstock Resources, Inc.* noted that the analysis is quite different where, as here, liability is alleged under § 3729(a)(1) because the text of § 3729(a)(7) does not require the presence of a "claim," but merely that a false record be used to reduce an obligation to "*transmit*" money to the Government. *See* 363 F.3d at 1047 ("The *transmission* of funds to the Government is enough; there is no requirement in the text that the Government have an ongoing interest in the funds or that the Government itself suffer a loss."); *Koch*, 1995 U.S. Dist. LEXIS 20832, at *56-57.  Relators have alleged a violation not of § 3729(a)(7), but of § 3729(a)(1), and that subsection does require a

_____

[64]  *See Campbell*, 282 F. Supp. 2d at 1340 ("[F]unds in the FMS Trust fund 'vest in the United States Government upon deposit therein' and [] payments from that fund are payments from the United States rather than the depositing foreign country. ... [T]he funds are plainly within the U.S. Treasury.") (citation omitted); *Hayes*, 297 F. Supp. 2d at 739 n.6 ("Funds used to pay for equipment that will be sold to foreign governments pursuant to a contract under the Arms Control Export Act are funds of the United States, regardless of whether payment from the government is deposited into the FMS Trust Fund before or after the US pays for the equipment.").

[65]  Known as the FCA's "reverse false claims" provision, section 3729(a)(7) provides for FCA liability when a person "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or *transmit* money or property to the Government."  31 U.S.C. § 3729(a)(7) (citation omitted).  *See Kennard v. Comstock Resources, Inc.*, 363 F.3d 1039, 1047 n.4 (10th Cir. 2004) (authorizing suit for underpayment of royalties on oil and gas leases to government where government acted as fiduciary for Indian Tribe); *United States ex rel. Koch v. Koch Indus.*, 1995 U.S. Dist. LEXIS 20832 (N.D. Okla. 1995) (same).

"claim" for liability to attach.

In sum, therefore, § 3729(a)(1) requires a "claim," or a request or demand for payment that if paid would result in economic loss to the government fisc, *i.e.* a request for payment from government funds; it does not extend to cases where the government acts solely as a custodian, bailee, or administrator, merely holding or managing property for the benefit of a third party.  The significance of this conclusion for this case is that if the funds used to pay the Custer Battles contracts were "Iraqi funds," even if administered or held in the possession of the United States, then the presentment of a fraudulent request for payment from these funds does not constitute a "claim" within the meaning of the FCA.  On the other hand, if the funds used to pay for the contracts belonged to the United States, then FCA liability may attach if Custer Battles knowingly presented a false or fraudulent claim to a United States government officer for payment from these funds.  Thus, it is necessary to consider each source of funds separately to determine whether a request for payment therefrom constitutes a "claim."

*1. Vested Funds*

Although Vested Funds were at one time property belonging to the Government of Iraq and its various agencies and instrumentalities, they ceased to be so, becoming property of the United States, as of the date of the first Vesting Order directing that they be confiscated and vested in the United States Treasury.[66]  By its own terms, the IEEPA provides that "all right, title, and interest in any property so confiscated shall *vest* ... in such agency or person as the President may designate" and that such "interest or property shall be held, used, administered, liquidated, sold or otherwise

---

[66] Funds confiscated and vested in the Treasury pursuant to the second Vesting Order dated August 28, 2003, were ultimately transferred to the DFI and thus are considered under the principles governing that fund.

dealt with *in the interest of and for the benefit of the United States*." 50 U.S.C. § 1702 (emphasis added).  Importantly, the statute does not authorize the government merely to take *possession* of the property, but to confiscate and vest them in the Treasury.  *See id.*; *Smith v. Federal Reserve Bank of New York*, 346 F.3d 264 (2d Cir. 2003) ("To seize or freeze assets transfers *possessory* interest in the property.  But confiscation, pursuant to the IEEPA § 203(a)(1)(C), transfers *ownership* of terrorist property by vesting right, title, and interest as the President deems appropriate.").  The plain meaning of the term "vest" is to transfer ownership or title.[67] And consistent with transfer of ownership to the United States, the IEEPA provides for unrestricted use of the funds in furtherance of United States interests.  Thus, by the plain terms of the IEEPA, title to the Vested Funds transferred from Iraq to the United States at the time the Funds vested in the Special Purpose Account in the United States Treasury.[68]  Significantly, this conclusion is consistent with two appellate court decisions that have considered the status of Vested Funds, finding that title to the Funds transferred to the United States at the time of the Vesting Order.  *See Smith*, 346 F.3d 264 (rejecting attempt by judgment creditors of Iraq to attach Vested Funds because title to the funds had passed to the United States); *Acree v. Snow*, 2003 U.S. Dist. LEXIS 27789 (D.C. Cir. Oct. 7, 2003) (adopting Second Circuit's reasoning in *Smith*).

        In an attempt to avoid this conclusion, defendants argue that Vested Funds were always Iraqi

---

[67]  *See, e.g.*, Black's Law Dictionary 1557 (7th ed. 1999) (Vest: "1. to confer ownership of (property) upon a person. 2. To invest (a person) with the full title to property."); *see also*, *Propper v. Clark*, 337 U.S. 472, 483-84 (1949) (vesting is a permanent transfer of title); *Regan v. Wald*, 468 U.S. 222, 228 n.8 (1984) (earlier version of IEEPA did not include "power to vest (*i.e.* to take title to) foreign assets").

[68]  Indeed, the IEEPA was amended in 2001 by the USA PATRIOT Act, P.L. 107-56, Title I, § 106, 115 Stat. 277 (2001), explicitly to empower the President to confiscate and vest assets of foreign countries in the United States.  50 U.S.C. § 1702(a)(1)(C).

funds and that they vested only "temporarily" in the United States Treasury until they could be expended for the reconstruction of Iraq.  In support of their argument, defendants note that the first Vesting Order explicitly stated that the vested property "should be used to assist the Iraqi people and to assist in the reconstruction of Iraq."  *See* 68 Fed. Reg. 14307.  While it was certainly the President's prerogative to direct that the funds, once vested, should be used for the benefit of the Iraqi people, this declaration of intent does not change the status of the funds; ownership and title are controlled by the plain language of the IEEPA.[69]  Once title transferred to the United States, the President was at liberty to direct the use of these funds for any purpose "in the interest of and for the benefit of the United States," including the reconstruction of Iraq, but also to fund the war effort, to reduce taxes, or to build a road.[70]  50 U.S.C. § 1702.   Thus, because the Vested Funds were United States government funds, a demand for payment from these funds constituted a "claim" within the meaning of the FCA.

   *2. Seized Funds*

   Although the status of Seized Funds is not as clear-cut as that of Vested Funds, the same result obtains – a demand for payment from the money seized by American or Coalition forces in Iraq was a demand for United States funds and, accordingly, constituted a "claim" under the FCA.

   The laws and usages of war, comprised generally of customary international law,

---

   [69] Nor is it controlling or persuasive that the CPA stated in CPA Memorandum Number 4 that "Iraqi Funds" include "Vested Funds."  It is the IEEPA that controls the status of the funds, not the CPA's understanding regarding those funds.

   [70] Nor is it significant that the Vested Funds were periodically converted to cash shipments and transported to Iraq because the transfer of the funds did not transfer title to Iraq. Once received in Iraq, the Vested Funds remained in the possession and control of the United States, subject to the budgeting authority of the OMB and the Department of Defense.  Not until the CPA was disbanded and substantially all of the Vested Funds were transferred to the Iraq Ministry of Finance did Vested Funds cease to be the property of the United States.

international conventions and treaties, and U.N. Security Council Resolutions, govern the actions of

an occupying force in the territory of an occupied State.  The law of occupation is a subset of the

laws of war and many of its governing principles, including the rights of an occupant with respect to

state-owned property, are set forth in the Hague Regulations of 1907.[71]  While the Hague

Regulations technically do not apply as a matter of treaty law, since Iraq was not a signatory to the

Hague Convention (IV) Respecting the Laws and Customs of War on the Land,[72] the Hague

Regulations are nonetheless pertinent as they generally reflect customary international practice and

the Coalition members understood that they would be governed by the obligations of the Hague

Regulations in the course of the occupation of Iraq.[73]

With respect to public moveable property — such as Iraqi state owned cash, securities, etc.

— Article 53 of the Hague Regulations of 1907 provides that:

> An army of occupation can only take possession of cash, funds, and realizable securities
> which are strictly the property of the State, depots of arms, means of transport, stores and
> supplies, and generally, all movable property belonging to the State which may be used for

---

[71] *See* Regulations Respecting the Laws and Customs of War on Land, annex to the Convention (IV) Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277 (hereinafter "Hague Regulations").

[72] *See* Hague Regulations, art. 2, 36 Stat. at 2290 ("The provisions contained in the Regulations referred to in Article 1, as well as in the present Convention, do not apply except between Contracting Powers, and then only if all the belligerents are parties to the Convention.").

[73] In their joint letter to the United Nations dated May 8, 2003, the United States and the United Kingdom represented that members of the Coalition would "strictly abide by their obligations under international law."  In response, the United Nations in Resolution 1483 recognized "the specific authorities, responsibilities, and obligations under applicable international law of these states *as occupying powers under a unified command*" and called upon all concerned "to comply fully with their obligations under international law including in particular the Geneva Conventions of 1949 and the Hague Regulations of 1907."  UNSCR 1483 ¶ 5 (emphasis added).  *See also* Brett H. McGurk, *A Lawyer in Baghdad*, 8 Green Bag 51, 52 (2004) (Associate General Counsel to the CPA stating that Coalition voluntarily submitted to the application of occupation law authority, including the Hague and Geneva Conventions).

military operations.

Hague Regulations, art. 53, 36 Stat. at 2308.  Pursuant to this regulation, an occupying force is permitted to seize public movable property and appropriate such property for its own uses, at least to the extent that it furthers the occupying force's military operations.[74]  There is some dispute over whether the occupying force is restricted in its use of public movable property.  Some authorities contend that the qualifier "which may be used for military operations" limits the property's use to the facilitation of military operations, while others have argued that it limits the category of property that may be confiscated, but not its use.[75]  In either case, however, it is clear that public movable property in the possession of the occupying force is not required to be *administered* for the benefit of the occupied territory; rather, the occupying force, having confiscated the property, may *use* it to benefit and further the interests of the occupying force.[76]  In this regard, the Hague Regulations

---

[74] *See* Gerhard von Glahn, The Occupation of Enemy Territory 180 (1957) ("An occupant is therefore entitled to seize and use for his own purposes any and all funds belonging to the enemy state and found in the occupied territory."); *id.* at 183 ("In all instances in which a belligerent occupant lawfully seizes enemy movable public property, he has a complete and legal right to use such property, remove it from the occupied territory, or consume it, if such is possible."); Harold Dichter, *Comment: The Legal Status of Israel's Water Policies in the Occupied Territories*, 35 Harv. Int'l L.J. 565, 582 (1994); Thomas G. Robisch, *General William T. Sherman: Would the Georgia Campaigns of the First Commander of the Modern Era Comply with Current Law of War Standards?*, 9 Emory Int'l. L. Rev. 459, 476 n.129 (1995) (public movable property with military value in occupied territory becomes property of capturing state).

[75] *See* Dichter, 35 Harv. Int'l L.J. at 582 (citing authorities); von Glahn, at 183 ("In all instances in which a belligerent occupant lawfully seizes enemy movable public property, he has a complete and legal right to use such property, remove it from the occupied territory, or consume it, if such is possible.").

[76] While possession, by itself, is not sufficient to trigger FCA liability — indeed, neither is possession and administration for the benefit of a third party — possession plus the freedom to *use* or *waste* property for the government's own benefit is sufficient to establish ownership. Thus, different from public immovable property, which must be stewarded and returned to the occupied country, or funds in the DFI, which the CPA administered on behalf of the Iraqi government, the government had an ownership interest in Seized Funds because it not only

distinguish public movable property from private property, which cannot be "confiscated,"[77] and

public immovable property, such as public buildings, real estate, forests, and agricultural estates,

which the occupying State must "safeguard[]" as an "administrator and usufructuary."[78]  Thus, the

Iraqi state-owned cash and other movable property seized by American and other Coalition troops in

Iraq as occupying forces, once transferred to the custody of the 336th FINCOM, became government

property to be expended at the direction and discretion of the United States.[79]

      This conclusion holds even if the United States did not gain unrestricted title to the Seized

Funds.  To be sure, the laws of war might have limited the scope of their use to furthering the

-------------------

possessed the funds but could use or waste them to further its own military operations.

    [77] *See* Hague Regulations, art. 46, 36 Stat. at 2306-07.

    [78] *See* Hague Regulations, art. 55, 36 Stat. at 2309.  Defendants argue that the Hague
Regulations only permit an occupying force to administer property of the occupied nation
temporarily, citing McGurk's *A Lawyer in Baghdad* in support.  *See* 8 Green Bag at 52, 56. Yet,
the argument presented there addresses public immovable property (*i.e.* buildings and real
property), not public movable property, to which, as noted here, different rules apply.

    [79] While the substantial majority of the Seized Funds were confiscated by American
troops, it is likely that British or other Coalition member troops also took initial control of some
of the Seized Funds.  Thus, at the time of seizure, the status of this property is unclear.  *See* von
Glahn, at 182-83 ("When a conflict involves combined operations by the forces of several
countries, ... [i]t may be assumed that at times it would be somewhat unfair to all concerned if
only the state whose forces were involved in the actual capture or seizure were confirmed in the
exclusive enjoyment of benefits, to the complete and final exclusion of all other participating
states. ... Conventional international law being silent on this somewhat delicate question,
agreements among the participating states appear to be necessary for a solution to the problem,
both as to title to seized property and to allocation of 'compensation' to nations allied with the
captor-state.").  There is no evidence in the record of an explicit agreement among Coalition
states governing the status of Seized Funds, but there is some indication of an implicit one as all
Coalition member governments transferred these Seized Funds to the United States.  Thus, by the
time that defendants submitted claims for payment from Seized Funds, all of the funds had been
delivered into U.S. custody and the U.S. Department of Defense had exclusive authority to
budget and direct their expenditure.  In any event, absent any evidence of an explicit agreement
in the record at this time, at best, defendants can raise a triable issue of fact with respect to
Seized Funds.

government's military operations, but within this limitation, the United States still had the freedom to exercise dominion and control over the money.  In contrast with the facts presented in *Cohn* or *Bustamante*, the government had more than mere custodial rights to the Seized Funds.  Instead, it had the discretion to direct their expenditure in the best interests of the United States, whether to fund the reconstruction of Iraq or to facilitate military operations in furtherance of the occupation.  For the purposes of the FCA, therefore, Seized Funds belonged to the United States government and a demand for payment therefrom constituted a "claim" under the FCA.

Defendants seek to avoid this conclusion by noting that, as with Vested Funds, the government went to some lengths to make clear that it considered Seized Funds to be Iraqi Funds that were to be used to benefit the people of Iraq.[80]  While it certainly may have been sound policy to make clear that the government did not intend to expend Seized Funds for purposes other than to further the reconstruction of Iraq, these declarations of intent do not control the legal status of the property.  In other words, while the expenditure of Seized Funds for the reconstruction of Iraq was well within the government's discretion, it was by no means dictated by international law.  Instead, these funds, once confiscated, became the property of the United States.

### 3. Development Fund for Iraq

For the purposes of the FCA, there were important differences between the DFI on the one hand, and Seized and Vested Funds on the other.  Most significantly, as the government conceded in

---

[80] *See* Franks, Freedom Message to the Iraqi People ("Iraq and its property belong to the Iraqi people and the Coalition makes no claim of ownership by force of arms"); Memorandum from George W. Bush, President to Secretary of Defense (Apr. 30, 2003) ("[Seized Funds] shall be used only to assist the Iraqi people and support the reconstruction of Iraq, consistent with the laws and usages of war."); *see* CPA Memo No. 4 (describing Seized, Vested and DFI Funds as "Iraqi Funds"). Also, as noted, Seized Funds were separately reported on DoD financial statements in a "Statement of Custodial Activity" and reported as "Non-entity Seized Iraqi Cash."

45

its brief, the "funds in the DFI have always been Iraqi funds;" they never became United States government property.  Gov't Br. at 35.  The DFI was established by international agreement and United Nations Security Council Resolution as a depository for Iraqi proceeds from the sale of Iraqi national resources and for repatriated Iraqi funds seized and returned to Iraq by United Nations member states. *See* UNSCR 1483 ¶ 14.  Unlike Vested Funds, funds in the DFI did not vest in the U.S. Treasury.  And unlike Seized Funds, the funds in the DFI could not be used or wasted to further the interests of the United States.  Instead, all of the funds in the DFI either came directly from Iraqi sources or became Iraqi funds upon donation to the DFI.

Iraqi ownership of the DFI is further confirmed by the DFI's founding provisions in Resolution 1483, which make clear that, from its inception, the DFI was Iraqi money, administered for a time by the CPA, but strictly on behalf of the people of Iraq.  Specifically, although the corpus of the bank account was held in the FRBNY, Resolution 1483 directed that the DFI would be held there as a state bank account by the Central Bank of Iraq.  *See id.*  And significantly, although the DFI was administered by the CPA, the CPA was obligated by U.N. directive to administer the fund for "purposes benefiting [sic] the people of Iraq."  *See id.*  Moreover, instead of seeking DoD approval before approving expenditures from DFI funds, the CPA was required instead to consult with the "Iraqi interim administration."  *See id.* ¶ 13. Consistent with this theory of Iraqi ownership of the DFI, the administration of that fund shifted to the Iraqi Interim Government upon the transfer of sovereignty at the end of June 2003.

In sum, a request for payment from the DFI was not a demand for payment from U.S. government money that caused financial loss to the federal fisc.  Instead, loss of DFI funds as the result of fraud was damage to the property of the Iraqi people.  Accordingly, any demands for payment from the DFI were not "claims" within the meaning of the FCA.

While the parties dispute whether the CPA was an instrumentality of the United States, this conclusion holds whether or not the CPA was a U.S. instrumentality. Even if the CPA was a U.S. instrumentality, it was charged only with *administering* the DFI; it did not have the authority to *use* or *waste* the funds in the interests of the United States. Indeed, it did not even have possession of the funds. Like the customs agent in *Cohn*, the CPA played a restricted role as an administrator or custodian of the funds in the DFI, required to expend Iraqi money for the benefit of the people of Iraq. Accordingly, if DFI funds were paid out in response to a fraudulent request for payment, the United States government would not itself suffer any economic loss. And, as discussed at length, it is not sufficient for FCA liability to attach where the United States is merely a custodian, bailee, or administrator of a third-party's property.

The government objects to this conclusion, arguing that the United States had certain "rights, interests, and responsibilities" for the funds, either through the CPA or as a member state of the Coalition. Given this premise, the government concludes that the United States should be able to use its laws, including the FCA, to protect its interests by redressing and deterring fraudulent attempts on the DFI. Yet, the purpose of the FCA was not to protect any property in which the government might have an interest. Indeed, it is not even so broad as "to punish every type of fraud committed *upon the government*." *Harrison*, 176 F.3d at 785 (emphasis added). Such an expansive application of the FCA would extend its reach far beyond the limits supported by the text or its history. Thus, a mere interest in the DFI is not sufficient to make a request for payment from the DFI a "claim."[81]

---

[81] Nor is it significant, as relators suggest, that some of the payments from the DFI were in the form of U.S. currency. The form of payment or currency used to pay a request for payment is of no significance; it is the source and ownership of the funds that matters.

Relators also argue that because the United States government at one time provided *a portion* of the money held in the DFI, namely $210 million in Vested Funds, requests for payment from the DFI are "claims." *See* 31 U.S.C. § 3729(c) (providing that a "claim" includes any requests or demand for money or property made to a grantee "if the United States Government provides *any portion* of the money or property which is requested or demanded"). Yet, once the Vested Funds were transferred to the DFI, the United States relinquished control of those funds and they ceased to be United States government property. Therefore, the United States did not "*provide*" a portion of the money or property requested or demanded from the DFI, as § 3729(c) requires, even if it, at one time, *provided* a portion of the money now held in the DFI. To reach the opposite conclusion would necessarily involve re-writing the definition in § 3729(c) to read not that a "claim" includes requests for payment submitted to grantees if the government "provides" any portion of the funds used to pay the claim, but any request for payment where the money "*has already been* ... provided by the Federal Government."[82] Such a judicial revision of the statute finds no support in the FCA's plain language and would require courts to trace the chain of title of any money that might once have been provided by the United States government to determine FCA liability. Moreover, such a result would lead to FCA liability in an expansive array of scenarios, including, for example, any corrupt attempt to cause foreign governments to pay out money received in the form of United States foreign aid. Thus, a demand for payment from the DFI, even if part of the money ultimately came from the

---

[82] *See id.*; *Totten II*, 380 F.3d at 493 (emphasis original) (rejecting argument that FCA applies to requests for payment presented to federal grantee where government has relinquished all control of the disposition of the money and grantee does not re-present the claim to the United States) (citing *United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes.")). *But see Totten II*, 380 F.3d at 502 (Garland J., dissenting).

United States, does not constitute an FCA "claim."[83]

In sum, based on the undisputed record facts as they now appear, any request submitted to the CPA for payment from Seized or Vested Funds constituted a "claim" within the meaning of the FCA. Requests for payment from funds in the DFI, however, were requests for Iraqi funds and thus did not constitute an FCA "claim." In this case, it appears that the entire $16.8 million BIAP contract price was paid with Vested Funds and Seized Funds. And while the majority of the ICE contract price was paid with DFI money, approximately $12 million, the record reflects that $3 million of the contract price was paid with Seized Funds. Thus, defendants have failed, with respect to either contract, to demonstrate that no "claim" was submitted within the meaning of the FCA. And, accordingly, they are not entitled to summary judgment on this issue.

**B. Presentment**

Before FCA liability will attach to a "claim" for payment under § 3729(a)(1), the false or fraudulent "claim" must be "knowingly present[ed], or caus[ed] to be presented, to an officer or employee of the United Government or a member of the Armed Services of the United States." 31 U.S.C. § 3729(a)(1); *see also Totten II*, 380 F.3d at 491 (holding that presentment is a requirement of the FCA). This requirement ultimately presents no obstacle to FCA liability in this case because the undisputed facts in the record reflect that demands for payment from Seized and Vested Funds

---

[83] Even were FCA liability to extend to claims for money that had once been provided by the United States to a federal grantee, the amount in the DFI attributable to Vested Funds was such an "insubstantial percentage of its total" makeup — no more than 2-3% — that FCA liability likely would not attach to requests for payment from the DFI. *See United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 738 (D.C. Cir. 1998) (suggesting that FCA liability should not attach "where the grantee's federal funds are an insubstantial percentage of its total budget, where there is little likelihood that any of a defendant's money actually came from the federal grant, or where there is little continuing contact between the grantee and the government once the grant is made.").

under both the BIAP and ICE contracts were presented to a member of the Armed Services before payment.[84]

This conclusion does not depend on whether the CPA was an instrumentality of the United States – the answer is the same in either case.[85]  Of course, if the CPA was an instrumentality of the United States, the presentment requirement is obviously met.  In that case, presentment occurred when Custer Battles submitted allegedly false or fraudulent contract bids or invoices to the CPA's Contracting Officers who were also employees of the U.S. Armed Forces, and would have been acting in their capacity as representatives of a U.S. government entity.  Thus, a claim for payment presented to these officers was presented to "an officer or employee of the United States Government or a member of the Armed Forces of the United States."  31 U.S.C. § 3729(a)(1).

Yet, even assuming the CPA was not an instrumentality of the United States, the same conclusion holds.   In that event, defendants could not be held liable for presenting a claim for payment directly to an officer of the U.S. government because the CPA Contracting Officers, though

---

[84] Relators and the government argued in their briefs that "presentment" is not required for FCA liability to attach under § 3729(a)(1) because Congress, in amending the FCA to define a "claim" in § 3729(c) intended to expand the scope of the FCA to all grantees of federal funds, without regard to whether claims presented to those grantees are in turn presented back to the United States for payment.  For the reasons stated in Judge Roberts' well-reasoned majority opinion in *Totten II*, "no matter how 'claim' is defined, subsection (a)(1) requires the alleged false claimant to present it (or cause it to be presented) to a federal officer or employee."  380 F.3d at 493 (quoting *Totten I*, 286 F.3d at 554 (Randolph, J., concurring)).  While the legislative history does suggest an intent to remove the presentment requirement, if indeed Congress intended to remove the presentment requirement, but simply forgot to take it out, "the suggestion that Congress may have 'dropped a stitch,' is not enough to permit us to ignore the statutory text," which requires presentment.  *See Totten II*, 380 F.3d at 496.  *But see id.* at 502 (Garland, J., dissenting).  Significantly, the government conceded this point at oral argument.

[85] As discussed *infra* in Section II(D), because it is ultimately unnecessary to decide here whether the CPA is an instrumentality of the United States, the question is left unresolved.

also employees of the government, were not acting in their *capacity* as U.S. government officials.[86]

Nevertheless, the facts in the record reflect that defendants may still be held liable for "*caus[ing]*"

claims to be presented to a government official or employee.  *Id.*  As reflected in the facts section

above, the United States maintained dominion, control, and possession of the Seized and Vested

Funds until the Army was finally directed by CPA Contracting Officers to make payments directly to

the contractors, whether in the form of cash, electronic funds transfer, or a check drawn on the U.S.

Treasury.  Thus, when a contractor submitted a false or fraudulent invoice for payment to a CPA

Contracting Officer, like any subcontractor submitting a false invoice for payment to a contractor,

those contractors "*cause[d]*" the CPA Contracting Officer to present a request for payment, inflated

by the value of the false claim, to an officer of the United States Army.  31 U.S.C. § 3729(a)(1).

Thus, even if the CPA was not an instrumentality of the United States, the presentment requirement

is satisfied in the case of all requests or demands in connection with the BIAP and ICE contracts that

were then paid from Seized or Vested Funds.

## C. Denial of Summary Judgment for § 3729(a)(1) Claim

In sum, based on the undisputed facts currently in the record, it is clear that defendants have

_____

[86]  Relators and the government have argued that § 3729(a)(1), if it requires presentment, does not require presentment to the *United States*, but to an *officer* of the United States.  *See* 31 U.S.C. § 3729(a)(1).  And, their argument continues, because Patricia Logsdon and the other CPA Contracting Officers were also contracting officers for the United States Armed Forces – indeed, the United States issued their paychecks – then presentment of any false claim to these United States government employees was sufficient to satisfy the presentment requirement.  This is not so; it cannot be that the presentment requirement is satisfied as long as a false claim is presented to a person who happens to be an employee of the United States government, without respect to whether that person is acting in his or her capacity as a U.S. government employee.  To be sure, if a contractor submitted a false claim to a U.S. government employee for remodeling her kitchen, the presentment requirement would not be satisfied.  Thus, if the CPA was not a U.S. entity, then those U.S. employees detailed to the CPA were acting in their capacity as officers of the CPA, not as employees of the United States government.

failed to demonstrate that they are entitled to judgment as a matter of law on either the "claim" or

presentment issues.  Ultimately, from the facts in the record, it appears that defendants' liability will

be limited to money or property requested or demanded from Seized and Vested Funds, and will not

extend to money requested or paid out from the Development Fund for Iraq.  This conclusion is not

insignificant because the substantial majority of the money paid on the ICE contract was apparently

paid from the DFI.  Nonetheless, at this time summary judgment must be denied based on the facts

as they now stand in the record.  This does not foreclose the possibility that a different result might

obtain as more facts are adduced at trial.  All that is decided here is that on the current record,

defendants are not entitled to summary judgment as a matter of law.  But, unless new facts come to

light, the case will proceed primarily on a single issue: whether the claims for payment presented by

defendants to the CPA were "knowingly false or fraudulent."

## D. A Note on the Status of the CPA

Although it initially appeared otherwise, it now appears unnecessary to reach and decide *at

this time* whether the CPA is an instrumentality of the United States.  This is so because it appears

on this record that the Custer Battles contracts were paid with United States funds in reliance on

claims that defendants caused to be presented to officers of the United States Army.  Nonetheless,

the dispute as to the nature of the CPA may ultimately prove to be material and is thus worth a brief

note here.

Discerning the status of the CPA is not an easy task.  Relators and the government argue that

the CPA is not a U.S. agency or entity, but merely an "instrumentality of the United States."[87]  In

reaching this conclusion, the government observes that the CPA's creation was first announced by

---

[87]  The government was at great pains to emphasize that it takes this position for the
purposes of the FCA only, and not for any other purpose.

the Commander of the U.S. Central Command, was staffed, in large part, by employees of the

United States government, and was led by a CPA Administrator appointed by and subject to the

President.  Moreover, not only did the United States have substantial influence and control over the

CPA, but the CPA received a substantial part of its operating budget (approximately $1 billion) from

Congress.   In fact, Congress even purported to appropriate funds to the CPA "in its capacity as an

entity of the United States."  118 Stat. at 1225.  Thus, it is tempting to conclude that the CPA was

merely an alter-ego, a tool, or an instrumentality of the United States.

Yet, one should not too hastily conclude that because the United States was the CPA's

principal controller and contributor that it necessarily follows that the CPA is an instrumentality of

the United States.  For example, on this record, the CPA seems clearly different from the

Commodity Credit Corporation (CCC), which was held to be an instrumentality of the United States

in *Rainwater v. United States*, 356 U.S. 590, 592 (1958).  As noted in that decision, the CCC was

established "*by Congress*" as a "wholly owned government corporation" with all funds coming and

returning to the United States Treasury, and every officer and employee coming from the

Department of Agriculture.  356 U.S. at 591-92 ("[CCC] is simply an administrative device

established by Congress for the purpose of carrying out federal farm programs with public funds.").

In sharp contrast, there is no dispute that the CPA was not established by Congress.  Instead, as

described in a letter to the United Nations, the CPA was an entity created by the United States,

United Kingdom, and its Coalition partners "acting under existing command and control

arrangements through the Commander of Coalition Forces."  Moreover, the United Nations

recognized the CPA, not as an instrumentality of the United States, but as an entity through which

the Coalition nations acted "as occupying powers under unified command."  UNSCR 1483.  And

while the substantial majority of the CPA staff was comprised of United States employees, a

significant portion — 13% — hailed from other Coalition partners.  Thus, the CPA may also be described as an international body formed by the implicit, multilateral consent of its Coalition partners, which would not be subject to the specific laws of its members states, including the FCA. Given the fluid nature of the conflict in Iraq and the challenges of establishing a new government in a war zone, it is not surprising that the organization of the CPA appears at times to have been ad hoc and to have relied heavily on the resources of its largest contributing member.   Thus, it would seem that, like NATO or any other international organization created by the multilateral consent of multiple member nations, whether by treaty or otherwise, the CPA is not an instrumentality of each of its members states, distinctly subject to the laws of all of its members, but a wholly distinct entity that exercises power through a structure agreed to by its member states and that is subject to the laws of war and to its own laws and regulations.  In any event, at this point, it is unnecessary to reach and decide this issue.

IV.

A few issues remain to be addressed, but they are resolved, in large part by the conclusions reached under § 3729(a)(1) that the facts in the record satisfy the FCA "claim" and presentment requirements with respect to each contract.  All defendants have moved for summary judgment on relators' claims under §§ 3729(a)(2) and (a)(3) and defendant Custer Battles has moved to dismiss relator Baldwin's whistle-blower claim pursuant to § 3730(h).  For the reasons stated below, with one exception, defendants have failed to demonstrate that any of these claims should be dismissed.

## A.  31 U.S.C. § 3729(a)(2)

Section § 3729(a)(2) provides for FCA liability when a person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2).  Relators allege that defendants may be held

liable under § 3729(a)(2) for alleged fake leases and invoices, and forged signatures defendants "ma[de]" or "use[d]" to artificially inflate their claims paid or approved by the government.  *Id.*

In response, defendants argue that they cannot be held liable under this prong because relators have failed to satisfy either the "claim" requirement or the "implicit" presentment requirement in § 3729(a)(2).  Although the parties dispute whether presentment is required under § 3729(a)(2),[88] assuming *arguendo* that there is such a requirement, defendants' challenges to the "claim" and "presentment" requirements fail here for the same reasons they failed with respect to the § 3729(a)(1) claim.  Because defendants raise no other challenges under subsection (2), this claim survives the motion for summary judgment.

**B. 31 U.S.C. § 3729(a)(3)**

Section 3729(a)(3) imposes FCA liability on any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."  31 U.S.C. § 3729(a)(3). Defendants challenge relators' § 3729(a)(3) conspiracy claim on two grounds.  First, as with §§ 3729(a)(1) and (a)(2), defendants argue that summary judgment is appropriate because relators have failed to satisfy the FCA's requirement of a "claim."  For the same reasons already stated, this challenge fails.

---

[88] Defendants argue that the requirement that the false record must be used "to get a false or fraudulent claim paid or approved *by the Government*" requires that the claim be presented to the government.  31 U.S.C. § 3729(a)(2) (emphasis added).  In this regard, Judge Roberts' majority opinion in *Totten II* argues persuasively that by adding the phrase "by the Government" to § 3729(a)(2), Congress intended to refer back to the presentment requirement in § 3729(a)(1). *See Totten II*, 380 F.3d at 498.  Roberts points to the "parallel structure of (a)(1) and (a)(2)" to support the conclusion that (a)(2) is "designed to prevent those who make false records or statements to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval."  *Totten II*, 380 F.3d at 501 (emphasis original).  *But see id.* at 502 (Garland, J., dissenting).  Nonetheless, it is unnecessary to decide this issue here because the presentment requirement is ultimately satisfied.

Defendants' second argument – that the intra-corporate immunity doctrine bars this claim–

has more force; indeed, it warrants dismissal of this claim.  Under the intra-corporate immunity

doctrine, which has been applied in the FCA context, "a corporation cannot conspire with its own

officers while the officers are acting in their official capacity."[89]  Every defendant named in the

complaint in addition to Custer Battles itself is an employee of Custer Battles, a related entity or

subsidiary described in the complaint as a related "shell company," or an employee of one of those

related entities.[90]  Thus a conspiracy among the defendants is a "legal impossibility."  *Marmott*, 807

F.2d at 1184.[91]  Accordingly, because the relators cannot establish a valid conspiracy, their FCA

_____

[89]  *United States v. Warning*, 1994 U.S. Dist. LEXIS 10402, at *12 (E.D. Pa. 1994) (applying intra-corporate immunity doctrine in FCA context); *United States v. EER Sys. Corp.*, 950 F. Supp. 130, 133 (D. Md. 1996) (same); *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (holding that parent corporation and wholly-owned subsidiary are legally incapable of conspiring with each other); *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986) ("[A] conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility.").

[90]  Related entities that share common ownership or control are incapable of conspiracy. *See Zachair, Ltd. v. Driggs*, 141 F.3d 1162, 1998 U.S. App. LEXIS 8351 (4th Cir. 1998) (unpublished disposition) (applying *Copperweld* to related and controlled, but not wholly-owned entities even where complaint "fail[ed] to articulate the precise business relationship among the various corporate defendants"); *Advanced Health-Care Srvs, Inc. v. Radford Community Hosp.*, 910 F.2d 139, 146-47 (4th Cir. 1990) (two wholly-owned subsidiaries of same parent corporation are incapable of conspiring); *United States ex rel. Reagan v. E. Tex. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 856 (S.D. Tex. 2003) (wholly-owned subsidiaries incapable of conspiring with parent in FCA case); *United States ex rel. Krohn v. Sun W. Servs., Inc.*, 2000 U.S. Dist. LEXIS 17193, at *14-15 (D.N.M. 2000) (same).

[91]  Neither exception to the intra-corporate immunity doctrine applies here.  *See Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985) (noting exceptions to doctrine for independent personal stake and actions taken outside scope of employment).  The narrow personal stake exception applies only where the complaint alleges that defendant had a personal interest in the actions alleged wholly independent of the defendant's relationship with the alleged co-conspirator corporate defendant.  *See Douty v. Irwin Mortg. Corp.*, 70 F. Supp. 2d 626, 632-33 (E.D. Va. 1999) (noting limited nature of the personal stake exception). Nowhere does the complaint allege a personal interest wholly independent of these defendants' employment relationship with Custer Battles or its related entities, nor does the complaint allege that these

conspiracy claim under § 3729(a)(3) must be dismissed.

**C. 31 U.S.C. § 3730(h)**

Finally, defendant Custer Battles has moved to dismiss relator Baldwin's whistle-blower claim under § 3730(h), which "prevents the harassment, retaliation, or threatening of employees who assist in or bring qui tam actions." *Zahodnick v. IBM Corp.*, 135 F.3d 911, 914 (4th Cir. 1997).[92] Relators claim that Baldwin was terminated in response to his investigation of Custer Battles' FCA violations and his attempt to report defendants' alleged fraud to the CPA.  Defendants argue that the claim fails because a claim under § 3730(h) only protects conduct that "reasonably could lead, to a *viable* FCA action." *United States ex rel. Eberhardt v. Integrated Design & Constr. Inc.*, 167 F.3d 861, 866 (4th Cir. 1999) (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996)) (emphasis added).  Yet, for the reasons stated above, relators have identified a viable FCA action, and thus relator Baldwin's whistle-blower claim survives.[93]

---

defendants were acting outside the scope of their employment. Thus, neither exception to the doctrine applies.

[92]  31 U.S.C. § 3730(h) provides in pertinent part as follows:

Any person who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in ... his or her employment ... because of lawful acts done by the employee ... in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

[93]  Defendants also moved to dismiss the complaint under Rule 9(b), Fed. R. Civ. P., for failure to plead fraud with sufficient particularity.  While it is true that the complaint fails to satisfy Rule 9(b)'s requirements with respect to the WGI and BPI contracts, *see supra* note 47, the allegations of fraud with respect to the BIAP and ICE contracts satisfy Rule 9(b)'s requirements and thus dismissal of the claims regarding these contracts on Rule 9(b) grounds is unwarranted.  *See Harrison*, 176 F.3d at 784 ("A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.").

An appropriate Order will issue.


_____
/s/
Alexandria, VA                               T. S. Ellis, III
July 8, 2005                                  United States District Judge

---

Relators also filed two additional motions related to defendants' summary judgment motions.  Neither motion has merit.  And, in any event, given that summary judgment must be denied, the motions are moot.  First, relators filed a motion to deny summary judgment under Rule 56(f), Fed. R. Civ. P., alleging they needed additional discovery in support of their opposition.  Yet, ample time was provided to conduct any "*limited* discovery necessary to resolution of the pending motions." *See United States ex rel. DRC, Inc. v. Custer Battles, LLC*, Case No. 1:04cv199 (E.D. Va. Dec. 17, 2004) (Order) (emphasis added).  As demonstrated by the volumes of paper submitted by the parties in support of these motions and the thorough presentation of the facts, relators have failed to demonstrate a "legitimate need[] for further discovery" with respect to the narrow issues presented at this stage. *Nguyen v. CNA* Corp*., 44 F.3d 234, 242 (4th Cir. 1995).  Now that summary judgment will be denied, the parties will be permitted to conduct an additional period of discovery on all issues.

Second, relators filed a motion to strike the evidence offered in support of defendants' motions for summary judgment.  Relators objected to the admissibility of countless documents and instances of testimony in the record on the basis of relevance, competence, and hearsay.  The substantial majority of relators' evidentiary objections are meritless, and any challenges not lacking merit are now mooted because defendants' motions for summary judgment must be denied.