IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.  ) | |
| DRC, INC., et al.,                  ) | |
|                                     ) | |
|     Plaintiffs, ) | |
|                                     ) | |
|     v.          ) | Case No. 1:04cv199 |
|                                     ) | |
| CUSTER BATTLES, LLC, et al.,        ) | |
|                                     ) | |
|     Defendants. ) | |

**MEMORANDUM OPINION**

At issue prior to trial in this *qui tam* action is whether to grant Relators' request for a jury instruction allowing adverse inferences to be drawn as a result of defendant Joseph Morris' assertions of his Fifth Amendment privilege. Specifically, Relators seek to have the jury instructed that it may draw adverse inferences from defendant Morris' assertion of his Fifth Amendment privilege in refusing to answer specific deposition questions.[1] For the reasons that follow, Relators' request must be granted in part and denied in part.

I.

Relators[2] have brought this *qui tam* action under the False Claims Act (FCA), 21 U.S.C. § 3729 *et seq.*, naming as defendants Custer Battles, LLC (Custer Battles), and its related corporate entities Secure Global Distribution (SGD), Mideast Leasing, Inc (MEL), and Custer Battles Levant (CBL), as well as individual defendants Scott Custer, Mike Battles, and Joe Morris. Custer and Battles are the principals of Custer Battles. Morris served as Custer Battles' Chief Operating

---

[1] Relators' motion in this regard was originally filed in connection with the parties' summary judgment motions. When those motions were resolved without reaching this motion, Relators requested an instruction permitting the jury to draw adverse inferences from Morris' assertion of his privilege.

[2] Relators include DRC, Inc., Robert Isakson, and William "Pete" Baldwin.

Officer in Iraq during the relevant time period. The suit alleges that defendants defrauded the United States government out of millions of dollars in Iraq during 2003 and 2004: (1) by fraudulently inducing the Coalition Provisional Authority (CPA) to award Custer Battles a contract for the provision of security forces and related life support for the Baghdad International Airport (BIAP) in return for a firm fixed-price of $16.8 million; and (2) by submitting false invoices to the CPA during its performance of a contract for the provision of support services for the Iraqi Currency Exchange (ICE) project.

The facts pertinent to the resolution of Relators' request to draw adverse inferences from Morris' deposition may be succinctly stated.[3] Defendant Joseph Morris is a former employee and officer of defendant Custer Battles LLC (Custer Battles). As Chief Operating Officer for Custer Battles in Iraq starting in the summer of 2003, Morris was centrally involved in Relators' claims with respect to the ICE contract. The Relators' primary allegation is that claims submitted to the CPA for payment pursuant to the ICE contract were fraudulently inflated through the use of related shell companies. Specifically, Relators allege that the defendants hatched a scheme whereby Custer Battles would submit invoices indicating that it had paid certain related parties for materials and/or services required by the terms of the ICE contract, when, in fact, it had not done so. Relators further

---

[3] For a more complete statement of facts *see United States ex rel DRC Inc. v. Custer Battles, LLC*, 376 F.Supp.2d 617 (E.D.Va. 2005), which addressed the jurisdictional question whether Custer Battles' claims were actionable under the FCA, and concluded that FCA jurisdiction in this context turned on the source of the money used to pay the allegedly fraudulent claims. Allegedly false claims paid from funds belonging to the United States and thereby resulting in an economic loss to the United States are actionable under the FCA, whereas claims paid from funds that belonged to the Iraqi people, even if the United States acted as a custodian of the funds, are not actionable under the FCA. *Id.* at 641. Because the BIAP contract was paid entirely from funds belonging to the United States, the fraudulent inducement claim is actionable under the FCA in its entirety. *Id.* at 647. By contrast, all but the first $3 million of the moneys paid pursuant to the ICE contract were paid from the Development Fund for Iraq, which consists of funds belonging to the Iraqi people. Accordingly, only those fraudulent claims made to support the initial $3 million advance are actionable under the FCA. *Id.*

allege that, in order to provide evidence of the costs reflected in the Custer Battles invoices, defendants created subsidiary invoices – purportedly from various of Custer Battles' related companies – which represented significantly inflated costs for the materials or services, and submitted these invoices to the CPA.  Relators allege that, in fact, Custer Battles did not pay its related companies any money pursuant to these invoices.  Morris, as the Custer Battles employee in Iraq with primary authority over the performance of the ICE contract, is alleged to have personally created several of these fraudulent invoices.  For this reason, Morris' motion for summary judgment was denied with respect to his involvement in the alleged ICE contract scheme.[4]

Given Morris' status as a party defendant and his central role in the administration of the ICE contract, Relators understandably sought to depose him to ascertain facts relating to the alleged fraudulent scheme.  This discovery effort failed, as Morris asserted his Fifth Amendment privilege against self-incrimination throughout the depositions and indeed throughout this litigation.  He has refused to testify about any matters conceivably bearing on his activity in Iraq or his knowledge of any fraud.  Frustrated by Morris' refusal to testify, Relators seek an instruction permitting the jury to draw adverse inferences against Morris, as well as the other named defendants, based on Morris' refusal to answer.  Initially, Relators listed no fewer than seventeen separate inferences they claimed were warranted based on Morris' refusals to answer any questions during discovery.  When directed to do so, Relators, apparently acting alone,[5] limited the request to adverse inferences for Morris' refusal to answer the following six questions:

---

[4] *See* Order granting in part and denying in part Morris' motion for summary judgment, *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, Case No. 1:04cv199 (January 23, 2006). Because Morris was not involved in submitting the BIAP proposal to the CPA, Morris' motion for summary judgment in relation to Relators' claims of fraudulent inducement was granted.  *Id.*

[5] The parties were directed to meet and confer to reduce the number of adverse inferences to "two to three," but it does not appear that the parties ever did so.

1. Did you or someone acting at your direction create and backdate leases with Custer Battles' related entities, and forge signatures on those leases, in order to receive payment under the ICE contract?

2. Did you do so at the direction of Scott Custer and Michael Battles?

3. Did Custer Battles, you, Scott Custer and Michael Battles intentionally submit or caused [sic] to be submitted false or fraudulent ICE contract invoices for payment or approval?

4. Did Custer Battles, you, Scott Custer and Michael Battles cause to be submitted the following invoices under the ICE contract? (listing exhibits).

5. Did Custer Battles ever actually pay to the entities identified in the Custer Battles invoices submitted under the ICE contract the amounts stated in those invoices, or did the entities ever actually pay to any third parties the amounts shown in the entities' invoices to Custer Battles?

6. Did Custer Battles, you, Scott Custer and Michael Battles create or cause to be created, and then backdate and forge , SGD, MEL, Laru and CBL invoices that falsely depict costs billed by the Custer Battles related entities to Custer Battles, in order to receive payment under the ICE contract?

Thus, Relators seek to have the members of the jury instructed that they may, but are not required to, draw the inference that had Morris answered these questions, the answers would have been adverse to the defendants.

## II.

In considering Relators' request, it is first necessary to address whether an adverse inference is an appropriate and constitutionally permissible remedy for a civil defendant's assertion of his privilege against self-incrimination. Morris' invocation of his Fifth Amendment privilege, like the assertion of any privilege, stands in stark opposition to the otherwise liberal discovery rules, and "undermine[s] to some degree the trial system's capacity to ascertain the truth." Robert Heidt, *The Conjurer's Circle – The Fifth Amendment Privilege in Civil Cases*, 91 Yale L.J. 1062, 1082 (1982).

And, while there is no doubt that a witness is entitled to assert the privilege in a civil case,[6] it is also clear that an adverse inference based on a refusal to answer in a civil case is an appropriate remedy as it provides some relief for the civil litigant whose case is unfairly prejudiced by a witness' assertion of the Fifth Amendment privilege without placing the witness in the " 'cruel trilemma' of choosing among incrimination, perjury, or contempt."  Robert Heidt, *The Conjurer's Circle – The Fifth Amendment Privilege in Civil Cases*, 91 Yale L.J. 1062, 1086 (1982).  For this reason, while an assertion of the privilege cannot be used to the detriment of a criminal defendant, a district court may constitutionally permit a jury to draw an adverse inference from the refusal to testify on Fifth Amendment grounds by either a witness or party in a civil suit.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *Eplus Technology, Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) ("In a civil proceeding, a fact finder is entitled to draw adverse inferences from a defendant's invocation of the privilege against self-incrimination.").  Thus, the Constitution does not bar Relators' requested relief.

While an instruction permitting adverse inferences to be drawn from a civil defendant's assertion of his Fifth Amendment privilege is constitutionally permissible, it is not always appropriate.  A two step inquiry must be undertaken to determine whether such an instruction is appropriate in a particular case.  First, it is necessary to determine whether there was a valid basis for the witness' invocation of the privilege.[7]  This is necessary to ensure that courts, parties, and

---

[6] *See McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924) (The privilege "applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it.").

[7] The Fifth Amendment privilege against self-incrimination is triggered if a statement is (i) testimonial, (ii) incriminating, and (iii) compelled.  *See, e.g., Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 189 (2004) (Fifth Amendment does not protect a suspect's refusal to

juries are not deprived of relevant evidence and to prevent the mischief and unfairness that might flow from an invalid invocation of the privilege. Illegitimate assertions of the privilege serve no constitutional purpose, and may, as here, merely tar Morris' co-defendants with the taint that stems from the assertion of the privilege. To avoid this unfairness, Relators must demonstrate that Morris' privilege was validly asserted. When the privilege is invoked during discovery, this validity issue is typically resolved via a motion to compel.[8] Although this did not occur here, the parties do not seriously dispute that Morris had a valid basis for asserting the privilege.

A valid assertion of the privilege requires only the existence of a plausible possibility that the person might be prosecuted in this country.[9] Thus, the privilege may not be validly asserted when the feared prosecution is barred by the statute of limitations, double jeopardy, immunity or limited to a foreign jurisdiction. *See Sharp*, 920 F.2d at 1171; s*ee generally United States v. Balsys*, 524 U.S. 666 (1998) (holding that concern with foreign prosecution was beyond scope of Fifth Amendment privilege against self-incrimination). But if there is any plausible possibility of a prosecution, invocation of the privilege is valid. In the instant case, the record clearly reflects a valid basis for Morris' assertion of his Fifth Amendment privilege. Notwithstanding that all of Morris' alleged fraudulent conduct occurred in Iraq, there is a plausible possibility that Morris might

---

provide name). The focus here is on whether Morris' answers to the deposition questions might be incriminating.

[8] *See, e.g., Belmonte v. Lawson*, 750 F.Supp. 735 (E.D.Va. 1990) (denying a motion to compel testimony withheld on the basis of the Fifth Amendment privilege against self-incrimination).

[9] *United States v. Sharp*, 920 F.2d 1167, 1170 (4th Cir. 1990) (the 5th Amendment privilege against self-incrimination may be applied in a civil trial "not only to evidence which may directly support a criminal conviction, but to 'information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution.'").

be prosecuted in the United States for conspiring to commit fraud given that one or more putative co-conspirators may have committed overt acts in the United States in furtherance of the conspiracy.[10] Thus, it appears that Morris had a valid basis for asserting his Fifth Amendment privilege when asked in deposition about his role in the alleged fraudulent scheme relating to the ICE contract.

That the privilege was validly invoked does not end the analysis. The second step in the analysis requires an assessment whether the requested inferences, which are a form of evidence, comply with the Federal Rules of Evidence. *See* Fed.R.Evid. 101, 1101. Thus, any adverse inferences must be relevant, reliable, and not unfairly prejudicial, confusing, or cumulative. *See* Fed.R.Evid. 402, 602, 403. There is no doubt that the subject of the inferences is relevant; each has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Fed.R.Evid. 401, 402. The requested adverse inferences are plainly relevant evidence. Viewed in insolation, Morris' assertions of privilege contain no relevant facts, but viewed as answers to the questions put forth by Relators' counsel during the deposition, Morris' "[s]ilence is often evidence of the most persuasive character." *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153-54 (1923). This is so because the law presumes that a man falsely accused will object to allegations of criminal conduct. Indeed, the six selected questions Morris refused to answer in his deposition concern his

---

[10] *See* 18 U.S.C. § 371 ("If two or more persons conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."). *See also United States v. Bowman*, 260 U.S. 94, 98-99 (1922) (permitting extraterritorial application of a federal criminal fraud statute); *United States v. Inco Bank & Trust Corp.*, 845 F.2d 919, 920 (11th Cir. 1988) (defendant accused of participating in a criminal conspiracy under 18 U.S.C. § 371 may be prosecuted even if all acts performed in furtherance of the conspiracy were outside the United States).

involvement in the alleged fraudulent behavior, and an inference adverse to defendants drawn from his silence is relevant to proving the alleged fraud occurred. Thus, the requested adverse inferences satisfy the requirements of Rules 401 and 402.

Of course, the fact that a given inference may be relevant evidence does not mean that it is reliable evidence. Because a witness may only testify as to matters for which they possess "personal knowledge," any adverse inference drawn from Morris' testimonial silence requires finding that Morris had personal knowledge of the subject about which he refuses to testify. Fed.R.Evid. 602. This finding of personal knowledge must itself rely on the other evidence to be presented at trial; a conclusion as to the reliability of an inference cannot derive by bootstrapping from Morris' seemingly blanket invocation of the privilege against self-incrimination.[11] *See Doe v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) ("[T]he key to the *Baxter* holding is that such adverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer."). This requirement seeks to avoid allowing adverse inferences from the refusal to give testimony in situations where the testimony, if given, would presumably be speculative in nature. Thus, for example, attempts to draw adverse inferences from Morris' invocation of his privilege against self-incrimination in response to questions about Custer's or Battle's state of mind are inadmissible without independent evidence that Morris knew their state of mind. This is not a problem here, as none of the six deposition questions inquire into matters as to which there is any doubt about Morris' personal knowledge. To the contrary, the record in the instant case contains ample evidence

---

[11] Fed.R.Evid. 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, *but need not*, consist of the witness's own testimony." (emphasis added). Because a witness may not have personal knowledge of testimony which may nonetheless incriminate him, this inquiry requires a greater showing of reliability than the antecedent inquiry of whether the invocation of the fifth amendment privilege was appropriate in the first place.

of Morris' involvement in the billing for the ICE contract, which in turn ensures that the proposed adverse inferences, should the jury choose to draw them, are not unreliable.

Finally, even if relevant and reliable, any inference drawn from Morris' assertion of his privilege against self-incrimination "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. As already demonstrated, the probative value of most of the requested inferences is unassailable, but the Custer Battles defendants[12] contend that it is unfairly prejudicial to allow an inference to be drawn against their interests when they have no ability to control their former employee, who they contend was fired for theft and for engaging in an inappropriate relationship with a subordinate. In effect, the Custer Battles defendants argue that Morris is willing to suffer any inferences adverse to him as long as these inferences also taint his former employers.[13] In other words, the Custer Battles defendants argue that Morris' true reason for asserting the privilege is not fear of prosecution, but the desire to harm the Custer Battles defendants.

This argument cannot serve as the basis for exclusion under Rule 403. As long as Morris has a valid basis for asserting the privilege, his right to do so is absolute and it matters not what his real motive might be. Nor can the Custer Battles defendants claim that the prejudice that may result from allowing the inferences is "unfair prejudice." Had Morris elected to testify at trial that he engaged in fraud in connection with the ICE contract at the request of Custer and Battles (to take the most extreme hypothetical), such testimony would not be excluded as unduly prejudicial, despite the

---

[12] The Custer Battles defendants include all named defendants with the exception of Morris himself.

[13] In this regard, the defendants, specifically Custer and Battles, may attempt to rebut any inference against them through their own testimony.

fact that Morris was no longer under the control of Custer Battles. There is no logical reason why an inference drawn from Morris' refusal to testify about these issues should not likewise be admissible. *See City of New York v. Brink's, Inc.*, 539 F.Supp. 1139, 1142 (S.D.N.Y. 1982) *affirmed*, 717 F.2d 700, 707-10 (2d Cir. 1983). As the Second Circuit pointed out in *Brinks*, such evidence is not prejudicial in the sense of being inflammatory, but, rather, "is prejudicial in the sense of giving support to a party's position, i.e., it is 'damning.'" *Brinks*, 717 F.2d at 710 (citing *United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972)).

Even so, the permissibility of some adverse inferences against the Custer Battles defendants, does not mean that Relators are entitled to adverse inferences from the dozens of questions asked of Morris in the deposition. In addition to being cumulative, there is a danger that at some point the jury will become deaf to the substance of the questions asked and unanswered, and as a result, the specific inferences that are appropriately drawn will blur into a single inference that the defendants have committed all the acts alleged by the Relators. To avoid this result, it is necessary to reduce the number of requested inferences to those few that relate to the heart of the alleged fraud, and which have the most reliable basis. Those questions include the following:

1. Do you have any information suggesting that Custer Battles ever paid its related entities the amounts represented in the invoices submitted to the CPA, or that any of these related entities ever paid any other third party?

2. To the best of your knowledge, did Custer Battles ever inform the CPA that SGD, MEL, CBL and Laru were related entities?

3. Did you or someone acting at your direction create and backdate leases with Custer Battles related entities, and forge the signatures in order to receive payment from the CPA?

Each of these questions, and the inferences the jury will be permitted to draw from Morris' assumed invocation of the Fifth Amendment in response to these questions, relate to the very heart of the alleged fraud committed in relation to the ICE contract.  Each of these adverse inferences has a basis in otherwise admissible evidence, and the three inferences will not be unduly prejudicial, cumulative or confusing.  For these reasons, the Relators' request will be granted in part and denied in part, and the jurors will be instructed that they are permitted, but not required, to draw an adverse inference from Morris' invocation of the Fifth Amendment privilege against self-incrimination in response to the questions listed above.

An appropriate Order will issue.


Alexandria, VA
February 13, 2006

_____/s/_____
T. S. Ellis, III
United States District Judge