**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel.** | ) |
| **DRC, INC., et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **Case No. 1:04cv199** |
| | ) |
| **CUSTER BATTLES, LLC, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

---

**MEMORANDUM OPINION**

In this False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq.*, case, relators allege that

defendants[1] defrauded the United States by submitting false invoices and records to justify a $3

million advance payment that defendant, Custer Battles, received pursuant to a contract with the

Coalition Provisional Authority (CPA) for work performed in Iraq in 2003 and 2004.[2]  Following a

jury trial, the jury returned a verdict in favor of relators and defendants now seek judgment as a

matter of law on various grounds, pursuant to Rule 50, Fed.R.Civ.P.  Defendants' Rule 50 motions

have now been briefed and argued and are now ripe for disposition.  For the reasons that follow, the

motions must be granted on the ground that relators did not prove that the claims were presented to

---

[1] The defendants include: Custer Battles LLC's principals, Scott Custer and Michael
Battles; Custer Battles LLC (Custer Battles), a security and logistics support firm; Custer
Battles's related subsidiaries, Secure Global Distribution (SGD), Mideast Leasing, Inc. (MEL),
and Custer Battles Levant (CBL); and Custer Battles' former employee, Joseph Morris.
Defendants Custer, Battles, Custer Battles, SGD, MEL, and CBL were represented jointly
throughout this case and are referred to herein as the "Custer Battles defendants."  Defendant
Morris retained independent counsel.

[2] Relators' amended complaint also alleges that Custer Battles fraudulently solicited a
contract to perform security services for Baghdad International Airport (BIAP).  On January 30,
2006, these BIAP claims were severed from the ICE contract claims pursuant to the discretionary
authority of Rule 42(b), Fed.R.Civ.P.  *DRC, Inc. v. Custer Battles LLC*, Case No. 1:-4cv199
(January 30, 2006) (Order severing ICE and BIAP trials).  The BIAP trial has not yet been
scheduled.

the United States.

# I.

The contract at issue between the CPA and Custer Battles required Custer Battles to provide support services to the CPA while the CPA launched the Iraqi Currency Exchange (ICE) project. The ICE project was the CPA's effort to exchange new Iraqi dinars for the old Saddam Hussein-era dinars in circulation. Relators—a former Custer Battles subcontractor, DRC, Inc. (DRC); DRC's principal, Robert Isakson; and Custer Battles's former employee, William Baldwin—allege that Custer Battles and the other defendants used Custer Battles's shell subsidiaries—SGD, MEL, and CBL—to submit fraudulent invoices to the CPA.

At trial, three counts were presented. Count One alleged that the defendants had knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, a false or fraudulent claim to support the $3 million advance, in violation of 31 U.S.C. § 3729(a)(1). Count Two alleged that the defendants knowingly made, used, or caused to be made or used, false records or statements, and presented the false records or statements to the United States Government, in order to get paid or approved a false claim in support of the $3 million advance, in violation of 31 U.S.C. § 3729(a)(2). Count Three alleged that Custer Battles retaliated against relator Baldwin for blowing the whistle on Custer Battles's fraudulent behavior, in violation of 31 U.S.C. § 3730(h).

Over the course of a twelve day trial, the relators presented the testimony of twenty witnesses,[3] and successfully moved for the admission of over 200 exhibits. Relators' theory of the

---

[3] The witnesses at trial included: (1) Darwin Kibby, the CPA's contracting officer with responsibility for the ICE contract between August and mid-September 2003; (2) retired General Hugh Tant, the CPA official with primary authority over the ICE project; (3) Patricia Logsdon, the CPA's contracting officer with responsibility for the ICE contract between mid-September 2003 and December 2003; (4) Gregory T. Pusch, an attorney for Custer Battles during the

case was that, in the summer of 2003, defendants Custer, Battles, Morris, and others, conceived of a plan to defraud the CPA whereby defendants would submit to the CPA invoices that falsely inflated Custer Battles's direct costs for work performed pursuant to a time and materials contract.  In a time and materials contract the contractor, here Custer Battles, is (i) reimbursed for his direct costs, *i.e.*, labor and materials, and (ii) paid a fixed percentage of those direct costs, which is meant to cover the contractor's general and administrative expenses and provide a reasonable profit.

Although the parties disputed the nature of the ICE contract, the evidence tended to prove, and the jury ultimately found, that the ICE contract was a time and materials contract that was meant to reimburse Custer Battles for its direct costs and paid it an additional 25% of its direct costs; thus, in total Custer Battles was entitled to received 125% of its direct costs.  Ex. 13.  According to relators, defendants hatched a scheme to create the appearance of higher direct costs by presenting falsely inflated invoices to the CPA from fictional subcontractors—Custer Battles's subsidiaries SGD, MEL, and CBL—purportedly providing services under the ICE contract.  To prove this scheme, relators presented evidence that Custer Battles's used these false invoices to (i) get reimbursed for costs it never actually incurred, and thereby (ii) increase the base from which Custer

---

relevant time period; (5) Monty Jensen, an employee of Custer Battles in Iraq during the relevant time period; (6) Jeffrey Ottenbreit, an employee of BearingPoint, Inc., which was assisting the CPA in the ICE project during the relevant time period; (7) defendant Joseph Morris, Custer Battles's Chief Operating Officer during the relevant time period; (8) relator William Baldwin; (9) Andrew Dunphy, a special agent with the Defense Criminal Investigative Service (DCIS); (10) Stevens R. Miller, an expert in computer forensics; (11) James Powell, Custer Battles's Chief Financial Officer from September 2003 to June 2005; (12) Lori Pierce, the CPA's contracting officer with responsibility for the ICE contract between December 2003 and the end of the contract's performance; (13) Ngoctam Burch, an employee of Custer Battles from May 2002 to September 2003; (14) defendant Michael Battles; (15) defendant Scott Custer; (16) Jeffrey Thorpe, a special agent with the DCIS; (17) Marc Stanislawczyk, a government contracts lawyer who provided legal advice to Custer Battles in 2003; (18) relator Robert J. Isakson; (19) Daniel W. Ray, an expert in forensic accounting; and (20) Peter Miskovich, the Custer Battles employee responsible for closing out the ICE contract in February 2004.

Battles's 25% profit payment was calculated.

The centerpiece of the relators' case in chief was the testimony of relator Baldwin, Custer Battles's Iraq Country Manager throughout the relevant time period.  Baldwin testified about his growing concerns over Custer Battles's billing practices on the ICE project.  Specifically, Baldwin was concerned that the invoices, which were chiefly handled by defendant Morris, and approved by defendant Custer, were grossly overstated.  Additionally, relators presented damaging documentary evidence that tended to support their allegations of fraud by Custer Battles, including several invoices prepared by Custer Battles and presented to the CPA that contained suspiciously rounded figures.  *See, e.g.,* Ex. 76, 77, 102.  Even more damaging to Custer Battles, was a spreadsheet, left behind, allegedly by defendant Battles, at a meeting with CPA officials, which detailed both the "actual costs" of work done by Custer Battles and the much greater "invoiced" costs Custer Battles presented to the CPA.  The disparity between "actual costs" and "invoiced costs" represented a profit to Custer Battles far in excess of the 25% figure called for by the contract.  Ex. 96A.  In addition to the testimony and documentary evidence they adduced, relators also benefitted from defendant Morris's refusal to answer certain questions put to him by relators' counsel.  Specifically, the jury was instructed that it was permitted to draw an adverse inference from defendant Morris's refusal to answer, namely the inference that had Morris answered the questions, the answers would have been favorable to defendants.  *DRC, Inc. v. Custer Battles, LLC,* 415 F.Supp. 2d 628, 636 (E.D.Va. 2006) (permitting an adverse inference to be drawn from Morris's refusal to answer a narrow set of questions).  Thus, taken altogether, relators presented a significant amount of evidence tending to prove that Custer Battles did indeed submit false and fraudulently inflated invoices to the CPA for work performed under the ICE contract.

At the conclusion of relators' case in chief, both the Custer Battles defendants and defendant

Morris moved for judgment as a matter of law, pursuant to Rule 50(a), Fed.R.Civ.P., arguing that relators had failed to present sufficient evidence to allow a jury to find liability under the statute. Following oral argument on the motions, the parties were directed to submit supplemental memoranda on the motions.  A ruling on defendants' Rule 50 motions was deferred,[4] and the case was then submitted to the jury.  After several days of deliberation, the jury returned a verdict in favor of relators on all three counts.  Specifically, in response to special interrogatories, the jury stated that defendants had knowingly presented both false claims and false records to justify the $3 million advance Custer Battles received on the ICE contract.  As a result, the jury found the defendants jointly and severally liable for $3 million in damages to the United States.[5]  Furthermore, the jury found that defendant Custer Battles had retaliated against relator Baldwin for his protected activity and awarded Baldwin $165,000 in total damages.  Judgment has not yet entered on this verdict.

Following the verdict, the parties were ordered to appear for a hearing to resolve the pending Rule 50, Fed.R.Civ.P. motions, and for entry of judgment on the verdict, if appropriate.  *DRC, Inc. v. Custer Battles LLC*, Case No. 1:04cv199 (March 20, 2006).  After this order, but before the hearing, the relators filed a motion seeking judgment on the jury's verdict *and* entry of judgment as

---

[4] *See* March 2, 2006 Tr. at 144 (Docket #411) (deeming the Rule 50 motions made and reserving argument); Rule 50(b), Fed.R.Civ.P. ("If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.").

[5] Based on a prior ruling, the jury was instructed that $3 million was the maximum amount of damages they could award.  This award must be trebled by statute.  31 U.S.C. § 3729(a).  Additionally, defendants are liable for a penalty of between $5,000 and $10,000 for each false claim and false record presented.  *Id*. (authorizing "a civil penalty of not less than $5,000 and not more than $10,000").

a matter of law, pursuant to Rule 50(b), Fed.R.Civ.P.[6]   Further oral argument on the parties' Rule 50 motions was heard and the matter was taken under advisement.  *DRC, Inc. v. Custer Battles*, Case No. 1:04cv199 (April 7, 2006).

In their motion for judgment as a matter of law, defendants challenge whether relators adduced evidence (1) that any false claims (actionable pursuant to 31 U.S.C. § 3729(a)(1)) or false records (actionable pursuant to 31 U.S.C. § 3729(a)(2)) were knowingly *presented, or caused to be presented*, to employees or officers of the United States acting in their official capacity; (2) that the records submitted in support of the $3 million advance were materially false; (3) that the U.S. government or the CPA suffered any damage as a result of any false claim; (4) that any of the individual defendants — Scott Custer, Michael Battles or Joseph Morris — knew or should have known about any false document submitted in support of the $3 million advance; (5) that relator Baldwin was constructively discharged or demoted in retaliation for his protected activity; and (6) that the relators are "original sources" under 31 U.S.C. § 3730(e)(4).  These issues are addressed in turn.

## II.

The standard for granting a Rule 50, Fed.R.Civ.P. motion is well established.  If the evidence, viewed in the light most favorable to the non-moving party, is of such "quality and weight that reasonable and fair minded" jurors could reasonably rely upon that evidence to return a verdict in favor of the non-movant, the motion must be denied.  *Martin v. Cavalier Hotel Corp.,* 48 F.3d

---

[6] The defendants, correctly noted that Rule 50(b) motions are only proper after the entry of judgment and that relators' motion was contrary to the Court's explicit directions, promptly moved to strike the motion.  *See* Rule 50(b), Fed.R.Civ.P. ("The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial under Rule 59.").  Despite these flaws in the relators' motion, the defendants' motion to strike was denied, and the defendants were directed to submit a response to the relators' Rule 50(b) motion for judgment as a matter of law.

1343, 1350 (4th Cir. 1995).  In this respect, the Fourth Circuit has made clear that "[a] mere scintilla of evidence is insufficient to sustain the verdict, and the inferences a jury draws . . . must be reasonably probable."  *Lust v. Clark Equip. Co.*, 792 F.2d 436, 437 (4th Cir. 1986); *see also Charleston Area Med. Ctr., Inc. v. Blue Cross & Blue Shield Mut. of Ohio, Inc.*, 6 F.3d 243, 248 (4th Cir. 1993) ("We may not weigh the evidence, pass on the credibility of the witnesses, or substitute our judgment of the facts for that of the jury").  Thus, in addressing the defendants motions for judgment as a matter of law, "[t]he question to be resolved . . . is whether there is evidence on which a jury can properly base a verdict."  *Lust*, 792 F.2d at 437.

### A.

As explained above, the trial proceeded on three counts.  The first count alleged violations of 31 U.S.C. § 3729(a)(1), which provides, in pertinent part, that

> any person who knowingly presents, or causes to be presented, to an officer or employee of the United States government . . . a false or fraudulent claim for payment of approval . . . is liable to the United States Government for a civil penalty . . . .

Thus, to prevail under § 3729(a)(1), relators must prove by a preponderance of the evidence that: (1) there was a claim, (2) defendants knew the claim was false or fraudulent, (3) defendants presented, or caused to be presented, the false claim to an officer or employee of the United States for payment or approval, and (4) the false or fraudulent aspect of the claim or claims is material.  *United States ex rel DRC, Inc. v. Custer Battles LLC*, 376 F. Supp. 2d 617, 634 (E.D.Va. 2005)  [hereinafter *DRC I*] (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)).

The first of these elements–whether there was a "claim"–was addressed at some length in *DRC I*, where the term was defined to include any request or demand that draws on the U.S. government fisc.  *DRC I*, 376 F. Supp. 2d at 641.  In reaching its conclusion on the application of

7

this definition to the facts of this case, *DRC I* began by identifying three types of funds from which Custer Battles received payment for its contracting work in Iraq.  Specifically, payments were made from (1) Vested Funds, described as "Iraqi funds confiscated pursuant to Executive Order from United States bank accounts held in the name of the Government of Iraq," *id.* at 624; (2) Seized Funds, described as "Iraqi state- or regime-owned cash, funds, or realizable securities that were found and seized by Coalition Forces in Iraq as an occupying force in accordance with the laws and usages of war," *id.* at 626; and (3) DFI Funds, that is funds drawn from the Development Fund for Iraq (DFI), a fund established by the CPA and the United Nations to aid in the redevelopment of Iraq, *id.* at 626-27.  Of these three types of funds, for the reasons set forth in *DRC I*, Seized Funds and Vested Funds belonged to the United States government, while DFI Funds belonged to the people of Iraq and were merely administered by the CPA.  *Id.* at 645 ("[A]s the government conceded in its brief, the 'funds in the DFI have always been Iraqi funds;' they never became United States government property.").

The difference between Seized and Vested Funds, on the one hand, and DFI Funds, on the other, is significant with respect to what constitutes a "claim" under the FCA.  This is so because ownership of the funds will determine if there is a "claim" because a "claim" must be "a request or demand for payment that if paid would result in economic loss to the [U.S.] government fisc, *i.e.*, a request for payment from [U.S.] government funds; it does not extend to cases where the government acts solely as a custodian, bailee, or administrator, merely holding or managing property for the benefit of a third party."  *Id.* at 641.  The record establishes, without dispute, that only the $3 million advance, paid to Custer Battles by the CPA for work performed pursuant to the ICE contract, came from Seized Funds.  The remaining funds for the ICE contract came from DFI Funds, which are Iraqui, not U.S. funds.  *Id.* at 647. Thus, in terms of the ICE contract, only "claims"

8

submitted to support the initial $3 million advance, that is claims requesting funds from the U.S. government fisc, were at issue during the trial.

Given that the invoices defendants presented to the CPA to justify the $3 million advance satisfy the "claims" requirement, it is necessary to address defendants' challenge to relators' evidence on the FCA's third element, the "presentment" requirement. 31 U.S.C. § 3729(a)(1). This requirement was also at issue in the parties' summary judgment dispute. There, defendants questioned whether the then-voluminous record disclosed any evidence sufficient to satisfy relators' burden of proving presentment. Specifically, defendants argued that there was no evidence of presentment to a U.S. government officer or employee because the CPA was an international entity, not an American entity, and because CPA personnel, even if U.S. officers or employees, were acting in their CPA capacities, not in their official U.S. capacities. In the end, summary judgment was denied without reaching the issue of whether the CPA was a U.S. entity. Because it is now necessary to address this question, it is appropriate to review *DRC I's* ruling on presentment.[7]

As an initial matter, the parties do not dispute that "[b]efore FCA liability will attach to a 'claim' for payment under § 3729(a)(1), the false or fraudulent 'claim' must be 'knowingly present[ed], or caus[ed] to be presented, to an officer or employee of the United States Government or a member of the Armed Services of the United States." *DRC I,* 376 F. Supp. 2d at 647 (citing 31 U.S.C. § 3729(a)(1)).[8] Furthermore, it is clear from *DRC I* that presentment remains as a

---

[7] *DRC I,* as a prior ruling in this case, is binding under the "law of the case" doctrine, which provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 815-16 (1988) (quoting *Arizona v. California,* 460 U.S. 605, 618 (1983)).

[8] *See also United States ex rel Totten v. Bombadier Corp.,* 380 F.3d 488, 493 (4th Cir. 2004) ("*Totten II*"); *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 785 (4th Cir. 1999); *United States ex rel. Berge v. Bd. of Trustees of Univ. of Ala.,* 104 F.3d 1453, 1459 (4th

requirement notwithstanding Congress's amendment of the term "claim" in 31 U.S.C. § 3729(c).[9]

In meeting this presentment requirement, *DRC I* explained, it is not enough simply to demonstrate

that false claims were presented "to [] grantees of federal funds, without regard to whether claims

presented to those grantees are in turn presented back to the United States for payment."  *See DRC I*,

376 F.Supp.2d at 647 n.84 (citing *Totten II*, 380 F.3d at 496).  Moreover, *DRC I* explained that the

presentment requirement could not be satisfied by presentment to a United States government

employee or officer where the employee or officer is not working in his or her official U.S. capacity:

> [I]t cannot be that the presentment requirement is satisfied as long as a false claim is
> presented to a person who happens to be an employee of the United States
> government, without respect to whether that person is acting in his or her capacity as
> a U.S. government employee.  To be sure, if a contractor submitted a false claim to a
> U.S. government employee for remodeling her kitchen, the presentment requirement
> would not be satisfied.  Thus, *if the CPA was not a U.S. entity, then those U.S.
> employees detailed to the CPA were acting in their capacity as officers of the CPA,
> not as employees of the United States government.*

*Id.* at 648 n.86.  Thus, *DRC I* made clear that to satisfy the presentment requirement of 31 U.S.C.

§ 3729(a)(1), relators must produce evidence that defendants presented, or caused to be presented,

false claims to U.S. government employees or officers working in their official capacity.  In other

words, presentment to U.S. government employees or officers detailed to the CPA, but acting in

their CPA capacities, fails to satisfy the FCA's presentment requirement.

    This determination also affects the relator's claim under 31 U.S.C. § 3729(a)(2) that

_____

Cir. 1997).

[9] 31 U.S.C. § 3729(c) defines a "claim" as:

> any request or demand, whether under a contract or otherwise, for money or
> property which is made to a contractor, grantee, or other recipient if the United
> States Government provides any portion of the money or property which is
> requested or demanded, or if the Government will reimburse such contractor,
> grantee, or other recipient for any portion of the money or property which is
> requested or demanded.

defendants submitted false records or statements because this FCA subsection also embraces the presentment requirement.  Specifically, § 3729(a)(2) provides for FCA liability when a person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a).  Thus, an FCA claim under § 3729(a)(2) has three essential elements: (1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false. 31 U.S.C. § 3729(a)(2).  Although the parties dispute whether a presentment requirement is implicit in the first of these elements, *DRC I* reflects clear agreement with the opinion of then-Judge Roberts in *Totten II* that "by adding the phrase 'by the Government' to § 3729(a)(2), Congress intended to refer back to the presentment requirement in § 3729(a)(1)."  *DRC I*, 376 F. Supp. 2d at 650 & n.88 (citing *Totten II*, 380 F.3d at 498).  And, this view of now-Chief Justice Roberts was adhered to at the trial of this case, as the jury was instructed with respect to § 3729(a)(2) as follows:

> Finally, a defendant is only liable if the relators have proven, by a preponderance of the evidence, that any false record or statement was made or used in order to get paid or approved a false claim which called upon the $3 million advance payment, and was presented to the United States Government.

*See* March 17, 2006 Jury Instructions (Docket #426) at 246.  *See also id.* at 254-55 (describing the verdict form).  Thus, just as § 3729(a)(1) requires proof that false *claims* have been presented, or caused to be presented, to a United States government officer or employee working in his or her official capacity, § 3729(a)(2) also requires proof that any false *records or statements* were presented, or caused to be presented, to a United States government employee or officer working in their official capacity.

It follows, then, that if the CPA was an international entity, rather than a U.S. entity, submission of claims to the CPA, without more, would not satisfy the presentment requirement.  In

this event, it would be necessary for relators to show that by submitting the claim to the CPA, defendants caused the claim ultimately to be presented to a U.S. entity or to a U.S. officer or employee acting in her/his official capacity.  Relators have failed in this respect.  Relators have not pointed to any such evidence in the trial record, nor has an independent review of the record revealed that any such evidence was presented at trial.  It is obvious, then, that unless the CPA is a U.S. entity, the defendants' Rule 50 motions must be granted on the ground that the presentment requirement has not been proved.

On the other hand, if the CPA *was* a U.S. government entity, the result differs dramatically—that is, the presentment requirement is easily met, for "[i]n that case, presentment occurred when Custer Battles submitted allegedly false or fraudulent contract bids or invoices to the CPA's Contracting Officers who were also employees of the U.S. Armed Forces, and would have been acting in their capacity as representatives of a U.S. government entity." *DRC I*, 376 F. Supp. 2d at 648.  Indeed, the trial record is replete with evidence that invoices and records were presented to CPA employees, including members of the United States Armed Forces detailed to the CPA.  For example, Patricia Logsdon, the second contracting officer with responsibility for the ICE project, testified that she received copies of invoices members of Custer Battles's ICE team also presented to the BearingPoint employees responsible for handling the CPA's payment of subcontractors,[10] and indeed, several invoices that the relators contend were fraudulent were addressed specifically to her.[11]  Similarly, Jeffrey Ottenbreit, an employee of BearingPoint, who worked on the ICE project at the direction of CPA officials, testified that he received the allegedly fraudulent invoices from Ms.

---

[10] Feb. 16, 2006 Tr. (Logsdon) at 145-46.

[11] Exhibit 102 (October 28, 2003 Custer Battles invoice), Exhibit 113 (November 6, 2003 Custer Battles invoice); and Exhibit 123 (November 12, 2003 Custer Battles invoice).

Logsdon or directly from Custer Battles and that it was his common practice to submit invoices to

the CPA's Finance Office.  Feb. 21, 2006 Tr. at 79-80, 123, 152-53.  These examples illustrate that,

if the CPA is considered a U.S. government entity, relators have presented sufficient evidence to

allow a jury to find that the presentment requirements of both § 3729(a)(1) and § 3729(a)(2) have

been met.

   Although the issue of the CPA's status was fully briefed and argued on summary judgment,

it was ultimately unnecessary to resolve it because, as *DRC I* reflects, even if the CPA were not a

U.S. government entity defendants could be liable for "'*causing*' claims to be presented to a

government official or employee."  *DRC I*, 376 F. Supp. 2d at 648*.*  As explained in *DRC I*:

> [T]he United States maintained dominion, control, and possession of Seized and
> Vested Funds until the Army was finally directed by CPA Contracting Officers to
> make payments directly to the contractors, whether in the form of cash, electronic
> funds transfer, or a check drawn on the U.S. Treasury.  Thus, when a contractor
> submitted a false or fraudulent invoice for payment to a CPA Contracting Officer,
> like any subcontractor submitting a false invoice for payment to a contractor, those
> contractors "*caused*" the CPA Contracting Officer to present a request for payment,
> inflated by the value of the false claim, to an officer of the United States Army.

*Id.  DRC I* based its characterization of the billing process on the general budgeting, allocation, and

disbursement processes for Vested and Seized Funds used during the CPA's tenure as the governing

authority in Iraq.  *Id.* at 627-29.  According to the summary judgment record, this process

proceeded, *in general*, as follows: First, the Vested and Seized Funds were allocated to a specific

CPA ministry – in this case, the Ministry of Finance.  *Id.* at 628.  This allocation did not result in the

actual transfer of any funds, but rather simply allowed the CPA to plan its budget.  *Id.* at 628.  Once

the CPA allocated the Vested or Seized Funds, it solicited bids from contractors for the specific

project and awarded the contracts based on a competitive bidding process.  *Id.*  Review of the trial

record reflects that something similar to this process was used to plan and award the ICE contract,

and neither party contends otherwise.

Of course, for purposes of § 3729(a)'s presentment requirement, the critical step in the CPA's budgeting and payment process is the submission of invoices by contractors seeking payment on the contract.  The summary judgment record lacked specific facts concerning the payment of claims after the award of the ICE contract, and *DRC I* accordingly based its ruling on the CPA's typical practice for reimbursing contractors.  *DRC I* describes this practice as follows:

> Thereafter, the contracts were performed and contractors submitted invoices to the CPA for payment.  In reliance on these invoices, CPA Contracting Officers certified the disbursement of these funds to the United States Army.  Importantly, the Army in turn made disbursements from Seized and Vested Funds in reliance on these CPA certifications.  Payments were made by electronic fund transfer, check, or cash.  CPA payments via check were made with U.S. Treasury checks.  And cash payments in dollars were coordinated by the Army's 336th Finance Command (FINCOM), which maintained physical control of the currency.  Finally, the disbursement of the funds was recorded in the Army's STANFINS system as well as on the CPA ledger.

*Id.* at 629.  This general practice evidence indicated that any false claim presented to the CPA would necessarily "cause" the Army to release funds to CPA contractors.  Accordingly, summary judgment was denied on the ground that a triable factual issue existed as to whether this general practice occurred in the case of the ICE contract specifically.  Importantly, were the trial evidence to show that the general practice occurred with respect to the ICE contract, the presentment requirement would necessarily be satisfied, whether or not the CPA was a U.S. entity.  Accordingly, it was unnecessary at the summary judgment stage to decide the CPA's status.  But, *DRC I* explicitly noted the possibility that the trial record, if different, might require a determination of the CPA's status.  *Id.* at 649 (noting that the denial of summary judgment did "not foreclose the possibility that a different result might obtain as more facts are adduced at trial.").  Moreover, relators were given fair warning that the denial of defendants' motion for summary judgment in *DRC I* did not relieve them

14

of their burden of proving the element of presentment.[12]

In the end, relators failed to heed this advice.  Relators did not adduce trial evidence establishing the CPA's general procedure for the disbursement of funds to contractors as described by *DRC I,* or that any such procedure was followed in connection with the $3 million.  Indeed, the $3 million payment to Custer Battles differed from the routine practice described in *DRC I* in a material respect—it was an advance.  Because Custer Battles received an advance, it follows that the CPA never submitted to the U.S. Army any certifications based on Custer Battles's invoices for the disbursement of money.  The money had already been disbursed.  While the ICE contract required Custer Battles to justify the advance by submitting invoices to the CPA, the CPA apparently was not required to present these invoices to the U.S. Army.  As such, relators failed to adduce evidence that Custer Battles "caused to be presented" to the United States Army any invoices for work on the ICE project.

In short, evidence relied on in *DRC I* to avoid deciding whether the CPA is a U.S. government entity is not present in the trial record, and therefore the deferred question of the CPA's status can no longer be avoided.[13]  Fortunately, the issue was fully briefed and argued on summary judgment and was extensively discussed and analyzed in *DRC I*, which analysis is instructive to

---

[12] *See* Feb. 2, 2006 Tr. at 12 ("THE COURT: You do I think, understand, Mr. Grayson, that I did not make a finding under Rule 56 that [presentment of claims to government officials] occurred."); *id.* at 31 ("THE COURT: I don't think Mr. Grayson disputes that he has to show presentment.  This is just a part of that.  Is that right, Mr. Grasyon?  ATTORNEY GRAYSON: Yes, your honor."); *id.* at 45 ("THE COURT: [T]his does not absolve the relators from showing other aspects of presentment, who got the claim, where did it go, and so forth.").

[13] The potentially dispositive nature of the legal determination of whether the CPA is or is not a U.S. entity was noted by the Court when it took the Rule 50 motions under advisement. *See* March 6, 2006 Tr. at 242 ("The parties originally argued strongly about the CPA and I side stepped that question suggesting that I didn't need to reach it.  I think ultimately, I must reach it.").

quote here at length:

Discerning the status of the CPA is not an easy task. Relators and the government argue that the CPA is not a U.S. agency or entity, but merely an "instrumentality of the United States."[14] In reaching this conclusion, the government observes that the CPA's creation was first announced by the Commander of the U.S. Central Command, was staffed, in large part, by employees of the United States government, and was led by a CPA Administrator appointed by and subject to the President. Moreover, not only did the United States have substantial influence and control over the CPA, but the CPA received a substantial part of its operating budget (approximately $1 billion) from Congress. In fact, Congress even purported to appropriate funds to the CPA "in its capacity as an entity of the United States." 118 Stat. at 1225. Thus, it is tempting to conclude that the CPA was merely an alter-ego, a tool, or an instrumentality of the United States.

Yet, one should not too hastily conclude that because the United States was the CPA's principal controller and contributor that it necessarily follows that the CPA is an instrumentality of the United States. For example, on this record, the CPA seems clearly different from the Commodity Credit Corporation (CCC), which was held to be an instrumentality of the United States in *Rainwater v. United States*, 356 U.S. 590, 592 (1958). As noted in that decision, the CCC was established "by Congress " as a "wholly owned government corporation" with all funds coming and returning to the United States Treasury, and every officer and employee coming from the Department of Agriculture. 356 U.S. at 591-92 ("[CCC] is simply an administrative device established by Congress for the purpose of carrying out federal farm programs with public funds."). In sharp contrast, there is no dispute that the CPA was not established by Congress. Instead, as described in a letter to the United Nations, the CPA was an entity created by the United States, United Kingdom, and its Coalition partners "acting under existing command and control arrangements through the Commander of Coalition Forces." Moreover, the United Nations recognized the CPA, not as an instrumentality of the United States, but as an entity through which the Coalition nations acted "as occupying powers under unified command." UNSCR 1483. And while the substantial majority of the CPA staff was comprised of United States employees, a significant portion-13%-hailed from other Coalition partners. Thus, the CPA may also be described as an international body formed by the implicit, multilateral consent of its Coalition partners, which would not be subject to the specific laws of its members states, including the FCA. Given the fluid nature of the conflict in Iraq and the challenges of establishing a new government in a war zone, it is not surprising that the organization of the CPA appears at times to have been ad hoc and to have relied heavily on the resources of its

---

[14] The government was at great pains to emphasize that it takes this position for the purposes of the FCA only, and not for any other purpose.

> largest contributing member.   Thus, it would seem that, like NATO or any other
> international organization created by the multilateral consent of multiple member
> nations, whether by treaty or otherwise, the CPA is not an instrumentality of each of
> its members states, distinctly subject to the laws of all of its members, but a wholly
> distinct entity that exercises power through a structure agreed to by its member states
> and that is subject to the laws of war and to its own laws and regulations.   In any
> event, at this point, it is unnecessary to reach and decide this issue.

*See id.* at 649-50.  From this, it is clear that although the CPA's status was not formally decided on

summary judgment, the matter was thoroughly analyzed.  And, indeed, the result of that analysis is

clear—although the CPA was principally controlled and funded by the U.S., this degree of control

did not rise to the level of exclusive control required to qualify as an instrumentality of the U.S.

government.  *See Rainwater*, 356 U.S. at 592-94.  In fact, the evidence clearly establishes that it was

created through and governed by multinational consent.  This result is as compelling now as it was

on summary judgment.[15]  Thus, it follows that because the CPA was not a U.S. government entity,

and therefore U.S. employees of the CPA were not working in their official capacity as employees

or officers of the United States government, relators have demonstrably failed to provide sufficient

evidence to enable a jury to find presentment, as required by both § 3729(a)(1) and § 3729(a)(2).[16]

Accordingly, the defendants' Rule 50(a) motions must be granted with respect to Counts I and II on

the ground that relators failed to produce sufficient evidence of presentment, and thus judgment as a

matter of law must be entered for defendants on these counts.  *See* Rule 50, Fed.R.Civ.P.

------------

[15] *See also* March 6, 2006 Tr. at 242 ("THE COURT: It is my view that the CPA is not an American agency or entity.").

[16] It is important to note that the jury was asked to return a verdict under alternative assumptions: first, that the CPA was a U.S. government agency and the CPA's employees were U.S. government officials acting in their official capacity; and second, that the CPA was not a U.S. government agency and thus, the CPA's employees were not U.S. government employees acting in their official capacity.  *See* March 7, 2006 Jury Instructions (Docket #426) at 243-44. Despite the demonstrated absence of any presentment to the U.S. Army or any other U.S. government entity, the jury returned a verdict for relators under both assumptions.

Because the relators failed to adduce evidence of presentment, it is unnecessary to address the defendants' other arguments that (i) there was insufficient evidence that claims calling on the $3 million were materially false, (ii) the United States suffered no damage stemming from the alleged false claims, and (iii) the individual defendants did not have knowledge or reason to know of the alleged fraudulent behavior.

**B.**

Defendant Custer Battles next argues that relators failed to offer sufficient evidence that relator Baldwin was constructively discharged or demoted in violation of the FCA's whistle-blower provision, 31 U.S.C. § 3730(h).  This provision provides, in pertinent part:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against, in the terms and conditions of employment by his or her employer, because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole . . . .

31 U.S.C. § 3730(h).  Thus, an employee bringing a claim pursuant to the FCA's whistle-blower provision must prove: "(1) that he took acts in furtherance of a *qui tam* suit [*i.e.*, engaged in protected activity]; (2) that his employer knew of these acts; and (3) that his employer [demoted or] discharged him as a result of these acts." *Eberhardt v. Integrated Design & Construction, Inc.*, 167 F.3d 861, 866 (4th Cir. 1999) (quoting *Zahodnick v. IBM Corp.*, 135 F.3d 911, 914 (4th Cir. 1997)). With respect to the first element, the Fourth Circuit has explained that "an employee need not have actually filed a *qui tam* suit or even known about the protections of section 3730(h) in order to engage in protected activity." *Eberhardt*, 167 F.3d at 867.  Indeed, protected activity includes "investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Id.* (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996)).

With respect to the first two elements, relators presented sufficient evidence to permit the jury to find that Baldwin engaged in protected activity and that Custer Battles knew of this.  The evidence is easily summarized.  First Baldwin testified that he became suspicious of Custer Battles's billing practices under the ICE contract and advised the defendants that he thought their actions were illegal and should stop.  February 21, 2006 Tr. at 303 (Baldwin); February 22, 2006 Tr. at 12-17 (Baldwin).  Baldwin questioned Custer and Morris generally about Custer Battles's inflated profits, *id.* at 16-17, and specifically about certain charges to the CPA for forklifts, *id*. at 88-89, 96, and leases.  *Id.* at 182-86**.**  Most importantly, Baldwin, dismayed by Custer Battles's billing practices, resigned from the ICE contract board, and reported his suspicions to the Department of Defense's Defense Criminal Investigative Service (DCIS).  *Id.* at 151.  Additionally, Baldwin raised his concerns regarding Custer Battles's billing practices directly with defendant Custer.  *Id.* at 83 (telling Custer that he viewed Custer Battles's billing practices as fraudulent, and advising Custer to seek legal advice).  In short, relators presented abundant evidence to permit the jury to find that Baldwin engaged in protected activity and that his superiors at Custer Battles knew about this protected activity.

As to the third element, that the employer demoted or discharged the whistle-blower, relators presented ample evidence for the jury to conclude that Baldwin was demoted, and constructively discharged because he engaged in protected activity.  Prior to Baldwin raising his concerns over Custer Battles's billing practices, defendant Custer praised Baldwin's work.  *See, e.g.,* Ex. 3 (July 20 email from Custer to Morris "I truly enjoyed working with Pete and think he is one of the most professional, hard working guys I've ever had the pleasure to work with."); Ex. 19 (Sept. 10 email from Custer to Battles: "Pete is actually doing an outstanding job, although Joe has it in for him."); Ex. 65 (Sept. 24, 2003 email from Custer to Morris: "Pete has been doing an outstanding job . . . .").

This praise turned to scorn when Baldwin began to object to Custer Battles's billing practices.  Soon after, Baldwin was demoted from Country Manager to Facilities Manager.  *See* February 22, 2006 Tr. at 156-59 (Baldwin) ("Q: Did you remain country manager at Custer Battles throughout your tenure at Custer Battles? A: No.  I was demoted.  Q: Why were you demoted?  A: I was demoted because I resigned from the [ICE] board, and other issues.  Q: How do you know you were demoted because you resigned from the board? A: Because Scott Custer had a private meeting with me in the Mansour house and told me.").  Based on this evidence, it was reasonable for the jury to conclude that Baldwin was demoted for engaging in protected activity.

In addition, relators presented sufficient evidence that Custer Battles constructively discharged Baldwin.  Baldwin submitted his notice of resignation in January 2004 because of Custer Battles's persistent refusal to heed his warnings concerning the ICE billing practices.  Specifically, senior management, including Custer, Battles and Morris, ignored Baldwin's pleas to discontinue Custer Battles's suspect billing practices.  Indeed, the only reaction by Custer Battles to these pleas was to demote Baldwin.  *See, id.*; Ex. 114, 125.  Baldwin testified that he had asked defendants to allow him to do his job without implicating him in their fraud, but this request had been ignored.  *See* February 22, 2006 Tr. at 171-77; Ex. 125.  Ultimately, faced with the specter of remaining at Custer Battles and entangling himself in his employer's fraudulent practices, Baldwin chose to resign.  February 22, 2006 Tr. at 179-89.  These facts are sufficient to allow a jury to find that Baldwin was constructively discharged.  *See Batt v. City of Oakland*, Case No. C 02-04975, 2006 WL 1980401, at *7 (N.D.Cal. July 13, 2006) (holding that a plaintiff's knowledge of illegal acts coupled with threats to plaintiff rises "to the level of intolerable conditions required for a constructive discharge to occur.").  In sum, relators provided sufficient evidence that Baldwin was constructively discharged or demoted in violation of the FCA's whistle-blowing provision and

defendant's motion for Judgment as a Matter of Law is denied.  *See* Rule 50, Fed.R.Civ.P.

## C.

Finally, defendant Morris argues that neither Isakson nor Baldwin have standing to bring the claims made pursuant to 31 U.S.C. § 3729(a)[17] because they are not "original sources."  The FCA confers jurisdiction on district courts over a complaint by a private person, acting as a relator, provided the complaint is not based upon "the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media."  31 U.S.C. § 3730(e)(4)(A).  Even if a complaint is based, in part, on publicly disclosed information, a district court retains jurisdiction if "the person bringing the action is an original source of the information."  *Id*.  The statute defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B).  So, although the fraud committed by Custer Battles allegedly damaged the United States and not relators, the FCA permits relators to bring this suit in on behalf of the United States if the claims are not based upon a public disclosure, or if the relators are the "original source" of the claims.

Although framed as a standing argument, defendant Morris's argument simply revisits the ruling on subject matter jurisdiction made at the summary judgment stage of this litigation.[18]

---

[17] There is, of course, no doubt that Baldwin has standing to bring his whistle-blower claim.

[18] It should be noted that defendant Morris's motion is procedurally infirm.  Although framed as a Rule 50(a), Fed.R.Civ.P., motion for judgment as a matter of law, jurisdictional issues are decided by the Court and not the jury, and therefore, the appropriate vehicle to raise this argument would have been a Rule 12(b)(1), Fed.R.Civ.P. motion.

Succinctly stated, this jurisdictional argument asks (1) whether there was a public disclosure of Custer Battles's fraudulent behavior;[19] (2) if so, were the allegations of the complaint "based upon" that public disclosure;[20] and (3) if both of those prerequisites are met, then are the relators nonetheless "original sources" of the information contained in the complaint.  *See* 18 U.S.C. § 3730(e)(4).  Defendants unsuccessfully raised this issue at the summary judgment stage, and defendant Morris has presented no new evidence requiring reversal of that decision. *See DRC, Inc. v. Custer Battles, LLC*, Case No. 1:04cv199 (January 23, 2006 Transcript on Summary Judgment Motions) (Docket #417) at 79-81.  The prior ruling determined that there was no public disclosure,[21] and that, even assuming, *arguendo,* that there was a public disclosure, the complaint was not "based upon" that public disclosure.[22]  To date, defendant Morris has not presented any persuasive evidence that there was, in fact, a public disclosure, or that the complaint was "based upon" the public disclosure.  Therefore, defendant Morris's jurisdictional argument must fail, and his motion on this ground must be denied.

### III.

For the reasons stated above, defendants' Rule 50, Fed.R.Civ.P., motion for judgment as a

---

[19] *See Eberhardt ex rel United States v. Integrated Design and Constr. Inc.*, 167 F.3d 861, 870 (4th Cir. 1999) ("[W]e find that the methods of public disclosure set forth in section 3730(e)(4) are exclusive of the types of public disclosure that would defeat jurisdiction under that section.").

[20] *See United States ex rel. Siller v. Beckton Dickinson & Co.,* 21 F.3d 1339, 1347 (4th Cir. 1994) (A relator's action is "based upon" a public disclosure "only where the relator has actually derived from that disclosure the allegations upon which his *qui tam* action is based.").

[21] *Id.* at 79 ("I think it's clear that the set of facts from which someone might infer that there is an investigation into fraud is not a public disclosure as contemplated by the statute.").

[22] *Id.* at 82 ("In any event, I don't find that even assuming there was a public disclosure, that the allegations were based on the public disclosure.").

matter of law must be granted in part and denied in part.  Because relators failed to present evidence that any of the defendants presented or caused to be presented any false claims or records, the motion must be granted with respect to relators' claims in Counts One and Two made pursuant to 31 U.S.C. § 3729(a).  Because relator Baldwin presented ample evidence to warrant submission of his whistle-blower claim to the jury, Custer Battles's motion for judgment as a matter of law on that count must be denied.  Accordingly, judgment will be entered on the jury's verdict finding Custer Battles's violation of 31 U.S.C. § 3130(h), and awarding damages of $165,000 to Baldwin.  Finally, defendant Morris has not provided evidence that jurisdiction is lacking, and thus, his motion for judgment as a matter of law related to relators' standing is denied.

An appropriate order will issue.


_____/s/_____
Alexandria, Virginia                            T. S. Ellis, III
August 16, 2006                                United States District Judge