**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA <u>ex rel.</u>** ) | |
| **DRC, INC., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 1:04cv199** |
| ) | |
| **CUSTER BATTLES, LLC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION</u>

At issue in this False Claims Act ("FCA")[1] case is whether the summary judgment record discloses a triable issue of fact on Relators' sole remaining claim – that Custer Battles fraudulently induced Iraq's Coalition Provisional Authority ("CPA") to award it a contract to perform security services for the Baghdad International Airport ("BIAP") by representing that it would provide 138 security personnel.  As this issue has been fully briefed and argued, it is now ripe for disposition.  For the reasons that follow, defendants' motion for summary judgment must be granted on the ground that the undisputed facts demonstrate

(i)     That Custer Battles did not make a false statement because it did not represent to the CPA that it would provide a fixed number of 138 security personnel;

(ii)     That, even assuming Custer Battles made such a false statement, Custer Battles did not do so with the requisite scienter; and

(iii)     That, even assuming Custer Battles knowingly made a false statement, the statement was not material to the CPA's decision to award it the BIAP contract.

_____

[1] 31 U.S.C. § 3729 *et seq.*

1

**I.**

This protracted FCA case has already resulted in one jury trial and numerous hearings and rulings.  This lengthy history merits brief recapitulation.

Three Relators brought this action: DRC, Inc., Robert Isakson, and William D. Baldwin.  Relator DRC, Inc. ("DRC") is an Alabama corporation with its principal place of business in Mobile, Alabama.  DRC provides emergency construction, logistics, security, and life support services in disaster areas and war zones.  DRC collaborated with defendant Custer Battles, LLC to perform contracts with the CPA.  Relator Robert Isakson is the managing director of DRC and Relator William D. Baldwin was a Custer Battles employee in Iraq during the relevant time period.

Relators named seven defendants.  They are Custer Battles, LLC, Scott Custer, Michael Battles, Secure Global Distribution, Mideast Leasing, Inc., Custer Battles Levant, and Joseph Morris.  Defendant Custer Battles, LLC ("Custer Battles"), a Delaware limited liability company headquartered in Fairfax, Virginia, was formed by defendants Scott Custer and Michael Battles to provide support services to the United States and other governments engaged in wars and conflicts around the globe.  Defendants Secure Global Distribution, Mideast Leasing, Inc., and Custer Battles Levant are entities related to Custer Battles, either as wholly-owned subsidiaries or through common ownership.  These defendants have been represented jointly throughout this litigation and are collectively referred to herein as the "Custer Battles defendants."  Defendant Joseph Morris was a manager for Custer Battles in Iraq during the relevant time period and is separately represented.

On February 24, 2004, Relators filed a complaint initiating this civil FCA action and

2

alleging claims under §§ 3729(a)(1), (a)(2), and (a)(3).  In particular, the complaint alleges that defendants conspired to overbill the CPA for tens of millions of dollars in services and facilities in the performance of two CPA contracts: (i) the Baghdad International Airport contract (the "BIAP contract"), which was for the provision of security, housing, and related facilities and services at BIAP and (ii) the Iraqi Currency Exchange contract (the "ICE contract"), which was for security, construction, and operational services to support the Iraqi Currency Exchange.  With respect to the BIAP contract, Relators alleged that the Custer Battles defendants fraudulently billed the CPA for services and facilities never provided.  Similarly, with respect to the ICE contract, Relators alleged that the Custer Battles defendants used "shell companies" to create the appearance of additional costs and overhead, thus inflating the price of those products and services charged on a cost-plus basis to the CPA.  Thereafter, on August 26, 2004, Relators filed an Amended Complaint adding a fourth count under the FCA's "whistle-blower" provision, 31 U.S.C. § 3730(h), alleging that Relator Baldwin was terminated or forced to resign from Custer Battles because of his efforts to investigate and report the alleged fraud.

The Custer Battles defendants moved to dismiss the case for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), Fed. R. Civ. P., and for failure to state a claim, pursuant to Rule 12(b)(6), Fed. R. Civ. P.  This motion was converted to a motion for summary judgment, pursuant to Rule 56, Fed. R. Civ. P.  By Order and Memorandum Opinion, dated July 8, 2005, the motion for summary judgment was granted in part and denied in part.  *United States ex rel DRC, Inc. v. Custer Battles LLC*, 376 F. Supp. 2d 617, 634 (E.D.Va. 2005) ("*DRC I*").  The motion was granted with respect to Count III on the ground that the intra-corporate immunity doctrine warranted dismissal of Relators' § 3729(a)(3) claim.  It was denied in all other respects.

As *DRC I* reflects, the FCA requires that there be a "claim," that is, a request or demand for payment that if paid would result in economic loss to the U.S. government fisc. Such loss does not occur where the government acts solely as a custodian, bailee, or administrator, merely holding or managing property for the benefit of a third party. Thus, in this case, all false claims presented in connection with the BIAP contract were actionable under the FCA, as they were all paid from funds that belonged to the U.S. government. *DRC I*, 376 F.Supp.2d at 647. On the other hand, only those false claims that caused the $3 million advance to be paid under the ICE contract were actionable, as only this $3 million advance was paid from U.S. government funds. *Id.* Furthermore, with respect to the presentment requirement of § 3729(a)(1), *DRC I* made clear that to satisfy this element, Relators had to produce evidence that the Custer Battles defendants presented, or caused to be presented, false claims to U.S. government employees or officers working in their official capacity, rather than U.S. government employees or officers detailed to the CPA, and acting in their CPA capacities.[2] In addition, *DRC I*, in agreement with the opinion of then-Judge Roberts in *Totten,* held that "by adding the phrase 'by the Government' to § 3729(a)(2),[3] Congress intended to refer back to the presentment requirement in § 3729(a)(1),"

---

[2] In particular, *DRC I* explained:

[I]t cannot be that the presentment requirement is satisfied as long as a false claim is presented to a person who happens to be an employee of the Untied States government, without respect to whether that person is acting in his or her capacity as a U.S. government employee. To be sure, if a contractor submitted a false claim to a U.S. government employee for remodeling her kitchen, the presentment requirement would not be satisfied. Thus, if the CPA was not a U.S. entity, then those U.S. employees detailed to the CPA were acting in their capacity as officers of the CPA, not as employees of the United States government.

*DRC I*, 376 F.Supp.2d at 648 n.86.

[3] Section § 3729(a)(2) provides for FCA liability when a person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2).

and thus, presentment is also required for claims arising under § 3729(a)(2). *Id.* at 650 & n.88

(citing *United States ex rel. Totten v. Bombardier Corp.,* 380 F.3d 488, 498).[4]

Following *DRC I* and two weeks prior to trial, on January 30, 2006, the BIAP contract

claims were severed from the ICE contract claims, pursuant to Rule 42(b), Fed.R.Civ.P., because

the claims involved wholly separate factual and legal issues. *DRC, Inc. v. Custer Battles LLC*,

Case No. 1:04cv199 (January 30, 2006) (Order) (noting that severance of the claims was in the

interests of justice, would avoid prejudice, and would be conducive to expedition and economy).

Thus, the matter proceeded to trial on three claims relating to the ICE contract:

(i)     Count One alleged that the defendants had knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, a false or fraudulent claim to support the $3 million advance, in violation of 31 U.S.C. § 3729(a)(1);

(ii)    Count Two alleged that the defendants knowingly made, used, or caused to be made or used, false records or statements, and presented the false records or statements to the United States Government, in order to get paid or approved a false claim in support of the $3 million advance, in violation of 31 U.S.C. § 3729(a)(2); and

---

[4] It is worth noting that the Sixth Circuit has recently held that presentment is not required under 31 U.S.C. § 3729(a)(2)-(3). *See United States ex rel. Sanders v. Allison Engine Co.*, 471 F.3d 610 (6th Cir. 2006). This construction of the statute is unpersuasive. As explained more fully in *DRC I*, when Congress simultaneously amended § 3729(a)(2) to add "by the Government" and added § 3729(c), which broadly defines a "claim" to include requests made to third parties, provided that the U.S. government pays a portion of the money or property requested, "the intended effect was fairly obvious: Congress [in § 3729(a)(2)] was referring back to the presentment requirement of § 3729(a)(1)." *Totten*, 380 F.3d at 499. This reading comports with the parallel structure of § 3729(a)(1) and (a)(2) and ensures that § 3729(a)(1) is not rendered meaningless. Accordingly, as stated in *DRC I*, § 3729(a)(2) contains a presentment requirement. *DRC I*, 376 F. Supp. 2d at 650 & n.88; *see also United States v. City of Houston*, 2006 U.S. Dist. LEXIS 57741, at *15-20 (S.D. Tex. 2006) (holding that "liability arises under 31 U.S.C. § 3729(a)(2) only when a claim is presented to the United States Government for payment or approval"); *United States ex rel. Atkins v. McInteer*, 354 F. Supp. 2d 1302, 1304-05 (N.D. Ala. 2004) (dismissing FCA conspiracy claim under § 3729(a)(3) because the Relator did "not allege that any defendant *presented* a false claim to an officer or employee of the United States" and the "mere allegation of conspiracy does not eliminate the need under subsection (a)(1) for some action by the defendant whereby a claim is presented or caused to be presented").

5

(iii)     Count Three alleged that Custer Battles retaliated against Relator Baldwin for blowing the whistle on the Custer Battles defendants' fraudulent behavior, in violation of 31 U.S.C. § 3730(h).

Over the course of a twelve day trial, Relators presented testimony from twenty witnesses and successfully moved for the admission of over 200 exhibits.  Relators' theory of the case was that, in the summer of 2003, defendants conceived of a plan to defraud the CPA by submitting to the CPA invoices that falsely inflated Custer Battles' costs.  At the conclusion of Relators' case in chief, the Custer Battles defendants and defendant Morris moved for judgment as a matter of law, pursuant to Rule 50(a), Fed.R.Civ.P., arguing that Relators had failed to present sufficient evidence to allow a jury to find liability under the FCA.  Following oral argument and supplemental briefing, a ruling on defendants' Rule 50 motions was deferred, and the case was submitted to the jury.  After several days of deliberation, the jury returned a verdict in favor of Relators on all three counts, finding the defendants jointly and severally liable to the United States for $3 million in damages and finding that Custer Battles had retaliated against Relator Baldwin and awarding him $165,000.

Following this verdict, and following further briefing and argument, the Rule 50 motions were granted in part and denied in part, as reflected in a Memorandum Opinion dated August 16, 2006.  *DRC Inc. v. Custer Battles, LLC*, 444 F. Supp. 2d 678 (E.D.Va. 2006) ("*DRC II*").  The motion with respect to Count III was denied, as Relator Baldwin had presented ample evidence to warrant submission of his whistle-blower claim to the jury.  *Id.* at 692.  The Rule 50 motions relating to Counts One and Two were granted on the ground that Relators had failed to present evidence that any of the defendants presented or caused to be presented any false claims or records to the United States.  *Id.  DRC I* had made clear that to satisfy the FCA's presentment requirement, Relators had to produce evidence that defendants presented, or caused to be

presented, false claims to U.S. government employees or officers *working in their official capacities*, not in their CPA capacities.  *DRC I*, 376 F.Supp.2d at 648).  In this case, Relators did not satisfy this presentment requirement because, as *DRC II* explained, the CPA was an international entity, not a U.S. entity,[5] and thus, Relators' evidence that Custer Battles had submitted claims to the CPA, without more, did not satisfy the presentment requirement.[6] *DRC II*, 444 F. Supp. 2d at 686-89 (stating that "because the CPA was not a U.S. government entity, and therefore employees of the CPA were not working in their official capacity as employees or officers of the United States government, relators have demonstrably failed to provide sufficient evidence to enable a jury to find presentment").

Following *DRC II*, a briefing schedule was established to resolve the sole remaining BIAP contract claim, that is, that Custer Battles fraudulently induced the CPA to award the BIAP contract to Custer Battles by representing that Custer Battles would provide 138 security personnel.  Consistent with this schedule, the Custer Battles defendants filed the instant motion for summary judgment, arguing that the undisputed facts demonstrate

(i)   That Custer Battles did not make a false statement because it did not represent to the CPA that it would provide a fixed number of 138 security personnel;

---

[5] *DRC II* reached this conclusion by finding that while "the CPA was principally controlled and funded by the U.S., it did not rise to the level of exclusive control required to qualify as an instrumentality of the U.S. government.  In fact, the evidence clearly establishe[d] that it was created through and governed by multinational consent."  *DRC II*, 444 F. Supp. 2d at 686; *see also DRC I*, 376 F. Supp. 2d at 650 (noting that like "any other international organization created by the multilateral consent of multiple member nations, whether by treaty or otherwise, the CPA is not an instrumentality of each of its members states, distinctly subject to the laws of all of its members, but a wholly distinct entity that exercises power through a structure agreed to by its member states and that is subject to the laws of war and to its own laws and regulations").

[6] To have satisfied the presentment requirement, *DRC II* noted "it would be necessary to show that by submitting the claim to the CPA, defendants ultimately caused the claim to be presented to a U.S. entity or to a U.S. officer or employee acting in her/his official capacity."  *DRC II*, 444 F. Supp. 2d at 685.  Relators failed to make such a showing at trial.

7

(ii)     That, even assuming Custer Battles made such a false statement, Custer Battles did not do so with the requisite scienter; and

(iii)    That, even assuming Custer Battles knowingly made a false statement, the statement was not material to the CPA's decision to award it the BIAP contract.

The undisputed material facts and these issues are next addressed.

## II.

Before enumerating the undisputed facts, it is important to address a threshold matter, namely, the Custer Battles defendants' motion to strike, in its entirety, "Relators' Response to Defendants' Factual Allegations, Including Counter Statement of Material Facts" on the ground that it violates Local Civil Rule 56(B),[7] which in conjunction with Local Civil Rule 7(F)(3),[8] requires that a party responding to a motion for summary judgment submit a brief, no longer than thirty (30) pages, that includes a section identifying disputed material facts.

Relators effectively ignored this rule by filing two briefs totaling forty-five (45) pages to attempt an end-run around the Local Civil Rules.[9] This end-run attempt must fail if the rule is to have any force. Accordingly, Relators' Response to Defendants' Factual Allegations, Including Counter Statement of Material Facts must be stricken in its entirety. It is worth noting that striking Relators' Response does not make a material difference to the disposition of this motion

---

[7] Local Civil Rule 56(B) states:

A brief in response to [a motion for summary judgment] *shall include* a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated . . . In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

[8] Local Civil Rule 7(F)(3) explicitly limits responsive briefs to motions to thirty (30) pages.

[9] Compliance with Local Civil Rule 56(B) would have required Relators either to seek leave to file additional pleadings or to submit one brief no longer than thirty (30) pages in length.

because Relators' Opposition to Defendants' Motion for Summary Judgment incorporates the allegedly controverted facts through the appended exhibits.

Thus, the material facts recited herein relating to Relators' BIAP claim are derived from a review of the entire record, including the exhibits appended to Relators' Opposition to Defendants' Motion for Summary Judgment, and are largely undisputed. Where disputes exist, they are noted and, if material, the facts are construed favorably to Relators, as required. *See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, then, the striking of Relators' Response to Defendants' Factual Allegations has not altered the disposition of the Custer Battles defendants' summary judgment motion.

### III.

On June 19, 2003, the CPA, through the Iraqi Ministry of Transportation ("MOT"), distributed a Request for Proposals ("RFP") to provide security services at BIAP. This RFP neither required, nor referred to, the provision of a fixed number of security personnel. Several contractors, including Custer Battles, submitted proposals for the BIAP contract. Custer Battles' June 24, 2003 proposal for the BIAP contract (the "BIAP Proposal") does not state that Custer Battles will provide a fixed number of security personnel. Instead, it repeatedly refers to the "fluid situation at BIAP and Iraq," and states that Custer Battles will provide "flexible security management and services." In light of this fluid situation and because the BIAP contract was a fixed fee contract, Custer Battles submitted a "Detailed Cost Estimate" that "err[ed] on the high side." This estimate reflected a one year budget based on the salaries of 138.5 security personnel. As Relators acknowledge, this is the only specific reference to "138" security personnel in either the RFP, the BIAP Proposal, or any of the ensuing BIAP contracts.

To evaluate the BIAP RFP proposals, Franklin D. Hatfield, the Minister of Aviation for

Iraq in the CPA's MOT, facilitated a meeting of several members of the MOT to discuss contract proposals. He also forwarded the proposals to the United States' Department of Homeland Security ("DHS") and Transportation Security Administration ("TSA"). Hatfield, who along with Douglas Gould, the Aviation Security Manager for the MOT, established the initial requirements for the BIAP contract RFP, explained that in awarding the BIAP contract the primary requirements were that the contractor open BIAP for commercial flights by a time certain and that the contractor provide TSA - certified screeners. By contrast, a contractor's proposed staffing level was not important. This is because, according to Hatfield, "[t]here [was] no fixed BIAP staffing requirements." Hatfield Aff., ¶ 11. Instead, staffing was intended to be "open-ended and flexible because [there was no] firm estimate (at the time the BIAP Security RFP was prepared and issued) of security staffing needs . . . [Thus,] [t]he number of security personnel the contractor would provide was never a prerequisite for awarding the contract." *Id.* According to Hatfield, with these considerations in mind, every individual that reviewed the proposals recommended awarding the BIAP contract to Custer Battles. In particular, Custer Battles was chosen because it (i) submitted the lowest bid; (ii) was the only contractor that would commit to opening BIAP within the required time frame, and (iii) could provide TSA - certified screeners. Significantly, Hatfield stated that "[a]ny representation contained in the Custer Battles BIAP Proposal regarding a numerical and/or specific staffing level was not material to selection of Custer Battles. . . . [Any staffing level reference] was simply not a material or necessary condition to the award[] . . . ." *Id.* at ¶ 20.

Thereafter, on July 1, 2003, Custer Battles entered into a one-month Letter Contract with the CPA ("Letter Contract"), which provided that the CPA would pay a total firm fixed price of $16,840,832.00 in exchange for Custer Battles providing "comprehensive security coverage for

commercial and cargo aviation operations at [BIAP] consistent with the requirements stated in

CPA's Request for Proposals . . . ." Thus, the Letter Contract incorporated the BIAP RFP.

Neither the Letter Contract, nor the BIAP RFP, required a fixed number of security staff to be

provided under the contract. Then, on July 31, 2003, the Letter Contract was extended to allow

further time for negotiation of a long-term contract, which issued as the Extension to Letter

Contract ("Extended Letter Contract"). The Extended Letter Contract provides that "the original

terms of the Letter Contract will continue as stated in the Letter Contract dated July 1, 2003,

unless this Extension to the Letter Contract modifies or adds to the terms of the Letter Contract."

The Extended Letter Contract did not add any terms requiring a fixed number of security staff to

be provided by Custer Battles. One month later, on August 31, 2003, the long-term BIAP

contract was finalized at a firm fixed-price of $16.84 million, to be paid in monthly installments,

less three advance payments of $2 million each (the "Final Contract"). The period of

performance was one year, ending June 30, 2004, with a one-year renewal option. The Final

Contract states that Cuter Battles will provide security at BIAP "in accordance with the attached

proposed statement of work as submitted by Custer Battles dated" June 24, 2003, that is, the

BIAP Proposal.

     Pursuant to the Letter Contract, in July 2003, Custer Battles' began performing the

services required by the BIAP contract. As Relator Isakson testified, Custer Battles started with

"a few more than" 138 security personnel.[10] After the completion of the BIAP contract, the CPA

---

[10] In particular, Relator Isakson testified

    Q: So you don't – do you know whether or not at the time [of the BIAP contract] they intended to have 138 employees?
    A: They had 138 at one time.
    Q: Okay, so they started out with 138 employees?
    A: Maybe a few more than that.

rated Custer Battles' performance as "Exceptional."  According to Hatfield,

> Custer Battles met and/or exceeded every demand placed upon it by the MOT under the BIAP contract, including each and every demand related to deadlines, provision of TSA-certified screeners, *and security staffing levels*. . . . Custer Battles exceeded staffing level expectations in its actual performance under the BIAP Contract.

Hatfield Aff., ¶ 20.  Hatfield went further to state that "Custer Battles [sic] is one of the best

firms I have dealt with in my 34 years of government service."  *Id.* at ¶ 26.  And, indeed, Relator

Isakson testified that during his employment, Custer Battles was trying to give the CPA the best

value it could on the BIAP contract.  Isakson Dep. (Oct. 14, 2005), at 595:8-12.

On August 26, 2004, Relators filed an Amended Complaint alleging, *inter alia*, a "fraud-

in-the-inducement" theory of False Claims Act liability, under 31 U.S.C. § 3729(a)(1).  The

Amended Complaint referred only to the contract in effect in June and July 2003, namely the

Letter Contract, not the Final Contract.  In particular, Relators alleged in the Amended Complaint

that:

·   On June 24, 2003, Custer Battles submitted its BIAP proposal to the CPA promising to provide over 138 security personnel.

·   In June 2003, Custer Battles was awarded the BIAP contract.

·   From July 2, 2003 through July 30, 2003, Relator Robert Isakson performed services under the BIAP contract.

·   In June and July 2003, Custer Battles exploited the diminished BIAP operations by discharging or reassigning a substantial portion of its security personnel, yet continuing to submit monthly invoices at the BIAP contract price.

·   Thus, Custer Battles' representation, contained in its BIAP proposal, that it would provide 138 security personnel, was false.  Accordingly, its BIAP contract

---

Q: Maybe they had more than they were required to have?
A: Maybe two or three.

Isakson Dep. (Oct. 13, 2005), at 325:10-19.

monthly invoices were false.

**IV.**

At this point, it is appropriate to address the Custer Battles defendants' argument that Relators' have attempted to effect a constructive amendment of their Amended Complaint by shifting the focus from the Letter Contract awarded to Custer Battles in July 2003, which did not incorporate the BIAP Proposal, to the Final Contract entered into on August 31, 2003, which did incorporate the BIAP Proposal. As the Custer Battles defendants correctly point out, Relators' Amended Complaint did not mention the Final Contract, focusing instead solely on the July 2003 Letter Contract. Moreover, the Amended Complaint's allegations relating to understaffing focused solely on the time period between June and July 2003, during which Custer Battles was contractually obligated under the Letter Contract. Now, in its opposition to defendants' motion for summary judgment, Relators focus *solely* on the Final Contract, signed on August 31, 2003, which incorporated the BIAP Proposal, claiming that this contract, and Custer Battles' subsequent actions, serve as the basis for its fraudulent inducement claim.

An examination of Relators' Response to Defendant's Factual Allegations reveals that Relators are, in fact, seeking to shift the focus of their fraudulent inducement claim from the claims asserted in the Amended Complaint to a new claim not previously asserted. A few examples illustrate this point. On summary judgment, Relators now assert that:

(i)      The nature and type of services described in the BIAP Proposal "ha[ve] no relevance to Defendants' fraud . . . ."

(ii)     "[T]he statement of work in the cited June 2003 RFP is irrelevant, because the Relators' allegations concern the Defendants' fraudulent execution of the *August 31, 2003 BIAP Contract*."

(iii)    The date the BIAP Proposal was submitted to the MOT is "immaterial" because

13

"the *August 31, 2003 BIAP* contract explicitly incorporated the Defendants' proposal, which expressly provided for 138 personnel."

(iv)    The date the BIAP Proposal was submitted to the MOT is "misleading because it confuses a proposal in June of 2003 with the BIAP contract executed on *August 31, 2003.*"

(v)    The fact that Custer Battles began performing under the BIAP contract on July 1, 2003 is "irrelevant."

As these examples illustrate, Relators' failure to focus on the Final Contract until filing its opposition to the Custer Battles defendants' motion for summary judgment, well after the close of discovery, is an attempt to effect a constructive amendment of the complaint, which, if allowed, would seriously undermine the fairness of the litigation and unfairly prejudice the defendants.[11]   Constructive amendment of the complaint would also undermine the complaint's primary purpose, namely to guide defendants' discovery and to put "defendant[s] on notice of the evidence [they] need[] to adduce in order to defend against the plaintiff's allegations."  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000).

This prejudice is especially pronounced in the context of claims made pursuant to the False Claims Act, which, as an allegation of fraud, must comply with Rule 9(b)'s heightened pleading requirements.[12]   Rule 9(b) requires a complaint to state "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and

---

[11] *See Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989) ("A party is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories in an amended complaint."); *Matthews v. Xerox Corp.*, 319 F.Supp.2d 1166, 1172 (S.D.Cal. 2004) ("The Court is mindful that case law indicates that a plaintiff may not raise a new theory of liability for the first time, after the close of discovery, in his opposition to summary judgment without amending his complaint.").

[12] *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999) (applying Rule 9(b), Fed.R.Civ.P., to claims made under the False Claims Act).  Fed.R.Civ.P. 9(b) provides "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784

(4th Cir. 1999).  Among other things, this Rule is intended to "ensure that the defendant has

sufficient information to formulate a defense by putting it on notice of the conduct complained

of," and "to eliminate fraud actions in which all the facts are learned after discovery."  *Id.*

(quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue

Shield of Georgia, Inc.*, 755 F.Supp. 1055, 1056-57 (S.D.Ga. 1990)).  These principles, applied

here, require that disposition of the Custer Battles defendants' motion for summary judgment

focus solely on the allegations raised in the Amended Complaint, namely that Custer Battles

fraudulently induced the CPA to award it the Letter Contract based on its BIAP Proposal.[13]

## V.

It is well-settled that summary judgment is appropriate only when, viewing the evidence

in a light most favorable to the non-moving party, there is no issue of material fact and the

moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).  And, importantly, to defeat summary judgment the non-moving party may not rest

upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine material

issue for trial.  *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## VI.

In this FCA case, the question is whether the summary judgment record discloses a triable

issue of fact regarding whether Custer Battles fraudulently induced the CPA to award the BIAP

Letter Contract to Custer Battles by representing that Custer Battles would provide a fixed

---

[13] Even assuming this constructive amendment were permitted, Relators' claim would still fail on summary judgment.  *See infra* n. 16, 19, 20.

number of 138 security personnel.[14]  Analysis of this question properly begins with a review of

the pertinent provision of the FCA, namely 31 U.S.C. § 3729(a)(1), which provides, in pertinent

part, as follows:

> any person who knowingly presents, or causes to be presented, to an officer or
> employee of the United States government . . . a false or fraudulent claim for
> payment of approval . . . is liable to the United States Government for a civil
> penalty . . . .

It follows from this statutory language that to prevail under § 3729(a)(1), Relators must prove by

a preponderance of the evidence the following four elements: (1) a claim, (2) that is knowingly

false or fraudulent, (3) presented to an officer or employee of the United States for payment or

approval, and (4) that the false or fraudulent claim is material.  *U.S. ex rel DRC, Inc. v. Custer*

*Battles LLC*, 376 F. Supp. 2d 617, 634 (E.D.Va. 2005) (citing *Harrison v. Westinghouse*

*Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)).

With respect to the BIAP contract, Relators have alleged a "fraud-in-the-inducement"

theory of FCA liability.  In the FCA context, liability for fraudulent inducement attaches to all

claims "submitted to the government under a contract, when the contract or extension of

government benefit was obtained originally through false statements or fraudulent conduct."

*Harrison*, 176 F.3d at 787.  Thus, the test for FCA liability on a fraudulent inducement theory is

"(1) whether there was a false statement . . . ; (2) made or carried out with the requisite scienter;

(3) that was material; and (4) that caused the government to pay out money or forfeit moneys

due."  *Id.* at 788.

To meet the first element – a false statement – Relators claim that Custer Battles' BIAP

---

[14] As the Custer Battles defendants correctly concede, a fraudulent inducement claim is
cognizable under the FCA.  *See Harrison*, 176 F.3d at 787.

Proposal contained a false statement because it stated that Custer Battles "*would provide* a fixed number of security personnel," in particular "over 138 security and related personnel." It is well-established that the FCA requires proof of an objective falsehood. *See Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477–78 (9th Cir. 1996). Thus, to establish falsity "plaintiff must demonstrate that an objective gap exists between what the Defendant represented and what the Defendant would have stated had the Defendant told the truth." *United States v. Prahbu*, 442 F. Supp. 2d 1008, 1033 (D. Nev. 2006). Importantly, courts have held that "[a] legitimate estimate by a contractor of work performed is not a 'false claim.'" *San Francisco Bay Area Rapid Transit Dist. v. Spencer*, 2006 U.S. Dist. LEXIS 88022, at *51 (N.D. Cal. 2006).[15]

A thorough review of this record compels the conclusion that Relators have failed to establish that Custer Battles falsely stated that it *would provide* 138 security personnel. The record demonstrates that

> (i)  The BIAP RFP did not require, nor refer to, any fixed number of security personnel.

> (ii)  Custer Battles' BIAP Proposal does not state that Custer Battles "*will provide*" a fixed number of security personnel.

> (iii)  The BIAP Proposal repeatedly refers to the "fluid situation at BIAP and Iraq," and states that Custer Battles will provide "flexible security management and services."

---

[15] *See Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1047 (N.D. Ill. 1998) ("Courts have consistently declined to find that a contractor's exercise of scientific or professional judgment as to an applicable standard of care falls within the scope of the FCA."). *See also Harrison v. Westinghouse Savannah River* Co., 176 F.3d 776, 192 (4th Cir. 1999) ("Expressions of opinion are not actionable as fraud . . . ."); *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 810 (D. Utah 1988) (holding that an engineering judgment and recommendation "is clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of an FCA claim"); *United States ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625-26 ("Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false.") (S.D. Ohio 2000); *United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir. 1992) (noting that "bad math is no fraud").

(iv)    The BIAP Proposal includes a "Detailed Cost *Estimate*" based on a one year budget that included the salaries of 138.5 security personnel.

(v)     The CPA officials awarding the BIAP contract were not concerned with a contractor's proposed staffing level because "[t]here was no fixed BIAP staffing requirement."

(vi)    On July 1, 2003, Custer Battles began performing under the Letter Contract, which neither imposed a fixed staffing requirement, nor incorporated the BIAP Proposal and its estimate based on 138.5 security personnel.

As these references illustrate, Custer Battles did not represent or promise, in either its BIAP Proposal or the Letter Contract, that it would provide 138 security personnel.[16]  Accordingly, where, as here, the defendant did not commit to provide a fixed number of 138 security personnel, it is axiomatic that even if it did not provide 138 security personnel, it did not make a false statement.[17]

Yet, even assuming the summary judgment record discloses a triable issue of fact as to whether Custer Battles made a false statement, the record does not indicate that Custer Battles made this statement with the requisite scienter.  Under the FCA, liability attaches where a person "knowingly" presents or makes a false statement in connection with a claim seeking payments from the government.  31 U.S.C. § 3729(a)(1).  The FCA defines "knowingly" to mean that a

---

[16] Significantly, even assuming, as Relators now contend, that the proper focus is on the August 31, 2003 Final Contract, the record demonstrates that the Final Contract did not contain a fixed staffing requirement.  Rather, the Final Contract simply incorporates the BIAP Proposal, which includes the "Detailed Cost *Estimate*" based on 138.5 security personnel.  This estimate cannot form the basis for FCA liability because such an estimate or expression of opinion is not a false statement actionable under the FCA.  *See Spencer*, 2006 U.S. Dist. LEXIS 88022, at *51 ("A legitimate estimate by a contractor of work performed is not a 'false claim.'"); *Boisjoly*, 706 F. Supp. at 810 (holding that an engineering judgment and recommendation "is clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of an FCA claim").

[17] It is important to note that during oral argument on the Custer Battles defendants' motion, Relators conceded that there is "a paucity of evidence of falsity and materiality" in the relevant time period – the first two months of Custer Battles' performance under the Letter Contract.  January 5, 2007 Tr. at 31:1-5.

person has (1) actual knowledge of the falsity; (2) deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b).  Importantly, in the context of a fraudulent inducement FCA claim, "the requisite intent must be coupled with prompt, substantial nonperformance." *Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 386 (5th Cir. 2003).  Accordingly, "[i]t must be shown that the defendant promptly followed through on its intent not to perform by substantially failing to carry out its obligations under the contract." *Id.*  Put simply, Custer Battles must have intended at the outset, that is, at the time of entering into the Letter Contract, to provide fewer than 138 security personnel, and must have promptly provided fewer than 138 security personnel. This is because "[i]t would be illogical to find fraud where a party secretly did not intend to perform the contract when it was signed, but in actuality did perform." *Id.*

These principles, applied here, make pellucidly clear that the undisputed facts demonstrate that Custer Battles acted without the requisite scienter.  The Amended Complaint alleges that in June and July 2003, Custer Battles exploited diminished BIAP operations by discharging or reassigning a substantial portion of its security personnel, thus failing to provide the requisite 138 security personnel.  The record, however, reflects otherwise.  On July 1, 2003, Custer Battles began performing under the Letter Contract.  As Relator Robert Isakson testified, Custer Battles started with "a few more than" 138 security personnel.  That is, after entering into the Letter Contract, Custer Battles did perform under the Letter contract because it provided "a few more than" 138 security personnel.  Moreover, as Hatfield testified,

> Custer Battles met and/or exceeded every demand placed upon it by the MOT under the BIAP contract, including each and every demand related deadlines, provision of TSA-certified screeners, *and security staffing levels*. . . . Custer Battles exceeded staffing level expectations in its actual performance under the BIAP Contract.

There is simply no record evidence that Custer Battles provided fewer than "138" security personnel immediately after entering into, and commencing performance of, the Letter Contract in July 2003, as alleged in the Amended Complaint.[18]   Indeed, during oral argument on the Custer Battles defendants' motion Relators acknowledged that "as far as the record is, that we understand, that [Custer Battles] initially attempted or managed, according to Mr. Isakson, to put together 138 people for this project."  In these circumstances, where there is no evidence of "prompt, substantial nonperformance," Relators cannot establish the requisite scienter for FCA liability.[19]

Finally, even assuming that the record discloses a triable issue of fact regarding both falsity and scienter, the undisputed material facts demonstrate that any allegedly false statement regarding 138 security personnel was not material to the CPA's decision to award Custer Battles the Letter Contract.  It is well-established in the Fourth Circuit that a plaintiff in a civil FCA suit must prove that a false statement is material.  *Harrison*, 352 F.3d at 914, n.4.  "The test for determining materiality is whether the false statement has a natural tendency to influence agency

---

[18] Relators rely chiefly on the affidavits of Mr. Gregory Walker and Mr. Luke Kingree to establish that Custer Battles failed to provide "138" security personnel.  Yet, a review of these affidavits reveals that neither affiant makes such an assertion.  Indeed, neither two-page affidavit states that Custer Battles was required to provide "138" security personnel or that less than "138" personnel were provided.  Instead, Mr. Kingree, who worked for Custer Battles in the U.S., states, very generally, that, in his opinion, "Custer Battles was severely understaffed in its operations and in the performance of its Iraqi contracts."  Similarly, Mr. Walker, who arrived in Iraq in August 2003 and did not work on the BIAP contract, simply states that "Custer Battles was experiencing a manpower shortage in relation to the BIAP contract."

[19] Notably, even assuming the proper focus is on the August 31, 2003 Final Contract, the record evidence does not establish that Custer Battles provided less than "138" security personnel.  Instead, the record demonstrates that "Custer Battles met and/or exceeded every demand . . . under the BIAP contract, including . . . security staffing levels. . . .  Custer Battles exceeded staffing level expectations in its actual performance under the BIAP contract." Hatfield Aff., ¶ 20; *see also* Isakson Dep. (Oct. 14, 2005), at 595:8-12.

action or is capable of influencing agency action." *Id.*

This standard applied here makes clear that the allegedly false statement – that Custer Battles would provide 138 security personnel – did not influence or have a natural tendency to influence the CPA's decision to award Custer Battles the BIAP contract.  As the record reflects, the BIAP RFP did not require, nor refer to, any fixed number of security personnel.  This is because the CPA's primary concerns were that the contractor open BIAP for commercial flights within the required time frame and that the contractor provide U.S. TSA - certified screeners.  On this record, no specific staffing level or estimate was required and contractor staffing proposals were not material in the decision to award the contract.  Thus, the MOT and DHS/TSA officials reviewing the proposals submitted in response to the BIAP RFP chose Custer Battles because it submitted the lowest bid, because it was the only contractor that would commit to opening BIAP within the required time frame, and because it could provide TSA - certified screeners.  As Hatfield stated, "[a]ny representation contained in the Custer Battles BIAP Proposal regarding a numerical and/or specific staffing level was not material to selection of Custer Battles. . . . [any staffing level reference] was simply not a material or necessary condition to the award[] . . . ." Thus, the undisputed facts establish that the CPA was not concerned with security personnel staffing levels and selected Custer Battles based on other considerations.  And, indeed, Relators conceded the lack of materiality during oral argument on the Custer Battles defendants' motion, stating that "we concede that" there is "a paucity of evidence of falsity and materiality during those first two months" following the award of the Letter Contract.  In these circumstances, it is clear that staffing levels were not material to the decision to award the BIAP contract to Custer

Battles.[20]

In summary, the undisputed facts manifestly demonstrate that Relators cannot establish a fraudulent inducement claim under the FCA because they have failed to show (i) that Custer Battles made a false statement regarding fixed security personnel staffing levels; (ii) that Custer Battles knowingly made this allegedly false statement; and (iii) that this allegedly false statement was material to the CPA's decision to award the BIAP contract to Custer Battles.

An appropriate Order will issue.

<table>
<tr><td></td><td>___/s/_____</td></tr>
<tr><td>Alexandria, Virginia</td><td>T. S. Ellis, III</td></tr>
<tr><td>February 2, 2007</td><td>United States District Judge</td></tr>
</table>

---

[20] Even assuming that the proper focus is on the August 31, 2003 Final Contract, the record does not reflect that Custer Battles' estimate of "138" security personnel was material to awarding the Final Contract.  As Hatfield stated, the BIAP RFP did not contain a fixed staffing requirement.  Instead, it was meant to be open-ended and flexible.  As such, the officials responsible for reviewing the BIAP Proposal were concerned with price, timing, and the provision of TSA – certified screeners.  As Hatfield explained, these considerations, not any number of proposed or estimated security personnel, were material to awarding the BIAP contract.